UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

```
------------------------------------------------------x
DC CENTER FOR INDEPENDENT       :
LIVING; DUPONT EAST CIVIC ACTION :
ASSOCIATION, DANA BOLLES,       :
THEODOSIA ROBINSON,             :       CIVIL ACTION
                                :
          Plaintiffs,           :       CASE NO.:
                                :
vs.                             :       Judge:
                                :
                                :       Magistrate:
DISTRICT OF COLUMBIA; and       :
MURIEL BOWSER, in her official  :
capacity,                       :
                                :
          Defendants.           :
------------------------------------------------------x
```

## COMPLAINT

This civil rights case is brought by both individuals with disabilities and organizations representing people with disabilities. Plaintiffs seek to remedy the systemic discrimination by the District of Columbia ("District") against tens of thousands of people with mobility disabilities with respect to the design of its streets, on-street parking, and particularly in the ongoing redesign of streets to add miles of protected bicycle lanes that create serious barriers for individuals with disabilities. As a result, countless individuals with mobility disabilities are unable to move around the city on an equal basis with nondisabled citizens.

The design of the city streets along with on-street parking and the bicycle lane modifications prevent the Plaintiffs herein (and other people with disabilities within the District and visiting the District) from having safe and equal "curb access." Curb access refers to the ability to move safely between the sidewalk and vehicles—such as private cars, buses, taxis, paratransit (Metro Access), or ride services. Without curb access from these modes of travel, Plaintiffs and

others with disabilities struggle to work, shop, worship, go to doctors, socialize, and engage in other activities of daily life on an equal basis with nondisabled people. Notably, about three-quarters of the disabled population in the District is African American, and one-third is over the age of sixty five (65). African American and lower income people are more likely to take buses or drive to work, while younger, whiter, and wealthier residents are more likely to use travel in ways such as subway, bicycle, and walking which are less affected by curb access barriers. Studies have shown that cyclists are predominantly higher income, younger, white, and male.

This is not a choice between accessibility and bicycle lanes. These disability barriers are not necessary; rather, they result from the District's systemic failure to adopt available, well-known, accessible designs for on-street parking and curb access—including practical solutions for bicycle lanes. As explained below, it is well established that these actions violate disability discrimination laws, yet the District has explicitly rebuffed community requests to consider disability accessibility in its street design.

Plaintiffs, by and through their undersigned counsel, hereby file this Complaint and sue the District under the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* (hereinafter "Rehabilitation Act") and the District of Columbia Human Rights Act, D.C. Code § 2–1401.0, *et seq.* (hereinafter the "DCHRA"), for injunctive and declaratory relief, and attorneys' fees and costs. Plaintiffs also sue Muriel Bowser, in her official capacity as Mayor pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* (hereinafter "ADA"). In support of their claims, Plaintiffs allege as follows:

## JURISDICTION AND PARTIES

1. This is an action for relief pursuant to Title II of the ADA, 42 U.S.C. § 12131 *et seq.,* the Rehabilitation Act, 29 U.S.C. § 794, *et seq*., and the DCHRA, D.C Code § 2–1401.0.

2. This Court is vested with original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

2

This Court is vested with supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

3.     Venue is proper in the Court pursuant to 28 U.S.C. § 1391(b).

A. <u>DC Center for Independent Living</u>

4.     Plaintiff The DC Center for Independent Living ("DCCIL") is a nonprofit organization whose mission is to aid Washington, D.C. residents with disabilities in living independently in their homes and communities.

5.     "Independent living" in the context of persons with disabilities is a philosophy which holds that individuals with disabilities have the right to live with dignity and with appropriate support in their own homes, participate fully in their communities, and to control and make decisions about their lives.

6.     DCCIL advocates for the elimination of architectural, communication, and attitudinal barriers that prevent people with disabilities from living fully-engaged and self-directed lives, and provides disability-specific information and referrals such as ADA compliance and "know your rights" information and consultation, benefits planning, relocation by choice, asset management advice, travel training to help persons with disabilities travel independently day to day, and obtaining accessible housing for individuals in the District.

7.     In all these areas, DCCIL strives to ensure people with disabilities have access to information, and services that are needed to achieve or maintain independence in their communities.

8.     In furtherance of their mission of integration and independent living, DCCIL also provides disability awareness training to non-disabled members/consumers of the public to develop a community that is inclusive of persons with disabilities and educated about the needs of persons with disabilities.

9.      DCCIL also advocates on an individual and system-wide basis to protect the civil and human rights of people with disabilities in the following areas: independent living skills training, peer counseling and support, and assisting people with disabilities who are transitioning from nursing homes to independent living in their communities.

10.     DCCIL's services are available to the thousands of individuals with disabilities residing in the District of Columbia.

11.     The services provided by the DCCIL are responsive to the needs of individuals with disabilities in the District of Columbia.

### B.   Dupont East Civic Action Association

12.     Plaintiff Dupont East Civic Action Association ("DECAA") is a nonprofit incorporated to promote the interest of the residents of the District of Columbia, particularly those who reside in the greater Dupont Circle area.[1] Its purposes include charitable and educational activities, civic and social improvements to health, safety, and quality of life for residents within its boundaries and throughout the city.

13.     DECAA's fifty active members are residents who live within its boundaries within the District of Columbia. Its six associate members support its goals. Most active and associate members regularly use the District's streets, parking, and curb access. Many have mobility disabilities.

14.     Collectively, DCCIL and DECAA are referred to as the "Organizational Plaintiffs."

---

[1] DECAA's boundaries are: From the south side of Massachusetts Avenue NW running north along the east side of 14th Street NW to the north side of Euclid Street NW at its intersection with 14th Street, then west to 16th Street NW, then from the intersection of 16th Street NW and Euclid Street NW south along the western side of 16th Street NW to U Street NW, then west along the northern side of U Street NW to Florida Avenue NW, then south along the eastern side of Florida Ave NW to its intersection with the western side of 19th St. NW, then south to the south side of Massachusetts Ave NW then east along the south side of Massachusetts Ave NW to its intersection with 14th Street NW.

### C.  Dana Bolles

15.  Plaintiff Dana Bolles is a resident of the District of Columbia, where she also works as a federal employee.

16.  Ms. Bolles is a qualified individual with a disability under 29 U.S.C § 794 et seq. Ms. Bolles is missing both legs and both arms one to two inches above the elbows, which substantially impairs major life activities, including standing and walking, and limits her reach considerably. Ms. Bolles uses a power wheelchair for mobility.

17.  Ms. Bolles drives a wheelchair accessible van equipped hand controls and a ramp that deploys on the passenger side. Ms. Bolles has a disabled parking permit. She lives in the Southeast part of the District in the Navy Yard Area and regularly visits various destinations in other areas, including the Southwest.

### D.  Theodosia Robinson

18.  Theodosia "Tessie" Robinson is a resident of the District of Columbia.

19.  Ms. Robinson qualified individual with a disability under 29 U.S.C § 794 et seq. Ms. Robinson uses a rolling walker for mobility and has difficulty stepping up or down. She drives a car and has a disabled parking permit. She occasionally visits, and would like to visit, doctors, pharmacies, and stores in the District of Columbia.

20.  Collectively, the above-named natural persons are referred to as the "Individual Plaintiffs."

### E.  Defendants

21.  Upon information and belief, the District is a political entity located within the District of Columbia that is responsible for the management of transportation infrastructure and operations in the District of Columbia. The District is believed to manage transportation infrastructure and operations through the Department of Transportation (hereinafter "DDOT")

22.  Upon information and belief, the DDOT is responsible for the public on-street parking and

street design in the District of Columbia.

23. Upon information and belief, Muriel Bowser, named in her official capacity as the Mayor of the District, is the political official with chief executive authority over the District, and bears responsibility in her official capacity as Mayor and is ultimately responsible for administering, operating, and maintaining the DDOT's public goods and services and compliance with the law.

24. Defendants are responsible for complying with the obligations of the ADA.

25. Defendants are responsible for ensuring that the Services at Issue in the District comply with the ADA and that said programs or services do not discriminate against persons with mobility-related disabilities.

26. All events giving rise to this lawsuit occurred in the District of Columbia.

27. Defendants are obligated to comply with the ADA in providing the Services at Issue.

## **BACKGROUND**

28. DDOT designs the District's streets. It controls and constructs this public space to provide vehicle and bicycle travel lanes, on-street parking, pick up and drop off ("PUDO") spaces, loading zones, bus stops, crosswalks, and curb cuts.

29. This case seeks to eliminate disability discrimination in the following DDOT services ("Services at Issue"):

   a. On-street parking;

   b. Curb access, particularly access barriers introduced by protected bicycle lanes

   c. Pedestrian crossings, particularly unsafe and difficult to navigate crossings introduced by protected bicycle lanes

6

30.     Recently, DDOT has undertaken an aggressive program to provide hundreds of miles of

        protected bicycle lanes all while ignoring pleas to consider ADA accessibility and equal

        access for those who move around the District in ways other than by bicycle.

31.     People with mobility disabilities are some 12% of residents of the District—tens of

        thousands of people, not counting the many thousands of disabled visitors.[2]

32.     As of the 2015 census, about three-quarters of the disabled population in DC was African

        American, and one-third were over the age of 65.[3]

33.     According to a 2017 D.C. Policy Center report,[4] about double the number of Black people

        in the District drive compared to Caucasians, 47 percent to 27 percent. Bicycle commuters,

        who often live in the District's pricier central neighborhoods, are five times as likely to be

        white as Black.[5] Black people are also more likely to take the bus, while white people are

        more likely to take the subway.[6]

34.     Cyclists, in contrast, "are predominantly male, between 25 and 40 years old, white, and

        from higher income groups."[7]

35.     DDOT claims that it values equity, but its actions and formal policies fail to deliver on that

---

[2] *Disability & Health U.S. Profile Data for the District of Columbia (Adults 18+ years of age)*, Ctrs. for Disease Control and Prevention (May 18, 2022), https://www.cdc.gov/ncbddd/disabilityandhealth/impacts/dc.html.
[3] Coleen Jordan, *2015 Disability Characteristics Among DC Residents*, DC State Data Ctr. (Aug. 2017), https://planning.dc.gov/sites/default/files/dc/sites/op/publication/attachments/2015%20Disability%20Characteristics%20Among%20DC%20Residents.pdf.
[4] Yesim Sayin, *The Demographics of Walking and Biking to Work*, DC Pol'y Ctr. (June 6, 2017), https://www.dcpolicycenter.org/publications/the-demographics-of-walking-and-biking-to-work/.
[5] *Id.*
[6] *Id.*
[7] Ralph Buehler et al., *Trends and Determinants of Cycling in the Washington, DC Region* National Transportation Library Repository & Open Science Access Portal 5 (2011), https://rosap.ntl.bts.gov/view/dot/24356/dot_24356_DS1.pdf?.

promise.

36.     The DDOT was created by the District Department of Transportation Act of 2002 to manage the transportation infrastructure and operations in the District of Columbia.

37.     The DDOT's stated mission is to "equitably deliver a safe, sustainable and reliable multimodal transportation network for all residents and visitors of the District of Columbia."[8]

38.     The DDOT claims that it is "committed to elevating and advancing transportation equity by evaluating our polices, planning, community engagement and project delivery, to ensure public investments in transportation justly benefit all residents, visitors, and commuters."[9]

39.     The DDOT "has a firm commitment to not discriminate against qualified individuals with disabilities on the basis of disability in its services, programs, or activities, and will honor and work to satisfy the requirements of Title I, Title II, and Title IV of the Americans with Disabilities Act of 1990 (ADA) and Section 504 of the Rehabilitation Act of 1973 requirements covered under 49 CFR Part 27, Nondiscrimination on the Basis of Disability in Programs and Activities Received or Benefitting from Financial Assistance."[10]

40.     Further, the DDOT claims that it is "fully committed to upgrading the PROW [public right of way] so that people with disabilities have equality in access and safety in their travel opportunities in the District of Columbia. Whenever the Department substantially paves,

---

[8] *See About DDOT*, D.C. Dist. Dep't of Transp., https://ddot.dc.gov/page/about-ddot (last visited Nov. 17, 2022).
[9] *Id.*
[10] *See Americans with Disabilities Act - Equal Access for People with Disabilities - Title I - Title II - Title IV*, D.C. Dist. Dep't of Transp., https://ddot.dc.gov/page/americans-disabilities-act-equal-access-people-disabilities-title-i-title-ii-title-iv (last visited Nov. 17, 2022).

repaves, resurfaces, or engaged in construction of a roadway, bridge, or tunnel, it will bring that portion into compliance with the ADA."[11]

41.     In 2016, the DDOT issued an ADA Transition Plan for the Public Right-of-Way. This plan was created with the purpose of "establish[ing] a strategy for ensuring that the PROW in the District of Columbia is accessible to people with disabilities that are traveling in the Capital City."[12] The DDOT notes that "[m]any factors must be considered in achieving complete ADA accessibility and it is understood that this plan is an effort to guide the work of future projects, rehabilitate areas that are inaccessible or unsafe to people with disabilities, and create a culture that considers accessibility for people with various disabilities as a normal practice for new development."[13]

42.     Nonetheless, over thirty (30) years after the passage of the Americans with Disabilities Act, the DDOT continues to provide inadequate accessible parking spaces, PUDOs, and pedestrian thoroughfares in the District of Columbia.

43.     In fact, as explained below, the DDOT is completing projects in the District of Columbia that are making the Services at Issue *less* accessible to individuals with mobility disabilities.

44.     Prior to construction, one or more DDOT employees were confronted and advised that their plans to add bicycle lanes would make accessible parking spaces in the District of Columbia inaccessible and dangerous for individuals with mobility disabilities. Despite

---

[11] *Id.*
[12] *See* Exhibit "A", at p. 7.
[13] *See* Exhibit "A" at p. 11.

this advisement, the DDOT refused meaningfully to discuss its plan to install a new parking configuration on 17th Street.

45.   The DDOT's failure to make its existing parking accessible, its active construction of bike lanes that decrease accessibility, and as will be further explained below, its false statements that it is not obligated to comply with the ADA outside of the Central Business District and Stadium Event Zone, evidence a pattern/practice of discriminatory conduct against individuals with disabilities in violation of the ADA/RA.

46.   Despite the DDOT's stated commitment of complying with the ADA and promoting equity, it continues to provide inadequate public parking spots for individuals with disabilities. Furthermore, the DDOT is redesigning streets within the District of Columbia in ways that create barriers to the Services at Issue for individuals with disabilities.

    I.   <u>Newly Installed Bicycle Lanes Create Accessibility Barriers to Curb Access and Remove Already Inadequate Accessible Parking.</u>

47.   On information and belief, the DDOT operates, provides, and maintains the public, on-street parking and curb access throughout the District of Columbia.

48.   According to the 2022 Performance Oversight Questions, the DDOT has a stated goal of installing 20 miles of protected bike lanes by 2022 and installing five miles annually.[14] However, the DDOT routinely fails to use designs for the protected bike lanes that include Services at Issue that are accessible for individuals with mobility disabilities.

49.   This means that the DDOT will likely continue to install these protected bike lanes without

---

[14] Dist. Dep't of Transp., *2022 Performance Oversight Questions*, Council for the District of Columbia 42 (Feb. 2022), https://dccouncil.gov/wp-content/uploads/2022/02/FY21_PreHearingQuestionResponses_DDOTOversight_021022_FOR COUNCIL.pdf.

providing the proper number and dimensions of accessible spaces, accessible PUDOs, or pedestrian thoroughfares, making the District of Columbia even less accessible to individuals with mobility-related disabilities.

50.    In other words, the DDOT has a policy of making alterations to the streets by installing protected bicycle lanes in violation of ADA requirements for the Services at Issue, such as, making curb access and parking less, rather than more accessible.

A.   The New Street Design for 17th Street NW Decreases Accessibility

51.    An example of this illegal policy is a 2021 redesign of 17th Street between Massachusetts Avenue and T Street (hereinafter "17th Street"). This corridor is a major business district with many stores, restaurants, and retailers.

52.    In May 2021, the DDOT issued a plan to install protected bike lanes along 17th Street ("New 17th Street Plan"). This plan differed from a prior development plan related to 17th Street. The New 17th Street Plan did not include any accessible-designated parking spaces along the approximately half-mile stretch.

53.    The New 17th Street Plan removed parking spaces that were putatively accessible.

54.    The New 17th Street Plan also removed regular curbside parking, resulting in dramatically decreased parking and curb access for people with disabilities.

55.    Nor did the New 17th Street Plan create accessible PUDOs, despite requests from DECAA.

56.    For example, the New 17th Street Plan protected the bike lane and requires passengers exiting their vehicles on the east side of the street to exit directly into a single lane of oncoming bicycle traffic. The design did not include mid-block curb cuts.

57.    Therefore, a wheelchair user exiting on the driver's side of the vehicle on the west side of

17th Street would have to unload into a vehicular travel lane and travel along the vehicular travel or bike lane until they reach an intersection so they can access the sidewalk.

58.    This design—forcing wheelchair users to load and unload in a bike lane—has a disproportionate burden on individuals with disabilities.

59.    If a passenger has a mobility impairment, they will have to assemble their wheelchair or other mobility device in a bike lane, transfer into their wheelchair in the bike lane, and then travel down a row of parked cars to reach a crosswalk to be able to access the sidewalk.

60.    The on-street parking on 17th Street is also inaccessible due to the presence of tire stops and flexible posts in the narrow area between the bicycle lane and the parking spaces. These tire stops and flexible posts appear to be an attempt to deter vehicles from traveling into the bicycle lane. However, the consequence is that they interfere with the ability of individuals with wheelchairs, walkers, canes, and other mobility devices from entering and exiting their vehicles and/or assembling their mobility device.  In addition, they interfere the ability to reach exterior controls to fold and unfold the ramp, which are on the rear passenger side.

61.    The plans for the New 17th Street Plan demonstrate that there would have been sufficient space to install accessible parking spaces along with a divider that would have made the parking accessible for wheelchair users. For example, Defendant could have installed a boarding and alighting island wide enough for the ramp and with an accessible path of travel to the curb or, alternatively, installed an accessible parking space that is adjacent to a loading area that is not used as part of the bicycle route.

62.    Not only is the above design possible—it is something that Defendants have done, albeit

on rare occasion. For example, at the intersection K Street NW and 4 ½ Street NW, Defendants have installed a bicycle lane adjacent to an accessible parking space. That accessible parking space is adjacent to an access aisle that does not overlap with the bicycle lane.[15]

63.   Quite simply, the decision to provide parking where individuals with disabilities must enter and exit their vehicles into a bicycle lane is an incredibly dangerous design decision.

64.   Alarmed by the New 17th Street Plan, Ed Hanlon, a representative of DECAA, contacted District Officials including District of Colombia City Council Member Brooke Pinto and Mayor Bowser. Mr. Hanlon detailed how the 17th Street Plan violated the ADA and would make the parking, curb access, and PUDOs on 17th Street dangerously inaccessible to those with mobility disabilities.

65.   The DDOT only responded, as set forth below, that it had no obligation to provide

---

[15] *Photograph depicting accessible space with clearance, crosswalk, and curb ramp on K Street NW.*



accessible parking outside of the Central Business District ("CBD"). There was no response or interactive process about curb access and other barriers the new street design created for people with disabilities.

66.   Despite DDOT's alleged commitment to complying with the ADA, and in disregard of resident complaints concerning the inaccessible nature of the proposal, the DDOT proceeded with its plans and installed the New 17th Street Plan.

67.   The protected bicycle lanes that the District is installing (including on 17th Street NW) are not the "only means" through which the DDOT could configure the parking, vehicular travel lane, and bicycle lane.

68.   Along 17th Street, there are multiple locations where there is empty space in between the bicycle lane and the sidewalk which could have been used by the DDOT to install an accessible-designated parking space or an accessible pick-up and drop-off area.

69.   In some locations, these "empty areas" of street are used as so-called Streeteries—locations where nearby restaurants set up tables and chairs on the public street.

70.   In many other locations, however, the empty space is completely unused and does not appear to serve any meaningful purpose.

71.   For example, at approximately 17th Street and Q, there is empty space between the bicycle lane and the sidewalk.[16] Upon information and belief, instead of empty space, the DDOT

---

[16] *Photograph depicting empty space between the bicycle lane and the sidewalk on 17th Street near Q Street.*

could have installed an accessible space similar to the one depicted in footnote 15, *supra*.

        B.  <u>People with Disabilities Suffer Harm as a Direct Result of the Increasingly Inaccessible Services at Issue</u>

72.    Without accessible parking spaces, residents and visitors with disabilities are forced to park in spaces that put them at risk of serious injury or death, as explained further below. Wheelchair users require dedicated space around their parking spaces to ensure their safety when entering and/or exiting their vehicles. Many individuals with mobility disabilities may forego visiting areas that lack accessible parking spaces because they fear for their safety.

73.    The new street and parking design that the District is using for its protected bicycle lanes causes folding wheelchair users to be forced to assemble their wheelchairs, transfer to/from their wheelchairs, and enter and/or exit their vehicles in the travel lane or bike lane.



Unloading and loading a wheelchair can be a time-intensive process which makes these individuals at risk of being hit by a bicyclist, causing injury or death when trying simply to enter or exit their vehicles.

74.   By forcing individuals with disabilities to assemble their wheelchairs in a bicycle lane and then transfer to/from their wheelchairs in a bicycle lane, they are at risk of being hit and injured by passing cyclists, along with incurring damage to their wheelchairs.

75.   People with disabilities also fear for the safety of bicyclists who may be injured in collisions with wheelchair ramps or individuals with mobility disabilities forced into the bicycle lane by the inaccessible designs.

76.   For people who use power wheelchairs and rely on wheelchair ramps that deploy to the side of their vehicle, like plaintiff Dana Bolles and DCCIL's consumers who ride its bus, the new protected bicycle lane design means that they can no longer use parallel on-street parking or loading areas. When parking or loading zones are next to the curb and the sidewalk is not blocked, the wheelchair ramp can fold out onto the sidewalk. With the bicycle lane, the ramp deploys across the bicycle lane but then runs into the curb; the person on the ramp cannot exit in their wheelchair.

77.   Similarly, individuals who use walkers must load and unload their walkers in the bicycle lanes and may find it difficult or impossible to step up on the curb rather than alighting onto the sidewalk from their car.

78.   Further, for individuals with mobility disabilities, particularly those who use walkers of wheelchairs, a 4-inch curb can effectively be a wall trapping them in the bike lane and preventing access to the sidewalk.

79.     Thus, without access to a curb cut near their parking space, an individual with a mobility
        disability will have to traverse either through vehicular traffic in the vehicular travel lane
        or dodge cyclists in the bike lane to access the sidewalk. This is dangerous. Wheelchair
        users are lower to the ground and less visible to vehicular traffic.

80.     Individuals with any type of mobility impairment may move more slowly than those
        without mobility impairments and be forced to remain in the travel lane or bike lane looking
        for a curb ramp to allow them to access the sidewalk for long distances, all while dodging
        cars and cyclists.

81.     As a direct result of DDOT's actions, pedestrians with mobility disabilities, including the
        Individual Plaintiffs and the Organizational Plaintiffs' members/consumers, have regularly
        had close encounters with cyclists who whizz by at unsafe speeds, sometimes with
        disparaging comments about the pedestrians in "their" bike lanes.

82.     DDOT has also designed its bike lanes for high speeds that are unsafe near pedestrian
        crossings and loading and unloading zones. This design is in contrast to other cities that
        use structural features like speed bumps and warning tracks to slow cyclists down where
        appropriate, such as at pedestrian crossings. Similarly, DDOT funds training for cyclists
        but, on information and belief, does not include training about cycling in the presence of
        pedestrians with disabilities.

        C.   DCCIL Struggles to Operate its Transportation Service Throughout the
             District because of the Increasingly Inaccessible Services at Issue

83.     One service provided by the DCCIL is a complimentary transportation service for its
        consumers and stakeholders.

84.     Under this system, two different drivers for DCCIL will pick up individuals with disabilities from their residences and drive them to pre-scheduled locations, such as museums, event spaces, educational centers, etc.

85.     DCCIL's vans are capable of transporting fourteen (14) passengers and are equipped to pick up and drop off two (2) wheelchair users at a time.

86.     As a result of the increasing prevalence of bicycle lanes, and due to the limited number of accessible-designated parking spaces, the drivers of the vans have had increasing difficulty locating accessible PUDOs.

87.     A van operator for the DCCIL has reported that he is "usually" not able to find accessible on-street parking or a designated PUDO.

88.     Instead of being able to drop individuals off directly onto the sidewalk, the DCCIL drivers are increasingly having to pick up and drop off individuals with disabilities in bicycle lanes. This approach is dangerous for the van operators, for the passengers with disabilities, and for cyclists who whiz by at great speed.

89.     If Defendants were providing a sufficient number of designated accessible on-street parking or designated PUDOs, there would be more locations for the DCCIL drivers to pick up and drop off individuals with disabilities in safe locations.

90.     While the ADA does not provide detailed design specifications for bicycle lanes, on-street accessible parking, mid-block curb cuts, etc., local governments are still required to provide accessible on-street parking. *Fortyune v. City of Lomita*, 766 F.3d 1098 (9th Cir. 2014).

91.     28 C.F.R. § 35.151(b)(1) states:

> Each facility or part of a facility altered by, on behalf of, or for the

> use of a public entity in a manner that affects or could affect the
> usability of the facility or part of the facility shall, to the maximum
> extent feasible, be altered in such manner that the altered portion of
> the facility is readily accessible to and usable by individuals with
> disabilities, if the alteration was commenced after January 26, 1992.

92. Since the ruling in *Fortyune*, the Public Rights of Way Accessibility Guidelines ("PROWAG") has updated its guidelines to incorporate accessible on-street parking. Section R214 provides:

> Where on-street parking is provided on the block perimeter and the
> parking is marked or metered, accessible parking spaces complying
> with R309 shall be provided in accordance with Table R214. Where
> parking pay stations are provided and the parking is not marked,
> each 6.1 m (20.0 ft) of block perimeter where parking is permitted
> shall be counted as one parking space.

| Table R214 On-Street Parking Spaces | |
| --- | --- |
| **Total Number of Marked or Metered Parking Spaces on the Block Perimeter** | **Minimum Required Number of Accessible Parking Spaces** |
| 1 to 25 | 1 |
| 26 to 50 | 2 |
| 51 to 75 | 3 |
| 76 to 100 | 4 |
| 101 to 150 | 5 |
| 151 to 200 | 6 |
| 201 and over | 4% of total |

93. In *Sarfaty v. City of Los Angeles*, a protected bike lane design very similar to the protected bicycle lanes that the District is installing, such as the above examples on 17th Street NW, was found to be not readily accessible under § 35.151(b)(1). No. 2:17-cv-03594-SVW-KS, 2020 WL 4697906 (C.D. Cal. Aug. 12, 2020)

94. In sum, it is not the position of Plaintiffs that bicycle lanes and accessible-designated parking spaces are mutually exclusive. Plaintiffs are not opposed to bicycle lanes. Instead,

many of the barriers at issue in this case appear to stem from design decisions that fail to account or provided for meaningful accessibility for individuals with disabilities.

II. There is a Lack of Accessible Public Parking Spaces Outside of the Central Business District

95. Upon information and belief, there are approximately 20,000 metered parking spaces and 150,000 residential permit parking spaces in the District of Columbia.[17]

96. Additionally, upon information and belief, there are hundreds of thousands of unmetered on-street parking spaces in the District of Columbia that are provided for use by members of the public and are managed and maintained by the DDOT.

97. As detailed in the next section, there are only 400 accessible parking meter spaces, out of 20,000 metered parking spaces in the District of Columbia, relegated to only two small sections of the District of Columbia.

98. Thus, only two percent of the metered spaces offered by the DDOT are accessible, despite the fact that at least eleven percent of the residents in the District of Columbia identify as having a mobility disability.[18] This number does not include the millions of visitors to the nation's capital that have disabilities and require accessible parking spaces.

99. Based on the above, there is a systemic lack of accessible on-street parking throughout the majority of the District of Columbia. Consequently, throughout most of the District of Columbia, individuals with disabilities are not able to participate in a service that is widely and readily available to non-disabled persons.

---

[17] *See* Dist. Dep't of Transp., *Public Parking by the Numbers*, Park DC, https://www.parkdc.com/#public_parking_by_the_numbers (last visited Nov. 17, 2022).
[18] *See* Exhibit "A" at p. 11.

100.    Based on statements made by DDOT employees, the DDOT either believes that it is not required to provide accessible parking spaces throughout the entire District of Columbia, or, that all metered spaces are already accessible under the ADA. The DDOT's misconceptions of the ADA result in the lack of accessible public parking spaces in the District of Columbia.

101.    After Ed Hanlon of DECAA learned about the New 17th Street Plan, he and other members of DECAA contacted employees of the DDOT to ask about the lack of accessible parking spaces in the plan. The DDOT employees' responses to these inquiries underscore their failure to comply with the mandates of the ADA to provide accessible public parking in the District of Columbia.

102.    On June 2, 2021, Andrew DeFrank, the Community Engagement Specialist for the DDOT, stated in an email to DECAA member Nick DelleDonne:

> Since August 2020, outreach on the 17th street PBL [protected bike lane] plan has focused on all the competing uses of 17th Street between P Street and R Street. Streateries, loading zones, pickup dropoff zones (PUDO), and pedestrian access. ANC members, BID directors, business owners and managers have been kept updated on the plans. Our urban loading and freight delivery team as well as our parking and ground transportation management team worked out a strategy for accommodating loading zones in the morning and parking in the evening hours. **It's incorrect to say that the project does not comply with the ADA - designated ADA spaces are not required outside of the Central Business District (north of Massachusetts Avenue NW)**. (emphasis added)

103.    By and through this email, Mr. DeFrank clearly stated  that the DDOT  is not obligated under the ADA to provide any accessible parking spaces outside of the CBD.

104.    Mr. DeFrank's email fails to mention whether the ADA was considered when developing the New 17th Street Plan, nor does it mention whether the DDOT considered adding

accommodations for individuals with disabilities despite being notified that there was a lack of accessible parking spaces and PUDOs. Clearly, based on the New 17th Street Plan and DDOT's responses, the mandates of the ADA for accessible parking are not a priority for DDOT projects.

105.   Mr. Hanlon sent Mr. DeFrank an email questioning his assertion that the ADA did not apply outside of the CBD. In emails obtained pursuant to a Freedom of Information Act request, Mr. Hanlon's email was circulated among DDOT staff, including Everett Lott, the Director of the DDOT, and Cesar Barreto Vale, ADA Coordinator for the DDOT, and other administrative staff. Much of the internal discussions of the DDOT employees were redacted.

106.   Finally, in response to Mr. Hanlon's follow-up email, Anovia Daniels, the Community Engagement Manager for the DDOT, clarified Mr. DeFrank's statement: "We regret the error in the previous statement. We did not mean to imply that DDOT will not provide any accessible parking spaces. DDOT inadvertently omitted the word *"metered"* in [Mr. DeFrank's statement]."

107.   The DDOT's clarification of Mr. DeFrank's statement did not deny that the DDOT does not provide accessible parking outside of the Central Business District. Instead, it appears to suggest that the DDOT does not have an obligation to provide metered accessible parking spaces outside of the CBD.

108.   Indeed, at a town hall meeting on January 25, 2022, Everett Lott, Director of DDOT, repeated three times: "we're not legislatively mandated outside of the central business district" to provide accessible parking.

109.    However, outside of the CBD, there are thousands of metered parking spaces provided and

        available to non-disabled persons.

110.    Regina Arlotto, Transportation Planner for the DDOT, in response to the complaints about

        the accessibility of the New 17th Street Plan, stated in an email on June 23, 2021:

> The last issue that I am aware of stems from the incorrect belief that
> this street would not have any <u>reserved</u> handicap accessible metered
> spaces (<u>which is does not have currently</u>). We have responded
> informing them that all the metered spaces currently provided for in
> the plans are handicap accessible, and we will review the site to
> determine where we can locate reserved handicap accessible spaces.
> (emphasis in original)

111.    In a June 24, 2021 email, Ms. Arlotto further explained: "All current pay spaces are ADA

        <u>accessible</u>, and the pay meters have a setting where a handicapped user can enter their tag

        number and therefore not be charged for parking." (emphasis original)

112.    This communication demonstrates that Ms. Arlotto mistakenly believes that the only

        feature of an accessible space is that it be free of cost.

113.    In reality, however, an accessible-designated parking space is accessible to individuals with

        mobility-related limitation by being marked as accessible via clear signage, being near an

        accessible route and curb cut, containing an accessible loading area, and possessing

        painting demarcations to indicate the boundaries of the accessible parking space.

114.    Ms. Arlotto is also mistaken in her belief that accessible parking spaces do not need to be

        added to streets undergoing alterations. To the contrary, the ADA mandates that facilities

        altered by, on behalf of, for the use of a public entity after January 26, 1992, be designed

        and constructed so that the altered parts are readily accessible to and usable by individuals

        with disabilities to the maximum extent feasible. *See* 28 C.F.R. § 35.151(a)(1).

115.    Ms. Arlotto's clear misunderstanding of the mandates of the ADA is not surprising given

the DDOT's widespread failure to provide accessible parking in the District of Columbia.

116. On January 25, 2022, Everett Lott, Director of the DDOT, participated in a virtual town hall to discuss the DDOT's plans to install protected bike lanes. The meeting included various segments on the ADA. During the town hall, when discussing accessible parking spaces in the New 17th Street Plan, Mr. Lott repeatedly stated that the DDOT is not legislatively mandated to provide any accessible parking spaces outside of the CBD.[19]

117. Mr. Lott was made aware of the mandates of the ADA regarding accessible street parking through email correspondence with Mr. Hanlon in June 2021. Nonetheless, Mr. Lott has continued to insist that the DDOT has no obligation under the ADA to provide accessible street parking in the District of Columbia.

118. A reasonable inference can be drawn that the DDOT is of the opinion that it is somehow exempt from the mandates of the ADA and has no obligation to provide accessible parking in the District of Columbia.

119. The DDOT has instituted a Red Top Meter program in the CBD and Stadium Event Zone ("SEZ").

120. The Red Top Meter program provides spaces where individuals with disabilities can park and pay a discounted fee.

121. As of March 2020, there were a total of 370 "Red Top" parking meter spaces in the CBD and 30 "Red Top" parking meter spaces in the SEZ.[20]

---

[19] The Luv Lounge Radio Show hosted by DJ One Luv, *DCDBP Virtual Town Hall on DDOT Bike Lanes with special guest DDOT Director Everett Lott*, YouTube (Jan. 27, 2022), https://www.youtube.com/watch?v=wcaeAAJ47bo.

[20] *See Accessible Meters – Frequently Asked Questions*, D.C. Dist. Dep't of Transp. (Mar. 3, 2020), https://ddot.dc.gov/sites/default/files/dc/sites/ddot/page_content/attachments/FAQs_3.6.20.pdf.

122.   The DDOT insists that its Red Top Meters "[m]eet the latest ADA accessibility guidelines."[21] However, many of the Red Top Meter spaces are not accessible because they:

    a.   Are not defined with paint demarcation, making it foreseeable that cars and other vehicles will encroach on the accessible spaces;

    b.   Are not consistently located next to curb cuts, making individuals with mobility disabilities travel in the street or along a bike lane to reach the intersection where a curb cut is located;

    c.   Are not consistently located in the spots closest to the intersection, resulting in individuals with disabilities having to travel through the vehicular way to access sidewalks;

    d.   Are frequently located next to trees, planters, bike racks, trashcans, or other barriers, which serves as a barrier to loading or unloading for individuals with disabilities; and

    e.   Are often not clearly marked as accessible, which can result in vehicles for non-disabled persons partially or fully encroaching or blocking the space intended for an individual with a disability.

123.   For example, a Red Top Meter is located next to a tree and bike rack, making it difficult or impossible for a wheelchair user to open the doors of their vehicles and/or have room to transfer onto their wheelchair on the passenger side.

---

[21] *Id.*



124.   A Red Top Meter on F Street NW and 12th Street NW is located next to a bike rack, making it difficult or impossible for a wheelchair user to open the passenger side door of the vehicle they are riding in, deploy a wheelchair lift, and/or have room to transfer onto their wheelchair.



125.   A Red Top Meter on 12th Street NW and F Street NW is located next to a planter, making it difficult or impossible for a wheelchair user to open the doors of their vehicle and/or have room to transfer onto their wheelchair.



126.    A Red Top Meter on 17th Street NW and L Street NW is located next to a protected bike lane, requiring passengers to exit into the bike lane, making it difficult or impossible for a wheelchair user to open the doors of their vehicle and/or have room to transfer onto their wheelchair.



127.    This not an exhaustive list of inaccessible Red Top Meter Spaces, but rather, examples of spaces that are obviously inaccessible.

128.    In February 2022, the DDOT expressed plans to change the Red Top Meter program:

In the Central Business District, DDOT is looking to reimagine the

accessible meter program towards a more asset lite approach, much like the infrastructure that is in place in the Stadium Event Zone. The asset lite accessible meter parking does not use a red domed meter. The accessible meter spaces are marked by two red poles that are 110" in height, in addition to two ADA Pay-to-Park signs with pay-by cell information. The adjacent pay stations to the accessible meter spaces are inspected and retrofitted/replaced to ensure the parking meter pay station is ADA accessible. This retrofit includes meter programming using Pay-by-Plate, allowing ADA customers (and all customers) to not have to return to their vehicle to place their proof of payment on the dashboard. This creates a more unified and simplified customer experience, allows for greater opportunity and flexibility in designating additional ADA spaces, and reduces operating costs for the program.

The incumbent parking meter contract has been modified as of FY20 to ensure all parking meter assets, regardless of location, are installed and operable to ADA standards, facilitating easier expansion of the program in the future. Furthermore, DDOT's Curbside Management Division increased oversight in the Development Review process to ensure ADA accessibility is integrated into the curb design and programming for any new developments.[22]

129.    However, based on the DDOT's previous failures to make the Services at Issue accessible, it is unlikely that this "new" Red Top Meter program—just like the protected bicycle lanes that the District is installing, including on 17th Street NW—will actually be accessible to and usable by individuals with disabilities.

---

[22] Dist. Dep't of Transp., *2022 Performance Oversight Questions*, Council for the District of Columbia 106 (Feb. 2022), https://dccouncil.gov/wp-content/uploads/2022/02/FY21_PreHearingQuestionResponses_DDOTOversight_021022_FOR COUNCIL.pdf.

III.   <u>Plaintiffs Are Negatively Impacted by Defendants Failure to Make the Services at Issue Accessible.</u>

A.  <u>DCCIL</u>

130.   The DCCIL's activities relating to the Services at Issue stem from its consumers' need for independent travel so they have an equal opportunity to live, work, and participate in their communities.

131.   The consumers of the DCCIL live in, work in, and travel through the District of Columbia and are at risk of serious injury because the DDOT has failed to provide the Services at Issue, including safe and accessible on-street parking, PUDOs, and pedestrian thoroughfares.

132.   DCCIL expends substantial time and resources on advocacy work concerning independent living for people with disabilities in the District of Columbia, including providing information and referrals, providing independent living skills training, peer counseling, advocacy, and transition services.

133.   As is discussed above, DCCIL also provides limited transportation services to residents of the District of Columbia.

134.   As is discussed above, both the employees and consumers of the DCCIL are at risk of injury or harm due to having to perform pick up and drop offs in bicycle lanes and/or areas without accessible-designated parking spaces or accessible-designated pick-up and drop off areas.

135.   One or more DCCIL consumers have been at risk of injury or harm as a result of Defendants' discriminatory actions and would have standing to sue in their own right.

136.   The injuries at issue in this case would be directly redressed by injunctive and declaratory relief.

137.   DCCIL can bring this action on behalf of its consumer because the interests at stake are germane to DCCIL's purpose.

138.   DCCIL's claims are limited to injunctive and declaratory relief which do not require the participation of individuals in the lawsuit.

B.   DECAA

139.   DECAA's activities relating to the Services at Issue relate to its purposes, such as the purpose to "Promote vehicular and pedestrian safety on the sidewalks and streets within [its] Boundaries, as well as throughout the city of Washington." The group also works toward "promotion of civic discussion concerning the issues of transportation, parking…and accessibility for the disabled."

140.   The members of the DECAA live in, work in, and travel through the District of Columbia and are at risk of serious injury because the DDOT has failed to provide the Services at Issue, including safe and accessible on-street parking, PUDOs, and pedestrian thoroughfares.

141.   One or more DECAA members have been at risk of injury or harm as a result of Defendants' discriminatory actions and would have standing to sue in their own right.

142.   The injuries at issue in this case would be directly redressed by injunctive and declaratory relief.

143.   DECAA can bring this action on behalf of its members because the interests at stake are germane to DECAA's purpose.

144.   DECAA's claims are limited to injunctive and declaratory relief which do not require the participation of individuals in the lawsuit.

145.   For example, DECAA member Kerry Bedard lives at M and 21st Street. She has struggled with curb access and parking, particularly in the wake of protected bicycle lane projects.

She has a disabled parking permit and uses the "Red Top" meter spaces and curbside parking.

146.    Because of her mobility disability and service dog, she experiences difficulty using the parking spaces that DDOT is building next to protected bicycle lanes, because she cannot safely exit her car into a bicycle lane.

147.    On one occasion in the fall of 2021, Ms. Bedard tried to park in the spaces outside the bicycle lane on 17th Street. She was almost hit by a bicycle as she stepped out of her car; she was just able to move out of the way before the cyclist whizzed by.

148.    Ms. Bedard regularly went to the Safeway and hardware store on 17th Street and used the designated accessible space there. When the DDOT built a protected bicycle lane on 17th Street, it initially included only regular parking spaces on the street and removed all accessible parking spaces.

149.    Ms. Bedard oftentimes has to go to a different, more distant hardware store. She would return to the 17th Street hardware store and Safeway more frequently if there were accessible parking.

150.    Further, Ms. Bedard visits two banks on Connecticut Avenue between N and M street. She also used to visit restaurants in that area. She used to rely on Red Top parking spaces for travel to that area, but DDOT installed a bicycle lane, removing or relocating the accessible parking to a more distant location and, on information and belief, cutting down the total number of accessible spaces available for the area. As a result, she goes to the area less frequently and is forced to spend more time parking when she goes to the area.

C.  Dana Bolles

151.    Ms. Bolles' van is equipped with a passenger-side ramp that extends about five feet to the side of the vehicle when deployed. If the sidewalk is unobstructed, it can deploy over a

curb onto the sidewalk; otherwise, she needs a space with the full eight (8') foot clearance for the ramp to deploy and a person to get off the ramp in a wheelchair.

152. When Ms. Bolles permanently moved to the District in early 2022, she brought her van and initially attempted to drive to various destinations and attempted to find parking. Ms. Bolles found that it was so difficult to park near her home and the destinations she wanted to travel that, after a few tries, she largely gave up. Now, she limits her travel.

153. Ms. Bolles found that so-called "accessible" parking spaces had obstacles like tree boxes and trash cans that blocked the ramp, including several in the Navy Yard area near her home and in the Southwest area where she often travels.

154. As a result of the lack of parking, Ms. Bolles must limit her shopping. For example, Ms. Bolles limits her shopping at Costco because she cannot park near her home and thus can only buy what she can carry via public transportation or by rolling.

155. The protected bicycle lanes that the District has been installing made the parking problem worse for Ms. Bolles. With the design the District has regularly used, and continues to plan to use in future projects, the bicycle lane is located between the sidewalk and the parking spaces. There is not enough space for the ramp on her van to deploy with adequate clearance for her to exit her vehicle as the ramp will obstruct the bicycle lane, risking a collision with a cyclist.

156. For example, the protected bike lane on 4th Street SW uses the aforementioned design. Parking that Ms. Bolles could have used has been made completely inaccessible to her for blocks, including near destinations she visits and would drive to on occasion, like the Mall, Native American Museum, and the Peace Officers' Memorial.

157. Ms. Bolles often uses the subway or rolls in her wheelchair to move around the District, but sometimes would drive, such as after subway hours, in bad weather, or when there are elevator outages. For example, on one occasion, she wanted to take her visiting nieces to

the Library of Congress, but three different routes were blocked by elevator outages. Because she knows accessible parking is limited in the District, she could not drive and was unable to make the visit.

158.   Taxi and ride service options are expensive and accessible service can be limited, particularly when traveling to locations that are not on transit. Ms. Bolles regularly faces a no-win choice: take a taxi or car but risk being stranded if a return ride is unavailable; drive but risk being unable to find parking on return to the District; or not take the trip.

### D.   Teodosia "Tessie" Robinson

159.   Ms. Robinson lives in the Northwest part of the District.

160.   On occasion, Ms. Robinson goes to doctors' offices, pharmacies, and stores. She sometimes has to rely on rides from friends or pay for ride services because of the lack of accessible parking in the District. For example, she goes to the George Washington Hospital Medical clinic on M Street. Meter parking in the area is very limited, so she has had to pay for a garage or ride service to go to medical appointments.

161.   Ms. Robinson avoids some destinations because there is no accessible parking nearby. For example, she would like to go to the CVS at 1900 7th Street NW, but there is no accessible parking nearby.

162.   Ms. Robinson would like to go to more destinations in the District, and would do so if accessible parking were available nearby her preferred destinations.

163.   The District recently installed a protected bicycle lane the entire length of the block in front of her building and removed all parking along the street. Although the building has a parking lot in the rear, ride services, paratransit, and medical rides can be reluctant to use it.

164.   Instead, Ms. Robinson and about ten other residents of her building with mobility disabilities are often picked up and dropped off outside the bicycle lane. They struggle to clear the low concrete blocks and bollards that the District uses to divide protected bicycle lanes from the street, cross the bicycle traffic, and climb to the curb.

165.   Ms. Robinson has had close calls with bicycles in protected bicycle lanes that almost hit her as she was attempting to access the curb.

### COUNT I
### VIOLATION OF TITLE II OF
### THE AMERICANS WITH DISABILITIES ACT
### (As to MURIEL BOWSER)

166.   Plaintiffs reallege and reaver Paragraphs 1 - 165 as if they were expressly restated herein.

167.   The Individual Plaintiffs and the disabled members/consumers of the DCCIL the DECAA have utilized on-street parking in the District of Columbia numerous times in the past, and desire to do so in the near future.

168.   The Individual Plaintiffs and members/consumers of the Organizational Plaintiffs have utilized PUDOs in the District of Columbia numerous times in the past and/or desire to do so in the near future.

169.   The barriers above existing throughout the District of Columbia and are excluding, or will exclude, the Individual Plaintiffs and the disabled members/consumers of the Organizational Plaintiffs from being able to enjoy and participate in the programs, activities, and services at issue in this case, namely, on-street parking, PUDOs, and pedestrian thoroughfares.

170.   Additionally, the DCCIL has been harmed, and is at risk of future harm, *inter alia* because it provides a transportation service to individuals with disabilities and its drivers and

passengers are at risk of injury or harm, and its vehicles at risk of damage, from being forced to perform pick-ups and drop-offs in streets and bicycle lanes, instead of in designated accessible parking spaces or in accessible PUDOs.

171. The risk of injury to the DCCIL's drivers and consumers harms the DCCIL because it (a) presents the possibility of the DCCIL being sued and/or liable to injured drivers and consumers; and (b) individuals with disabilities being injured because of inaccessible features is contrary to the goals, mission, and purpose of the DCCIL.

172. On-street parking in the District of Columbia is a program, activity, or service of Defendants because this feature facilitates free and convenient access to local businesses, facilities, and housing. Additionally, on-street parking is a service because on-street parking is paid for by the government, is maintained and operated by the government, and solves a collective action problem. *See, e.g., Frame v. City of Arlington*, 657 F.3d 215, 226 (5th Cir. 2011).

173. Likewise, PUDOs and pedestrian thoroughfares are programs, activities, or services of the Defendants because they facilitate free and convenient access to local businesses facilities, and housing. Additionally, PUDOs and pedestrian thoroughfares are services because they are paid for by the government, are maintained and operated by the government, and solve a collective action problem.

174. The Individual Plaintiffs and the disabled members/consumers of the Organizational Plaintiffs plan to and will utilize and visit the on-street parking, PUDOs, and pedestrian thoroughfares in the District of Columbia in their daily life and to determine if the barriers to access alleged herein have been modified.

175. The Individual Plaintiffs and the disabled members/consumers of the Organizational

Plaintiffs presently fear that they will encounter the mobility-related barriers which exist at the on-street parking, PUDOs, and pedestrian thoroughfares when they use those services in the near future.

176. On information and belief, the barriers related to the Services at Issue are relatively uniform and pervasive throughout the District of Columbia.

177. Despite knowledge of the need to accommodate individuals with disabilities, the DDOT has not taken the steps necessary to modify the barriers and make the Services at Issue accessible to individuals with mobility-related disabilities.

178. The Individual Plaintiffs and the disabled members/consumers of the Organizational Plaintiffs continue to desire to use the Services at Issue but will continue to experience serious difficulty until the barriers discussed in this Complaint are removed and the systemic policies/procedures that caused the barriers have been remedied.

179. The Individual Plaintiffs and the disabled members/consumers of the Organizational Plaintiffs intend to and will visit the on-street parking, PUDOs, and pedestrian thoroughfares in the future, but fear that Defendants will continue to discriminate against them by failing to modify or remove the barriers to access.

180. Upon information and belief, all barriers to access and ADA violations still exist and have not been remedied or altered in such a way as to effectuate compliance with the provisions of the ADA.

181. Upon information and belief, removal of the barriers to access at the Services at Issue would provide the Individual Plaintiffs, and the disabled members/consumers of the Services at Issue, with an equal opportunity to participate in, or benefit from, the Services at Issue.

182.    Defendants failed to reasonably accommodate the Individual Plaintiffs, and the disabled members/consumers of the Services at Issue, by failing to ensure that the Services at Issue were compliant with the ADA.

183.    Defendants failed to provide reasonable modifications to the Individual Plaintiffs, and the disabled members/consumers of the Services at Issue, by failing to provide them with an equal opportunity to access the Services at Issue.

184.    Defendant Bowser is sued pursuant to the doctrine of *Ex parte Young,* 209 U.S. 123 (1908), because she has the ability to compel the District of Columbia to modify the barriers, policies, or practices at issue in this case.

<u>Law and Necessity of Remedy</u>

185.    42 U.S.C. § 12133 provides: "[t]he remedies, procedures, and rights set forth in section 794 of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violations of section 12132 of this title."

186.    Defendants have discriminated against the Individual Plaintiffs and the disabled members/consumers of the Organizational Plaintiffs by denying them full access to the Services at Issue by failing to make its facilities and services readily accessible as required by 42 U.S.C. § 12132 and its implementing regulations at 28 C.F.R. Part 35.

187.    Defendants have discriminated, and are continuing to discriminate, against Individual Plaintiffs and the disabled members/consumers of the Organizational Plaintiffs in violation of the ADA by excluding and/or denying them the full and equal benefits of its services, programs, and/or activities by failing to, inter alia, have accessible Services at Issue. Individual Plaintiffs and the disabled members/consumers of the Organizational Plaintiffs have reasonable grounds for believing that they are about to be subjected to discrimination

as a result of the barriers which are set forth above.

188.   28 C.F.R. § 35.130(b)(1) states that "[a] public entity, in providing any aid, benefit, or service, may not .... on the basis of disability—(i) [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service [or] (ii) [a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others."  28 C.F.R. § 35.130(b)(3) similarly states that "[a] public entity may not … utilize … methods of administration (i) [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability [or] (ii) [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."  Defendants have violated these provisions by providing the Services at Issue in a manner that renders them inaccessible to people with disabilities and/or failing to maintain their on-street parking, PUDOs, and pedestrian thoroughfares so that they are compliant with law and safe for people with disabilities to utilize.

189.   Defendants have discriminated against the Individual Plaintiffs and the disabled members/consumers of the Organizational Plaintiffs by excluding them from participation in, and denying the benefits of, the Services at Issue because of their disabilities, all in violation of 42 U.S.C. § 12132.

190.   Upon information and belief, Individual Plaintiffs and the disabled members/consumers of the Organizational Plaintiffs have been denied access to, and has been denied the benefits of the Services at Issue, and have otherwise been discriminated against and damaged by Defendants because of Defendants' discrimination, as set forth above.  Plaintiffs will

continue to suffer such discrimination, injury, and damage without the immediate relief provided by the ADA as requested herein.  Furthermore, as required by the ADA and all other remedial civil rights statutes, to properly remedy Defendants' discriminatory violations and avoid piecemeal litigation, Plaintiffs requires an inspection of the Services at Issue in order to catalogue and cure all the areas of non-compliance with the ADA.

191.   Defendants' exclusion of the Individual Plaintiffs and the disabled members/consumers of the Organizational Plaintiffs from full and equal benefits of the Services at Issue caused Individual Plaintiffs, and the disabled members/consumers of the Organizational Plaintiffs to experience isolation, segregation, frustration, and denial of their civil rights.

192.   Defendants, through their staff and/or employees, knew or should have known of their obligations under Title II of the ADA to provide accommodations to individuals with disabilities, including individuals who have mobility disabilities, and to engage in practices to promote compliance with these statutes.

193.   Defendants, through their staff and/or employees, knew or should have known that their policies and practices created an unreasonable risk of causing Plaintiffs and the disabled members/consumers of Organizational Plaintiffs greater levels of isolation, segregation, frustration, and denial of their civil rights than a non-disabled person would be expected to experience.

194.   The harm sustained by Plaintiffs and the disabled members/consumers of Organizational Plaintiffs herein is the expected and foreseeable consequence of Defendants' failure to comply with the requirements and mandates of Title II of the ADA. This statute and accompanying regulations exist to ensure that individuals with disabilities will have equal access to places of public accommodations. When the Defendants failed to adhere to their

obligations under these regulations, it was imminently foreseeable that those with disabilities would sustain the exact harms alleged by Plaintiffs and the disabled members/consumers of Organizational Plaintiffs.

195.   Despite the Defendants' knowledge of their obligation to accommodate persons with disabilities, they did not take adequate steps to ensure that they provided or maintained accessible on-street parking, PUDOs, and pedestrian thoroughfares for individuals with disabilities.

196.   As a result of the Defendants' failure to ensure equal access to on-street parking, PUDOs, and pedestrian thoroughfares, the Individual Plaintiffs and the disabled members/consumers of Organizational Plaintiffs received services that were unequal to those provided to individuals without disabilities.

197.   Based upon their failure to bring the Services at Issue into compliance with the requirements of the ADA, Defendants discriminated against Plaintiffs and the disabled members/consumers of DCCIL and the DECAA.

198.   Plaintiffs have retained the undersigned counsel and are entitled to recover injunctive and declaratory relief, reasonable attorneys' fees, and costs and litigation expenses pursuant to 42 U.S.C. § 12205 and 28 C.F.R. § 35.175.

199.   Plaintiffs are without adequate remedy at law and are suffering irreparable harm.

200.   Pursuant to 42 U.S.C. § 12131, *et seq.*, this Court is provided authority to grant Plaintiffs' requested injunctive relief including an order that Defendant Bowser take steps to ensure that the District of Columbia change its policies, procedures, and practices and alter the Services at Issue to make them readily accessible and usable to Plaintiffs and all other persons with mobility-related disabilities.

**COUNT II**
**VIOLATION OF THE REHABILITATION ACT**
**(As to the DISTRICT OF COLUMBIA)**

201.    Plaintiffs reallege and reaver Paragraphs 1 - 200 as if they were expressly restated herein.

202.    Plaintiffs brings this claim against Defendants, based upon the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*

203.    The Rehabilitation Act provides that:

> No otherwise qualified individual with handicaps in the United States, as defined by 7(8) [29 U.S.C. § 706(8)], shall, solely by reason of his or her handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance …

29 U.S.C. § 794(a).

204.    Upon information and belief, as set forth herein, Defendants have violated the Rehabilitation Act by excluding the Individual Plaintiffs, solely by reason of their disabilities, from the participation in, and denying them the benefits of, and has otherwise subjected them to discrimination as to the Services at Issue.

205.    Upon information and belief, there are additional, ongoing violations of the Rehabilitation Act in the Services at Issue which Plaintiffs are more likely than not going to encounter upon their future uses of the Services at Issue.  Plaintiffs bring this action:

    a.  to redress injuries suffered as a result of Defendants' discriminatory actions and inactions set forth herein;

    b.  to reasonably avoid further and future injury to Plaintiffs as a result of Defendants' ongoing failure to cease its discriminatory practices as set forth in this action, including correcting past violations of the Act and/or avoiding future violations in

planned renovations to the Services at Issue;

c.   to ensure Defendants' Services at Issue are accessible as required by the relevant applications of Title II of the ADA;

d.   to be made whole and ensure future compliance; and

e.   to reasonably avoid future ADA and Rehabilitation Act litigation involving the same Services at Issue and under the same laws as set forth herein with its concomitant impact on otherwise scarce judicial resources.

206.   Upon information and belief, the District of Columbia is the recipient of federal funds.

207.   As set forth above, Plaintiffs have been, and without the relief requested herein will continue to be, denied access to the Services at Issue by Defendants solely by reason of their disabilities, and have otherwise been discriminated against and damaged solely by reason of their disabilities as a result of Defendants' Rehabilitation Act violations set forth above.

208.   Upon information and belief, Defendants' exclusion of the Individual Plaintiffs from full and equal benefits of their services, programs, and activities caused the Individual Plaintiffs to suffer isolation, segregation, frustration, and denial of their civil rights.

209.   The Defendants, through their staff and/or employees, knew or should have known of their obligations under the Rehabilitation Act to provide accommodations to individuals with disabilities, including individuals with mobility-related disabilities, and to engage in practices to promote compliance with these statutes.

210.   The Defendants, through their staff and/or employees, knew or should have known that their policies and practices created an unreasonable risk of causing Plaintiffs and others

with disabilities greater levels of isolation, segregation, frustration, and denial of their civil rights than a non-disabled person would be expected to experience.

211. The harm sustained by Plaintiffs herein is the expected and foreseeable consequence of the Defendants' failure to comply with the requirements and mandates of federal civil rights law. The statute and accompanying regulations exist to ensure that individuals with disabilities will have equal access to publicly-owned facilities. When the Defendants failed to adhere to their obligations under these statutes and regulations, it was imminently foreseeable that those with disabilities would sustain the exact harms alleged by Plaintiffs in this lawsuit.

212. As a result of the Defendants' failure to provide accessible on-street parking, PUDOs, and pedestrian thoroughfares to Plaintiffs, they received services that were unequal to those provided to individuals without disabilities.

213. The harm sustained by Plaintiffs herein is the expected and foreseeable consequence of the Defendants' failure to comply with the requirements and mandates of the Rehabilitation Act. This statute and accompanying regulations exist to ensure that individuals with disabilities will have equal access to publicly owned and/or operated properties and services. When the Defendants failed to adhere to their obligations under these regulations, it was imminently foreseeable that those with disabilities would sustain the exact harms alleged by Plaintiffs in this lawsuit.

214. Plaintiffs are entitled to recover reasonable attorneys' fees, costs, and litigation expenses from Defendants pursuant to 29 U.S.C. § 794(b).

215. Pursuant to 29 U.S.C. § 794(a) this Court is provided authority to grant Plaintiffs' injunctive relief including an order to alter the Services at Issue to make them accessible

to and usable by individuals with disabilities to the extent required by the Rehabilitation

Act.

**COUNT III**
**VIOLATION OF THE DC HUMAN RIGHTS ACT**
**(As to the DISTRICT OF COLUMBIA)**

216.   Plaintiffs reallege and reaver Paragraphs 1 - 215 as if they were expressly restated herein.

217.   Under the DC Human Rights Act, D.C. Code § 2-1402.01:

> Every individual shall have an equal opportunity to participate
> fully in the economic, cultural, and intellectual life of the District
> and to have an equal opportunity to participate in all aspects of
> life, including, but not limited to, in employment, in places of
> public accommodation, resort or amusement, in educational
> institutions, in public service, and in housing and commercial
> space accommodations.

218.   In 2002, the DC Council amended the DCHRA to prohibit the District government from

discriminating against individuals with disabilities. Id. § 2-1402.73.

219.   The pertinent provision reads as follows:

> Except as otherwise provided for by District law or when
> otherwise lawfully and reasonably permitted, it shall be an
> unlawful discriminatory practice for a District government
> agency or office to limit or refuse to provide any facility, service,
> program, or benefit to any individual on the basis of an
> individual's actual or perceived: . . . disability . . . . Id.

220.   The DCHRA defines "disability" as "a physical or mental impairment that substantially

limits one or more of the major life activities of an individual having a record of such

impairment or being regarded as having such an impairment." D.C. Code § 2-1401.02(5A).

221.   The Individual Plaintiffs are persons with disabilities within the meaning of the statute

because they have impairments that substantially limit one or more major life activities

(e.g., walking). The Organizational Plaintiffs represent individuals with disabilities.

222.   Defendants administer District government agencies and offices which provide the

Services at Issue.

223. By failing to plan to meet the needs of persons with disabilities for accessible on-street parking, PUDOs, and pedestrian thoroughfares, Defendants have limited or refused to provide the Services at Issue to Plaintiffs on the basis of their disabilities in violation of D.C. Code § 2- 1402.73.

224. Defendants' violations of the DCHRA have proximately caused injuries to Plaintiffs, as set forth herein.

225. As described above, Defendants' conduct constitutes an ongoing and continuous violation of the DCHRA.

226. Unless restrained from doing so, Defendants will continue to violate said law, and their conduct will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

227. Plaintiffs will suffer irreparable harm because Defendants will continue to discriminate against them and deny them access to the Services at Issue.

228. Pursuant to D.C. Code § 2-1403.13(a)(1)(E), this Court is permitted to grant any relief it believes is appropriate.

229. Plaintiffs are entitled to injunctive relief, as well as reasonable attorneys' fees and costs pursuant to the DCHRA.

## **RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants, and request the following relief:

    A.    This Court issue a Declaratory Judgment that determines that Defendants[23] are in

---

[23] Relief is sought against Mayor Bowser as to the ADA claim and against the District as to the RA and DCHRA claims.

violation of Title II of the ADA, the RA, and the DCHRA in administering the Services at Issue;

B.      This Court grant permanent injunctive relief against Defendants ordering them to cease violating the statutory and regulatory requirements of the ADA, RA, and DCHRA and that they be Ordered to take steps to bring the Service at Issue into compliance with accessibility provisions and requirements of the ADA, RA and DCHRA;

C.      This Court grant permanent injunctive relief against Defendants including an Order to make the Services at Issue readily accessible to and usable by individuals with disabilities to the extent required by the ADA; and to require that Defendants make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford all offered goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities;

D.      This Court enter an Order directing Defendants to alter and modify the Services at Issue as appropriate and necessary to comply with the ADA, RA, and DCHRA;

E.      This Court enter an Order a supervising and monitoring Order as to Defendants' efforts to bring itself into compliance with the ADA, RA, and DCHRA;

F.      This Court award Plaintiffs reasonable attorneys' fees, costs and litigation expenses pursuant to 29 U.S.C. § 794a(a)2 and 42 U.S.C. § 12205 and 28 C.F.R. § 35.175 and D.C. Code § 2-1403.13(a)(1)(E); and

G.      Such other relief as the Court deems just and proper, and/or is allowable under Title II of the ADA, the RA, and the DCHRA.

DATED:      New York, NY
            November 21, 2022

                            Respectfully Submitted,

                            _____
                            VLADECK, RASKIN & CLARK, P.C.
                            Attorneys for Plaintiffs
                            Maia Goodell
                            565 Fifth Avenue, 9th Floor
                            New York, New York 10017
                            T: (212) 403-7300; F: (212) 221-3172