**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DC CENTER FOR INDEPENDENT LIVING, *et al.*, <br><br>         Plaintiffs, <br><br>         v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br><br>         Defendants. | <br><br><br><br> Civil Action No. 1:22-cv-03541-JMC |

## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT</u>

Plaintiffs D.C. Center for Independent Living (DCCIL), Dupont East Civic Action Association (DECAA), Dana Bolles, and Theodosia Robinson allege that protected bicycle lanes and on-street parking in the District of Columbia violate the Americans with Disabilities Act (ADA), the Rehabilitation Act, and the District of Columbia Human Rights Act (DCHRA). Plaintiffs make wide-reaching, general allegations regarding a lack of accessibility along the District's recently installed protected bicycle lanes and its entire on-street parking scheme. But Plaintiffs only provide specific allegations regarding a handful of accessible parking spots allegedly missing from a half-mile stretch of 17th Street NW and, instead, rely on conclusory statements, scattershot grievances, and pure speculation. In spite of this, Plaintiffs seek relief that would have the Court issue an injunction and appoint a monitor that would usurp control over nearly every facet of the District's street designs. Not only is the relief sought outside the scope of the alleged injuries, but Plaintiffs have not plausibly alleged standing to bring their claims. And even if the Court finds jurisdiction at all, Plaintiffs simply have not pled facts sufficient to establish any violation of the ADA, Rehabilitation Act, or DCHRA because

Plaintiffs fail to allege that they are unable to meaningfully access the services at issue. Thus, Plaintiffs' claims should be dismissed.

## BACKGROUND

### I.    Relevant Statutory and Regulatory Framework

The Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (Section 504) create federal accessibility standards. The requirements of these two statutes are substantially similar. Title II of the ADA directs that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Under the implementing regulations, "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a).

The ADA provides local governments with flexibility in how to manage facilities constructed before the Act's passage that do not meet the Act's technical requirements. Specifically, "[a] public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance" with the requirements of the ADA and its implementing regulations. 28 C.F.R. § 35.150(b). On the other hand, facilities altered after the passage of the ADA must, to the maximum extent feasible, be "altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(b)(1). Facilities built after March 15, 2012, must comply with

the 2010 Standards for Accessible Design (2010 Standards).  28 C.F.R. § 35.151(c)(3).[1]

Facilities altered after March 15, 2012, must comply with the 2010 Standards to the maximum

extent feasible.  28 C.F.R. §§ 35.151(b)(1), (c)(3).  The 2010 Standards for state and local

governments include the Title II regulations and the 2004 ADA Accessibility Guidelines.  28

C.F.R. § 35.104; *see also 2010 ADA Standards for Accessible Design*, U.S. Department of

Justice (Dec. 7, 2012), https://tinyurl.com/yc5wzcx6.

      The Architectural and Transportation Barriers Compliance Board (Access Board) issues

minimum guidelines to ensure that facilities are accessible to individuals with disabilities.  42

U.S.C. §§ 12204(b), 12134.  These guidelines are not binding until they are incorporated into

regulations promulgated by the Department of Justice.  *See* 42 U.S.C. § 12134.  The Access

Board issued proposed Accessibility Guidelines for the Public Rights-of-Way in 2011 and

supplemental guidelines in 2013 (collectively, "PROWAG").  Accessibility Guidelines for

Pedestrian Facilities in the Public Right-of-Way (PROWAG), 76 Fed. Reg. 44664 (proposed

July 26, 2011); Accessibility Guidelines for Pedestrian Facilities in the Public Right-of-Way;

Shared Use Paths, 78 Fed. Reg. 10110 (proposed Feb. 13, 2013).  These guidelines have not been

finalized or adopted as regulations.

## II.    District Street Design and Bicycle Lane Project

      The District Department of Transportation (DDOT) manages and maintains the District's

transportation infrastructure.  D.C. Code § 50-921.01.  As part of this work, DDOT manages and

regulates on-street parking in the District and oversees most capital projects related to the public

space, including the installation of bicycle lanes.  *See* D.C. Code § 50-921.04.  As Plaintiffs

---

[1]    Construction or alteration of a facility that commenced between the passage of the ADA and March 15, 2012, had to comply with prior technical standards.  28 C.F.R. § 35.151(c).

acknowledge, DDOT is committed to achieving equity and accessibility in its pursuit of its mission. *See* Compl. ¶¶ 37–39 (footnotes and citations omitted).

To that end, DDOT implements a number of programs to provide accessible parking to District residents and visitors with disabilities. For example, DDOT designates certain metered parking spaces as dedicated accessible parking spaces in two high-traffic areas: the "Central Business District" and the "Stadium Event Zone." *Accessible Meters – Frequently Asked Questions*, DDOT (March 3, 2020), https://tinyurl.com/2p9eh8n5; *see* Compl. ¶¶ 119, 121.[2] As of March 2020, there were approximately 400 designated accessible parking meter spaces in these two areas. *Accessible Meters – Frequently Asked Questions*; *see* Compl. ¶ 121. Outside of these areas, individuals with disabilities who have qualified placards or license plates may park at any meter for free for up to double the posted time limit on the meter or up to 4 hours. *Accessible Meters – Frequently Asked Questions.* Additionally, individuals with qualifying disabilities who live in single-family homes and meet certain criteria can apply for a reserved on-street parking space for their residence. *See* 18 DCMR § 2710; *Residential Disability Parking Permit (RDPP)*, DDOT, https://tinyurl.com/2p8u7e7x.

The installation of protected bicycle lanes is part of a broader project called Vision Zero DC, which seeks to transform District roadways safety efforts and sets a goal of zero fatalities or serious injuries on District Streets. *Vision Zero DC,* Vision Zero DC, https://visionzero.dc.gov/. Protected bicycle lanes play an important role in this plan. And the District's development and design of the protected bicycle lanes follow federal requirements and national best practices established by the Federal Highway Administration and the National Association of Transportation Officials. *Bicycles*, District Department of Transportation, https://movedc-

---

[2]    All electronic cites were last accessed on February 9, 2023.

dcgis.hub.arcgis.com/pages/bicycles (citing *Bikeway Selection Guide*, Federal Highway Adminstration (Feb. 2019).  A protected bicycle lane is "a space in the public right of way that is designated for bicycle use and physically separated from the main travel lanes" through the use of "vertical posts, curbs, or by placing a parking lane between the travel lanes and the [bicycle] lanes."  *Engineering for Safety*, Vision Zero DC, tinyurl.com/53wv445a.  In addition to cyclists, these protected bicycle lanes may be used by people riding electric scooters and motorized wheelchairs.  *Id.*  The District's decision to implement these bicycle lanes is based in part on "[r]esearch [showing] that increased rates of bicycling and protected bicycle lanes increase safety for all users of the street" and the fact that "[p]rotected bike lanes have been proven to save lives by reducing exposure to potential crashes and reducing conflicts."  *Id.*  The District has committed to building 10 miles of protected bike lanes per year beginning in 2022.[3]  *Id.*

### III.   Plaintiffs' Complaint and Procedural History

Plaintiffs DCCIL, DECAA, Dana Bolles, and Theodosia Robinson filed this case on November 21, 2022 against the District of Columbia and Mayor Muriel Bowser, alleging in the main that the District's implementation of protected bicycle lanes throughout the city has reduced the accessibility of on-street parking, curb access, and pedestrian crossings (referred to collectively as the "Services at Issue," Compl. ¶ 29, in the improved areas.  *See id.* ¶¶ 29, 47–94.  Plaintiffs further allege that there is a general lack of accessible on-street parking throughout the District.  *Id.* at ¶¶ 95–129.  Plaintiffs bring claims under the ADA, Section 504, and the DCHRA, Compl. ¶¶ 166-229; and they seek declaratory relief, an injunction requiring that on-street

---

[3]      DDOT has constructed over 100 miles of bicycle lanes since 2001; and in 2009, it began prioritizing the installation of protected bicycle lanes.  *Bicycle Lanes*, District Department of Transportation, https://ddot.dc.gov/page/bicycle-lanes. commenced a plan to build 20 miles of protected bicycle lanes over three years to expand the network of bicycle lanes.  *Id.*

parking, curb access, and pedestrian crossings city-wide be modified to improve accessibility, and an award of attorney's fees and costs. *Id.* at 46.

## LEGAL STANDARD

### I.    Motion to Dismiss Under Rule 12(b)(1)

Because federal courts are courts of limited jurisdiction, the law presumes that "a cause lies outside this limited jurisdiction." *Rasul v. Bush*, 542 U.S. 466, 489 (2004) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (U.S. 1994). Thus, on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of demonstrating that the court's jurisdiction is proper by a preponderance of the evidence. *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). "[S]ubject matter jurisdiction is, of necessity, the first issue for an Article III court." *Loughlin v. United States*, 393 F.3d 155, 170 (D.C. Cir. 2004). In determining whether it has jurisdiction, a district court may consider material outside of the pleadings. *See, e.g.*, *Halcomb v. Office of the Senate Sergeant-At-Arms*, 563 F. Supp. 2d 228, 235 (D.D.C. 2008). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

### II.    Motion to Dismiss Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Twombly*, 550 U.S. at 556). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679. "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. at 678

(quoting *Twombly*, 550 U.S. at 557). In evaluating a motion under Rule 12(b)(6), the Court "may consider … the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Laughlin v. Holder*, 923 F.Supp.2d 204, 209 (D.D.C. 2013).

## ARGUMENT

### I.    Plaintiffs Lack Article III Standing to Bring Their Claims.

#### A.    The Individual Plaintiffs Have Not Demonstrated that They Have Standing to Challenge the Protected Bicycle Lanes.

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021)). "The party invoking federal jurisdiction bears the burden of demonstrating Article III standing." *Jibril v. Mayorkas*, 20 F.4th 804, 813 (D.C. Cir. 2021) (citing *TransUnion LLC*, 141 S. Ct. at 2207–08). A plaintiff "must demonstrate standing for each claim that is being pressed and for each form of relief that is being sought." *Id*. Applying these long-established principles, neither of the individual plaintiffs here have sufficiently demonstrated standing to challenge the implementation of protected bicycle lanes throughout the District.

#### 1.    Dana Bolles

Plaintiff Dana Bolles has not adequately alleged an injury-in-fact caused by the installation of bicycle lanes—either on 17th Street Northwest or generally. Ms. Bolles' only specific allegation relating to the installation of bicycle lanes and/or any concrete effect on her personally is that, after DDOT installed bike lanes on 4th Street Southwest, "[p]arking [she]

could have used [was] made completely inaccessible to her for blocks, including near

destinations she visits and would drive to on occasion." Compl. ¶ 156. Ms. Bolles provides no

further details about the bike lane(s) with which she takes issue, the accessible parking

apparently lost as a result of this public space improvement, or the accessible parking that

remains available to her on and around 4th Street Southwest (of which there appears to be

several options, *see* Accessible Parking Meter Map, https://www.parkdc.com/pages/meters).

Those are important—indeed, indispensable details—for Ms. Bolles to establish an injury

relevant to her claim that she was denied meaningful access to the District's network of

accessible parking. *See* Section II below. Although, at the pleadings stage, Plaintiffs' bar for

alleging injury is lowered, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1991),

"nondescript and conclusory allegations" of this nature are not enough for the Court to presume

the existence of more "specific" jurisdictional facts, *Brown v. FBI*, 793 F. Supp. 2d 368, 374

(D.D.C. 2011) (internal quotation and citation omitted). *Cf. Osborn v. Visa Inc.*, 797 F.3d 1057,

1066 (D.C. Cir. 2015) (finding standing at pleadings stage where the plaintiffs had pled facts that

were "specific, plausible, and susceptible to proof at trial"). Beyond her vague allegations

concerning access to 4th Street Southwest, Ms. Bolles' only other issue is that the parking

around her home in Navy Yard—some of which *is* accessible—is sometimes blocked by tree

boxes or trashcans, Compl. ¶¶ 152–54—but she rightly attributes neither of those obstacles to the

District. *See Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017).

Accordingly, Ms. Bolles has failed to adequately allege that she was actually injured by the

implementation of the bicycle lanes Plaintiffs seek to challenge here.

### 2.  Teodosia Robinson

Plaintiff Teodosia Robinson likewise has not adequately alleged that the implementation of protected bicycle lanes caused the injuries she alleges.  "The second element in Article III standing is a causal connection between the injury and the defendant's conduct. . . ."  *ASPCA v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 338 (D.C. Cir. 2003).  A plaintiff must allege that the injury-in-fact is "fairly traceable 'to the challenged action of the defendant.'  And not the result of 'the independent action of some third party not before the court.'"  *Ctr. for Biological Diversity*, 861 F.3d at 182 (quoting *Lujan*, 504 U.S. at560).  Ms. Robinson alleges that she has been injured by the protected bicycle lanes because "ride services, paratransit, and medical rides can be reluctant to use" the parking lot in the rear of her building and, as a result, she is picked up and dropped off outside the bicycle lane.  *See* Compl. ¶ 163–64.  Thus, the only injury Ms. Robinson alleges based on the protected bicycle lanes themselves is the result of third parties' refusal to use the available parking lot.  Because Ms. Robinson has not plausibly alleged that her stated injuries are fairly traceable to the installation of protected bicycle lanes, she cannot establish standing here.

### B.    The Organizational Plaintiffs Lack Standing to Pursue Claims under the ADA.

Organizations can satisfy Article III standing requirements in one of two ways: "An organization can have standing on its own behalf or on behalf of its members."  *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006).  Here, DCCIL appears to assert the former, organizational standing, while DECAA asserts the latter, representational standing, but both fail to satisfy Article III requirements.  *See* Compl. ¶¶ 130–38, 139–50.

Organizational standing requires a showing "that the organization itself, like any individual plaintiff, satisfies the three familiar elements of standing — (1) injury, (2) causation, and (3) redressability." *Ctr. For Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 36 (D.D.C. 2018), *aff'd sub nom. Ctr. For Responsible Sci. v. Hahn*, 809 F. App'x 10 (D.C. Cir. 2020).  To satisfy the injury requirement, the organization must show a "concrete and demonstrable injury to [its] activities." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (citation omitted).  And to determine this, the D.C. Circuit asks "whether the agency's action or omission to act injured the organization's interest" and whether "the organization used its resources to counteract that harm." *Ctr. For Responsible Sci*, 346 F. Supp. 3d at 36 (internal quotation marks omitted) (citing *People for the Ethical Treatment of Animals v. USDA (PETA)*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)).

Here, DCCIL has failed to demonstrate that it has standing to bring claims on its own behalf because it is has not alleged that it has "used its resources to counteract" the changes resulting from the recently installed protected bicycle lanes or the District's on-street parking generally.  *Ctr. For Responsible Sci*, 346 F. Supp. 3d at 36.  DCCIL alleges that it has expended "resources on advocacy work concerning independent living for people with disabilities," Compl. ¶ 132, but that is not sufficient to establish organizational standing because "resources spent educating the public or the organization's members cannot establish Article III injury 'unless doing so subjects the organization to operational costs beyond those normally expended.'" *Ctr. For Responsible Sci*, 346 F. Supp. 3d at 36  (quoting *Food & Water Watch*, 808 F.3d at 920 ).  Thus, Plaintiffs have failed to sufficiently allege that DCCIL satisfies the standing requirements.

Additionally, DECAA has failed to demonstrate that it has representational standing to bring a suit against the District regarding the accessibility of parking outside of the area around 17th Street NW.  "To establish representational standing, an association must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Nat'l Ass'n of Home Builders v. E.P.A.*, 667 F.3d 6, 12–13 (D.C. Cir. 2011) (internal quotation marks and citations omitted).  Regarding the first prong of the test, DECAA's only allegation regarding its members' standing outside of the 17th Street NW issue involves one member's alleged difficulty finding accessible parking on one block on Connecticut Avenue.  Compl. ¶ 150.  DECAA has failed to demonstrate that its members would have standing to bring claims against the District for relief related to parking accessibility in the District generally because, for the reasons discussed below, the allegations are insufficient to pursue prospective relief and the relief requested is not tailored to the alleged injury.  *See* Sections I.C and I.D.

### C.    Plaintiffs Lack Standing To Pursue Claims for Prospective Relief Because They Fail To Allege a Real and Immediate Threat That Any Past Injuries Are Likely To Occur Again in the Future.

To the extent Plaintiffs seek prospective declaratory and injunctive relief ordering the District to change its policies, practices, or procedures, they have not pled facts to establish standing to do so.  "[W]hen [plaintiffs] seek[ ] prospective declaratory or injunctive relief, allegations of past harms are insufficient."  *Nat'l Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 91 (D.D.C. 2013).  Rather, "[w]hen a plaintiff seeks injunctive or declaratory relief specifically for the purpose of challenging an alleged policy or practice, it must also demonstrate that it is 'realistically threatened by a repetition of its experience.'"  *Id.* (quoting *Haase v. Session*, 835

11

F.2d 902, 910–11 (1983) (alteration omitted)).  "This threat must be 'real and immediate,' or

alternatively, 'realistic' in nature."  *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102

(1983)).  A court "may not hear a claim for equitable relief that rests solely on a 'speculative

claim of future injury.'"  *Tipograph v. Dep't of Justice*, 146 F. Supp. 3d 169, 175 (D.D.C. 2015)

(quoting *Lyons*, 461 U.S. at 111); *accord Citizens for Responsibility and Ethics in Washington

(CREW) v. U.S. Dep't of Homeland Security*, 527 F. Supp. 2d 101, 106 (D.D.C. 2007) (granting

motion to dismiss when alleged future injuries were "too speculative and remote" to support

standing to seek prospective relief).

     Here, Plaintiffs allege that DDOT "routinely fails to use designs for the protected bicycle

lanes that include Services at Issue that are accessible for individuals with mobility disabilities,"

and that "[t]his means that [ ] DDOT will likely continue to install these protected bicycle lanes

without providing the proper number and dimensions of accessible spaces, accessible [pick up

and drop off spaces (PUDOs)], or pedestrian thoroughfares."  Compl. ¶¶ 48–49.  But this blanket

allegation is insufficient to demonstrate a real and immediate threat that future bicycle lanes will

be constructed in a purportedly unlawful way.  To be sure, Plaintiffs only make detailed

allegations related to the protected bicycle lane on one half-mile stretch of one street—17th

Street Northwest.  *See* Compl. ¶ 52.  As noted above, Plaintiffs otherwise make vague allegations

about one other protected bicycle lane (on 4th Street Southwest) that has apparently resulted in

some unspecified inconvenience to Ms. Bolles, *see* Section I.A.1 above, and then rest on

unsubstantiated speculation that DDOT's future work on bike lanes will be to their detriment, *see*

Compl. ¶¶ 49, 129, 155, 205.  That, as they admit, is both contrary to DDOT's stated mission,

*see* Compl. ¶¶ 37–39 (footnotes and citations omitted), and disproved by concrete facts they

themselves plead showing that DDOT has recently configured some on-street parking spaces and

bicycle lanes in a way that even Plaintiffs consider accessible, *see* Compl. ¶ 62 (describing public space configuration 4th and K Streets NW). Thus, Plaintiffs' claims about the construction of future bicycle lanes are at best speculative and cannot support a claim for prospective relief. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409-10 (2013) ("threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." (emphasis in the original) (internal quotations omitted)).

  To the extent Plaintiffs seek prospective relief concerning the future design of on-street parking, Plaintiffs have also failed to show standing to seek prospective relief. Plaintiffs' only allegation to suggest there is a risk that on-street parking will be implemented in a purportedly unlawful way is DDOT's intention to modify the Red Top Meter program. Compl. ¶¶ 128–29. Plaintiffs quote DDOT's response to an oversight question in 2022 discussing this proposed modification, *see id.*, but this response does not show a real or immediate threat that on-street parking will be altered in a purportedly unlawful way. In its response, DDOT advised that it intends to update the Red Top Meter to be more like the designated accessible parking in the Stadium Event Zone. *Id.* ¶ 128. Plaintiffs have not alleged that this parking in the Stadium Event Zone is inaccessible. Other than allegations related to the protected bicycle lanes, Plaintiffs' only examples of purportedly inaccessible parking spaces are the Red Top Meter spaces that DDOT purportedly intends to modify. *See* Compl. ¶¶ 122–29. Plaintiffs' general allegation that "based on DDOT's previous failures to make the Services at Issue accessible, it is unlikely that this 'new' Red Top Meter program . . . will actually be accessible to and usable by individuals with disabilities," *id.* ¶ 129, is a speculative claim of future injury that cannot support prospective relief.

### D.    Plaintiffs' Proposed Relief Is Not Tailored to Redress Plaintiffs' Alleged Injuries.

To the same end, Plaintiffs here seek wide-reaching declaratory and injunctive relief but have not sufficiently alleged injuries to support anything close to what they ask the Court to order.  "'[S]tanding is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)); *cf. Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.").  Again, Plaintiffs here seek an injunction requiring that on-street parking, curb access, and pedestrian crossings city-wide be modified—under the supervision of a court-appointed monitor—to improve accessibility for Plaintiffs and others like them.  *See* Compl. at 45–46.  But, as explained, the only *detailed* non-speculative factual allegations Plaintiffs assert related to the District's management of public space infrastructure concern a one half-mile section of 17th Street NW.  Thus, even if Plaintiffs have standing at all—and even if they have standing to seek prospective relief—they have not pled facts that would allow the Court to entertain their claims related to *every* parking spot and *every* bike lane and *every* curb cut in *every* corner of the city.  Accordingly, if this Court finds jurisdiction at all, it should nevertheless dismiss the Complaint as it relates to any aspects of DDOT's work other than the bike lane improvements along 17th Street NW.

### II.    Plaintiffs Fail To Allege a Violation of the ADA.

Plaintiffs have not pled facts sufficient to state a claim under the ADA.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  To

prove that public services or programs violates Title II, a plaintiff must show that "(1) he or she is a qualified individual with a disability; (2) he or she was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his or her disability." *Equal Rts. Ctr. v. D.C.*, 741 F. Supp. 2d 273, 283 (D.D.C. 2010) (cleaned up); *see Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1267–68 (D.C. Cir. 2008) (same for the Rehabilitation Act).[4]  In determining whether an individual has been "excluded" or "denied" benefits of a service or program, courts evaluate whether the individual has "meaningful access" to the service or program at issue. *Am. Council of the Blind*, 525 F.3d at 1267.  A lack of "[m]eaningful access" is generally found "[w]here the plaintiffs identify an obstacle that impedes their access to a government program or benefit." *Id.* "By contrast, where the plaintiffs seek to expand the substantive scope of a program or benefit, they likely seek a fundamental alteration to the existing program or benefit and have not been denied meaningful access." *Id.*

Plaintiffs allege two theories of ADA discrimination in the Complaint:  (1) lack of access to services adjacent to the newly installed bicycle lanes, and (2) lack of access to city-wide on-street parking.  Compl. ¶ 29.  On either theory, however, Plaintiffs have failed to sufficiently plead facts that—even if they were true—would show that the District has violated the ADA.

A.    **Plaintiffs Fail to State a Claim Under the ADA for Services Adjacent to Bicycle Lanes.**

---

[4]    "[C]laims and defenses" under the ADA and Section 504 of the Rehabilitation Act are "virtually identical." *Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999); *see also Am. Council of the Blind*, 525 F.3d at 1260 n.2 (discussing that courts have treated cases interpreting Title II of the ADA and Section 504 as interchangeable).  Plaintiffs also bring a claim under the DCHRA.  Compl. ¶¶ 216–29.  And "[t]he DCHRA is . . . interpreted in parallel with the ADA." *Seth v. District of Columbia*, 813 Fed. App'x 611, 613 n. 1 (D.C. Cir. 2020).

Though Plaintiffs take aim at a broad range of issues related to the recently installed protected bicycle lane—including on-street parking, PUDOs, curb access, and pedestrian thoroughfares—Plaintiffs' allegations fail to show that the District is denying them meaningful access to those programs or services in violation of the ADA. *See* Compl. ¶ 29.

For the recently installed protected bicycle lanes, the ADA implementing regulations require that a "facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151. And the alterations must comply with the 2010 Standards to be considered accessible. 28 C.F.R. § 35.15.

Here, Plaintiffs' allegations regarding the bicycle lanes are untethered to any statutory requirements, the 2010 Standards, or even the non-binding Access Board guidelines. And they fail to show any lack of meaningful access to the services at issue in the Complaint. Plaintiffs thus fail to state a plausible violation of the ADA.

### 1.    On-Street Parking

Plaintiffs broadly complain about the lack and quality of accessible parking spots on the streets that have newly constructed bicycle lanes. Compl. ¶¶ 29, 49, 50. But, even if the Court were to accept Plaintiffs' vague allegations as true, the absence of accessible parking spaces on a particular street is not a violation of the ADA.

Plaintiffs cite PROWAG regarding the minimum number of accessible on-street parking spaces in support of their claims, but the Access Board guidance instead illustrates the insufficiency of Plaintiffs' pleading. *See* Compl. ¶ 92. For starters, the District is not bound to PROWAG guidance because it has not been finalized or adopted as regulations. *See* Background above; *Sarfaty v. City of Los Angeles*, No. 17 Civ. 3594 (SVW), 2020 WL 1078804, at *5 (C.D.

Cal. Feb. 7, 2020) ("The Court declines to consider the PROWAG standards in its analysis, because … they have not yet been adopted by the DOJ, the agency responsible for implementing ADA regulations."); *Am. Council of Blind of New York, Inc. v. City of New York*, 495 F. Supp. 3d 211, 226–28 (S.D.N.Y. 2020) (same).

But even if the PROWAG guidance were instructive, it would not be necessary for the District to designate accessible parking spots alongside bicycle lanes.  Plaintiffs cite the portion of the guidance that recommends at least one accessible space *per block perimeter* where metered parking is offered.  Compl. ¶ 92; *see* R214 On-Street Parking Spaces, PROWAG, 76 FR 44664-01.  This provision means that, for example, a city is not advised to provide an accessible metered parking space on *every* side of every block with metered parking; instead, the local government is advised to have an accessible metered parking spot *on one side* of each city block. This means that the District *could* provide zero metered parking spots on District streets with protected bicycle lanes and—assuming parking was available on cross streets or the other side of the block—still be compliant with the PROWAG guidance.  Thus, the number of accessible parking spaces on a particular street, without more, does not speak to whether individuals with disabilities have meaningful access to on-street parking.  And, here, Plaintiffs have not alleged more; Plaintiffs fail to allege that individuals with disabilities are unable to meaningfully access on-street parking due to a lack of accessible parking in the area *around* bicycle lanes.  Plaintiffs have merely contended that there should be more accessible parking on particular streets, but they are not entitled to that under the ADA.  *See Jones v. City of Monroe*, 341 F.3d 474, 479 (6th Cir.2003) (rejecting an ADA claim based on plaintiff's desire to park in public parking next to her office building because the "benefit that [the city] is providing to all of its citizens, including [the plaintiff], is free downtown parking at specific locations; it is not free downtown parking

that is accessible to wherever a citizen, disabled or non-disabled, chooses to go or work.").

Thus, Plaintiffs have failed to allege a lack of meaningful access to on street parking by bicycle

lanes.

Moreover, Plaintiffs' reliance on anecdotal evidence of inaccessible on-street parking is

insufficient to state a claim under the ADA. *See Kirola v. City & Cnty. of San Francisco*, 860

F.3d 1164, 1183 (9th Cir. 2017) (finding "class members' anecdotal testimony about cracked

pavement, potholes, uneven sidewalks, and missing or difficult-to-use curb ramps did not

establish inaccessibility at a programmatic level" of public rights-of-way). Plaintiffs only allege

that there are a few places without accessible parking next to a bicycle lane. Compl. ¶¶ 29, 49,

50. But DDOT's project to install protected bicycle lanes involves the installation of 20 miles of

protected bicycle lanes. *See* Background above; Compl. ¶ 48. Here, Plaintiffs' allegations

cannot show that the District's designs for on-street parking next to a bicycle lane are in violation

of the ADA on a programmatic level.

Plaintiffs' allegations regarding the quality of accessible parking around bicycle lanes

also falls flat. Plaintiffs' allegation that the District's design for "its protected bicycle lanes

causes folding wheelchair users to be forced to assembler their wheelchairs, transfer to/from their

wheelchairs, and enter and/or exit their vehicles in the travel lane or bicycle lane" is not

supported by the facts in their Complaint. Compl. ¶ 73. Plaintiffs fail to provide *any* example of

a designated accessible parking spot that so puts wheelchair users at risk. In fact, Plaintiffs point

to an appropriately designed parking spot adjacent to a bicycle lane and generally seek more of

them. *Id.* ¶ 62.

Thus, besides their conclusory allegations that bicycle lanes have rendered parking not

generally accessible, which the Court need not accept as fact at the motion to dismiss stage,

*Iqbal*, 556 U.S. at 679, Plaintiffs here have only pled that their access to parking *on particular streets*—namely, those with new bicycle lanes—is not meaningfully accessible. *See* Compl., generally. But that's not the correct inquiry under the ADA. Under the ADA, the question is whether on-street parking in the areas where there are bicycle lanes are meaningfully accessible. And Plaintiffs have failed to plead facts that would show it is not.

### 2.    Pick up/Drop Off Zones

Similarly, Plaintiffs fail to plead sufficient facts about PUDOs that, even if true, could state a claim under the ADA. Plaintiffs allege that PUDOs have been eliminated where bicycle lanes have been installed and Plaintiffs express a general desire to have more PUDOs installed, but neither amounts to an ADA violation. *See* Compl. ¶¶ 49, 55, 89.

There is no requirement that the District provide accessible PUDOs where they do not currently exist because the ADA "does not mandate the provision of new benefits." *Am. Council of the Blind*, 525 F.3d at 1268 (quoting *Rodriguez v. City of New York*, 197 F.3d 611, 619 (2d Cir.1999) (internal citation marks omitted)). The ADA does not require a local government to provide new services to assist individuals with disabilities; the ADA only requires that public entities make services it already offers meaningfully accessible to individuals with disabilities. *Id.* at 1267 ("[W]here the plaintiffs seek to expand the substantive scope of a program or benefit, they likely seek a fundamental alteration to the existing program or benefit and have not been denied meaningful access."); *see Alexander v. Choate,* 469 U.S. 287, 303 (1985) (holding that the state was not required to expand its Medicaid benefits "simply to meet the reality that the handicapped have greater medical needs."). Here, Plaintiffs fail to grasp this distinction. Plaintiffs' allegations about a general lack of access to accessible PUDOs does not implicate the ADA; the ADA does not require that the District install accessible PUDOs where it does not already provide them to the general population.

PROWAG guidance mirrors this principle.  It does not mandate that a city create PUDOs where they do not exist.  The only guidance in PROWAG states that if a city has PUDOs, at least one PUDO per every 100 feet of loading zone should be accessible according to its guidelines. PROWAG, 76 FR 44664-01 ("Where passenger loading zones are provided, at least one passenger loading zone for each 30 meters (100 feet) of continuous loading zone space or fraction thereof must be accessible and comply with the technical requirements for passenger loading zones in Chapter R3.").  In other words, PROWAG advises that the creation of accessible PUDOs is only necessary if passenger loading zones are a service the city *already* offers; it does not mandate the creation of accessible PUDOs under any other circumstances.

Here, Plaintiffs do not allege that PUDOs exist, but are inaccessible; Plaintiffs instead allege that there are not enough accessible PUDOs.  *See* Compl. ¶¶ 49, 55, 89.  The distinction is crucial and fatal to their ADA claim.

### 3.    Pedestrian Thoroughfares

Plaintiffs make vague, conclusory allegations that the District's bicycle lanes create unsafe pedestrian thoroughfares, but fail to allege facts sufficient to support an ADA claim.  *See* Compl. ¶ 29; *Iqbal*, 556 U.S. at 679.  Plaintiffs allege that pedestrian crossings are "particularly unsafe and [it is] difficult to navigate crossings introduced by protected bicycle lanes," but the only related allegations are that bicycle lanes are designed "for high speeds," and the District does not use "structural features like speed bumps or warning tracks to slow cyclist down" near pedestrian crossings.  Compl. ¶ 82.  Plaintiffs fail to identify any factual basis for the conclusion that the design is unsafe and do not link these allegations to any accessibility concerns.  They have not, therefore, stated a plausible violation of the ADA.

### 4.    The 17th Street Example

Plaintiffs cite 17th Street NW as an example of how the District's street designs violate the ADA, but it is, instead, illustrative of the deficiencies in Plaintiffs' pleading.  *See* Compl. ¶¶ 51–71.  Plaintiffs have failed to plead facts sufficient to show that any aspect of the protected bicycle lane on 17th Street—including on-street parking, PUDOs, curb cuts, or curbside parking—violates the ADA.

Plaintiffs' allegations that a half-mile stretch of 17th Street lacks accessible on-street parking spaces are insufficient to show that individuals with disabilities lack meaningful access to on-street parking.  *See* Compl. ¶ 60.  Plaintiffs again fail to make allegations regarding accessibility in the area, generally.  There is no discussion of the accessibility of on-street parking in the area that would still allow individuals with disabilities access to the same service.  For example, as discussed above, even in PROWAG guidance, there is no requirement that individuals with disabilities be able to park on particular streets.  *See* Section I.A.1.  A city can be compliant with PROWAG guidance by providing accessible parking anywhere on the perimeter of a block.  *Id.*  This means that, for example, on-street parking with access to 17th Street may still be available to individuals with disabilities if accessible parking is available on cross streets.  Plaintiffs have pled no such lack of access; their allegations are hyper-focused on a half-mile stretch of one street, without consideration to the ADA's mandate to look at meaningful access to services.  *Am. Council of the Blind*, 525 F.3d at 1267.

Plaintiffs also allege that the District's decision not to include other services in the 17th Street redesign amounts to a violation of the ADA—but it does not.  Specifically, Plaintiffs claim that the decisions not to include curbside parking and accessible PUDOs is unlawful.  Compl. ¶¶ 53–56.  Plaintiffs do not allege that these services—PUDOS, mid-block curb cuts, and curbside parking—are included in the redesign and just not accessible to individuals with disabilities; they

want these features to be *added* to the design.  But, under the ADA, the District is under no

obligation to provide these *new* services.  *Am. Council of the Blind*, 525 F.3d at 1267.  Thus,

Plaintiffs have failed to state a claim under the ADA.

**B.** **Plaintiffs Fail to State a Claim Under the ADA for the District's On-Street Parking.**

Plaintiffs make blanket allegations about on-street parking throughout the District.  But

Plaintiffs have not alleged facts sufficient to show a violation of the ADA for these services.

For existing services in the District, like public on-street parking, the ADA implementing

regulations require that public entities "operate each service, program, or activity so that the

service, program, or activity, when viewed in its entirety, is readily accessible to and usable by

individuals with disabilities."  28 C.F.R. § 35.150(a); *Fortyune v. City of Lomita*, 766 F.3d 1098,

1102 (9th Cir. 2014) (finding that public on-street parking is a "service, program, or activity"

within the meaning of the regulation).  "Title II's emphasis on 'program accessibility' rather than

'facilities accessibility' is meant to ensure public entities provide broad access to public services,

while maintaining flexibility for these entities to choose how best to make access available."

*Wright v. Bd. of Commissioners of Cap. Area Transit Sys.*, No. CV 20-644-SDD-RLB, 2022 WL

17574078, at *10 (M.D. La. Dec. 9, 2022); *see Fortyune*, 766 F.3d at 1102–03 (noting public

entities "are not required to make structural changes to all existing on-street parking facilities if

they can make public on-street parking accessible by other means, such as by providing

accessible on-street parking at other nearby sites.") (citing 28 C.F.R. § 35.150(b)(1)); *Cohen v.

City of Culver City*, 754 F.3d 690, 697 (9th Cir. 2014) (noting that requiring disabled individuals

to "take a marginally longer route" complies with 28 C.F.R. § 35.150) (internal quotation marks

omitted)).

Plaintiffs contend that "[based] on" their allegation that "two percent of metered spaces offered by DDOT are accessible" but "at least eleven percent of the residents in the District of Columbia identify as having a mobility disability," "there is a systemic lack of accessible on-street parking." Compl. ¶¶ 98, 99. But, even if Plaintiffs' numbers are accurate, the statistic would not be sufficient to state a claim for relief under the ADA. As an initial matter, Plaintiffs have not identified any portion of the ADA, regulations, and technical guidance that require or even suggest that the number of accessible accommodations mirror the percentage of the population that identifies as having a disability. Comparing the two data points is simply not relevant to an ADA claim.

Regardless, the allegation that 2% of the District's metered parking is accessible is not sufficient to form the basis of an ADA claim. Though there are no ADA regulations directly addressing on-street parking, the 2010 Standards regarding public parking facilities suggest that the District's metered parking scheme does not violate the ADA, and Plaintiffs have failed to allege facts to show otherwise. The 2010 Standards mandate that 2% of total parking spaces at a public parking facility be accessible if there are between 501 and 1000 parking spaces and, if there are more than 1000 parking spaces, that there be 10, plus 1 for each 100 or fraction thereof over 1000, accessible parking spaces. 36 C.F.R. § Pt. 1191, App. B, Table 208.2. If this formula were applied to the purported 20,000 metered parking spaces, it would only require 210 accessible parking spaces, which mirrors the approximately 2% of accessible metered parking spaces Plaintiffs complain of. Moreover, Plaintiffs' cited PROWAG guidelines also show that their statistics are unhelpful to their argument. *See* Compl. ¶ 92. PROWAG guidelines do not address on-street public parking as a whole but provide guidance regarding the number of accessible spots on a particular block. *Id*. Even then, the guidance suggests that only 4% of the

23

total metered parking spaces on a block with more than 201 metered spaces be designated as accessible parking spots. *Id.* The fact that 2% of the metered parking in the District is designated accessible parking shows that the District's program is in step with the regulations and guidance, and Plaintiffs have failed to state a claim regarding the lack of accessible parking in the District. *Cf. Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010 (7th Cir. 2016) (affirming grant of summary judgment on ADA challenge to parking accessibility where the ratio of accessible parking spaces to overall spaces was above the relevant ADA Accessibility Guidelines).

Plaintiffs also rely on a handful of anecdotes regarding inaccessible on street parking to support their broad claim, but their allegations are insufficient to state a violation of the ADA. Plaintiffs allege that it is difficult to find accessible parking on a half-mile portion of 17th Street Northwest, on one block of Connecticut Avenue, by "the CVS at 1900 7th Street [Northwest]" and on 4th Street Southwest near the Mall. Compl. ¶¶ 52, 150, 156, 161. Plaintiffs additionally contend that some of the Red Top Meters are inaccessible but only cite four examples of Red Top Meters that are, for example, next to a bike rack or planter that Plaintiffs allege make it difficult for some wheelchair users to use. Compl. ¶¶ 123–26. Even if these anecdotes were accurate, it would not be sufficient to show that on-street parking as a whole is inaccessible because it represents a small fraction of the accessible parking offered in the District. *See Kirola*, 860 F.3d at 1183 (finding expert testimony that 1,358 out of 1,432 curb cuts inspected, 13 out of 14 sites inspected, and all 10 of the intersections inspected were inaccessible was insufficient to show inaccessibility on a programmatic level because "this evidence describes only a small part of the City's approximately 2,000 miles of sidewalks, 27,585 street corners, and roughly 7,200 intersections"). An ADA claim requires Plaintiffs to "demonstrate that the public

program in its entirety is not accessible to them by reason of their respective disabilities. Title II does not impose liability merely on a showing that there are locations" that are "part of the public program" that do not satisfy the relevant regulations. *Equal Rts. Ctr.*, 741 F. Supp. 2d at 284–85.

Moreover, Plaintiffs make no allegations about non-metered parking in the District. Plaintiffs allege that "there are hundreds of thousands of unmetered on-street parking spaces in the District of Columbia that are provided for use by members of the public," Compl. ¶ 96, but Plaintiffs do not allege whether those parking spaces are readily accessible. Plaintiffs cannot reasonably contend that the whole of the District's on-street parking scheme is inaccessible when they fail to make *any* allegations regarding the vast majority of on-street parking available in the District.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint.

Date: February 9, 2023.                                     Respectfully Submitted,

                                                            BRIAN L. SCHWALB
                                                            Attorney General for the District of Columbia

                                                            STEPHANIE E. LITOS
                                                            Interim Deputy Attorney General
                                                            Civil Litigation Division

                                                            */s/ Matthew R. Blecher*
                                                            MATTHEW R. BLECHER [1012957]
                                                            Chief, Civil Litigation Division, Equity
                                                            Section

                                                            */s/ Pamela A. Disney*
                                                            PAMELA A. DISNEY [1601225]
                                                            HELEN M. RAVE [90003876]
                                                            Assistant Attorneys General

Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 807-0371
Email: pamela.disney@dc.gov

*Counsel for Defendants*