UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

```
-------------------------------------------------x
DC CENTER FOR INDEPENDENT        :
LIVING; DUPONT EAST CIVIC ACTION :
ASSOCIATION, DANA BOLLES,        :
THEODOSIA ROBINSON,              :        CIVIL ACTION
                                 :
          Plaintiffs,            :        CASE NO.: 1:22-cv-03541-JMC
                                 :
vs.                              :        JUDGE JIA M. COBB
                                 :
DISTRICT OF COLUMBIA; and        :
MURIEL BOWSER, in her official   :
capacity,                        :
                                 :
          Defendants.            :
-------------------------------------------------x
```

## PLAINTIFFS' STATEMENT UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs DC Center for Independent Living, Dupont East Civic Action Association, Dana Bolles, and Theodosia Robinson, provide this Statement of Undisputed Facts in support of their Motion for Partial Summary Judgment, in accordance with Local Rule 7(a). Plaintiffs contend that the facts below are not in dispute:

  1) *Dana Bolles, Plaintiff*

1.    Ms. Dana Bolles lives in the Navy Yard neighborhood in the Southeast part of the District.[1]

2.    Ms. Bolles is missing both of her legs and portions of both of her arms, and uses a power wheelchair for mobility.[2]

---

[1] Ex. 15 at ¶3.
[2] *Id*. at ¶4.

1

3.      Ms. Bolles wants to be able to drive her accessible van around the District when she is unable to walk (in her wheelchair) or take the subway.[3] Ms. Bolles' van has hand controls and a ramp that deploys on the passenger side.[4]

4.      To get into the van, Ms. Bolles uses a switch on the rear passenger side, which requires that the space next to the length of the van be accessible (a flat surface without barriers).[5]

5.      Ms. Bolles often has trouble accessing parking spaces that are designated as "accessible," because they have obstacles, such as a tree box, trash can, or bicycle rack adjacent to them, which block the area where Ms. Bolles would deploy her wheelchair ramp.[6]

6.      In Ms. Bolles' neighborhood, there is metered parking with about four areas designated as accessible in a two-block radius.[7]

7.      At least two of the putatively accessible spots have obstacles on the sidewalk that make them impossible for Ms. Bolles to use.[8]

8.      Also, the signage designating the spaces as accessible has gone missing several times and taken months to be replaced.[9] Ms. Bolles took photographs of the "accessible" parking spaces in her neighborhood that have obstacles next to them which make them impossible for her to use.[10]

---

[3] *Id*. at ¶¶5-6.
[4] *Id*. at ¶¶8-9; Ex. 3 at 11:1-6.
[5] Ex. 15 at ¶11.
[6] Ex. 15 at ¶15; Ex. 3 at 20:16-21:19.
[7] Ex. 15 at ¶17.
[8] *Id*. at ¶17; Ex. 3 at 22:1-6.
[9] Ex. 15 at ¶17.
[10] *Id*. at ¶18; *Id*. at Ex. 1.; Ex. 3 at 22:7-29:21.

9.      Due to the lack of accessible parking near her house, Ms. Bolles limits her grocery shopping because she is able to carry much less when she rides on public transportation or just rolling in her wheelchair.[11]

10.     Ms. Bolles also hesitates to drive outside of the District because she is not certain she will be able to find accessible parking near her home when she returns.[12] Ms. Bolles limits her driving in the evenings because in the past she has struggled to find accessible parking near her home when she returns late.[13]

11.     The PBLs installed between the sidewalk and the parking spaces have also made it difficult for Ms. Bolles to park.[14]

12.     Without a PBL, Ms. Bolles can park if she can deploy her ramp onto an even curb.[15] In parking spaces where there is a PBL between the parking and the sidewalk, she cannot— the ramp ends too close to the curb, or the surface is uneven.[16]

13.     Often, Ms. Bolles does not even attempt to park in these spaces because she can tell they are too tight for her to deploy her ramp, and she does not want to get stuck.[17]

14.     Ms. Bolles encountered an uneven surface created by a PBL—the street being curved downward at the edge by the curb—in December 2022, on I St. SE.[18]

---

[11] Ex. 15 at ¶19; Ex. 3 at 32:10-34:19.
[12] Ex. 15 at ¶28.
[13] Ex. 3 at 51:19-52:15.
[14] Ex. 15 at ¶20.
[15] *Id.*
[16] *Id.* at ¶21.
[17] *Id.* at ¶21.
[18] *Id.* at ¶22.

15.    Though Ms. Bolles could exit her vehicle, when she returned to her car she could not get back up the ramp because the slope was too steep.[19] Ms. Bolles asked a stranger to help push her up the steep slope.[20]

16.    Ms. Bolles is consequently reluctant to try to drive and park in the District, particularly next to bike lanes.[21]

17.    When the slope is too steep, she could lose control of her wheelchair on her ramp, or tip over out of her wheelchair and hit her head.[22]

18.    Ms. Bolles is also concerned about deploying her ramp into a bike lane; even though she checks for cyclists before deploying her ramp, she still has concerns about a cyclist colliding with it.[23]

19.    Ms. Bolles has had the experience of almost getting hit by a cyclist while crossing a bike lane to get up onto the curb.[24] The cyclist was going very fast, nearly collided with her, and yelled at her.[25]

20.    Ms. Bolles identified a number of areas she would like to travel but has had difficulty parking. For example, for museums and sites like the Mall, Native American Museum, and Peace Officers' Memorial, the PBL on 4th St. SW is designed the same as the one on I St. SE, where she got stuck.[26]

21.    In July 2019, Ms. Bolles wanted to take her nieces to the Library of Congress, but

---

[19] *Id*. at ¶22.
[20] *Id*. at ¶22.
[21] *Id*. at ¶23; Ex. 3 at 46:6-12, 47:12-17.
[22] Ex. 15 at ¶23.
[23] *Id*. at ¶24.
[24] *Id*. at ¶25
[25] *Id*. at ¶25.
[26] *Id*. at ¶26; Ex. 3 at 42:7-14.

could not do so because of elevator outages and the lack of sufficient number of accessible parking spaces.[27]

22.    In the past, Ms. Bolles has tried to find accessible parking near the Mall, but was unable to find any and ended up parking at her workplace and walking from there.[28]

23.    Almost a mile stretch of New Jersey Ave. SE near the Navy Yard is also completely inaccessible to Ms. Bolles.[29] From the Capitol South Metro Station heading south there is PBL parking and other street parking where the surface is very uneven.[30]

24.    She has also encountered difficulties with a lack of accessible parking near the Wharf in Southwest.[31] There is no accessible street parking in this area.[32] Though there are spots across Main Ave., the ground is not wide or flat enough and she cannot use those spots.[33] She would like to visit the Wharf and park nearby, which she would do if there were parking in that area.[34]

25.    Where no access aisle is provided, a person with a disability can get stuck.[35] As Ms. Bolles explained:

> "First, there may not be enough space for the ramp on my van to deploy with adequate clearance to exit the vehicle – the ramp ends too close to the curb for me to get off.  While I cannot give exact locations, I have sometimes driven by parking spots on narrow streets outside of protected bicycle lanes where it looks too tight for me to deploy my

---

[27] Ex. 15 at ¶27.
[28] Ex. 3 at 44:1-20.
[29] Ex. 15 at ¶33; Ex. 3 at 41:20-42:6.
[30] Ex. 15 at ¶33.
[31] *Id*. at ¶34.
[32] *Id*. at ¶34; Ex. 3 at 57:18-59:12.
[33] Ex. 15 at ¶34.
[34] *Id*. at ¶34.
[35] Xavier Davis, Defendants' ADA Coordinator agreed that access aisles were necessary because wheelchair users need to open their car doors all the way. See Ex. 4 at 33:1-11.

ramp. When it looks tight, I do not try it because I do not want to get stuck."[36]

26.    Ms. Bolles recounted an incident where she had to request the assistance of a stranger because she parked in an on-street parking space that was too steep:

> "This happened to me in late December 2022. Because the weather was very cold and it was late at night, against my better judgment, I parked outside a protected bicycle lane on I St. SE, near my home at the time. I was able to get out, but when I returned to my car, I was not able to get back up the ramp independently– the slope was too steep for my wheelchair to get up. I had to ask a stranger to push me up the ramp."[37]

27.    Ms. Bolles has also had trouble finding accessible parking around U St.[38]

28.    When Ms. Bolles travels to places that are not accessible via public transit, several times a year, she has to make a difficult choice: she can either take a taxi or ride service, and risk getting stranded if a return ride is unavailable, or she can drive and risk not being able to find accessible parking when she returns to the District.[39]

29.    As a result of the issues with accessible parking in the District, Ms. Bolles has relied much more on Uber.[40]

30.    From June 2022 to December 2023, she spent around $170 on Uber trips within the District; she continues to take Uber.[41]

31.    She would have been able to drive her own car and avoid these costs, if accessible parking were available to her.[42]

---

[36] *See* Ex. 15 at ¶21.
[37] Ex. 15 at ¶22.
[38] Ex. 3 at 57:10-17.
[39] Ex. 15 at ¶29.
[40] *Id*. at ¶¶30-31.
[41] *Id*. at ¶¶30, 31.
[42] *Id*. at ¶30; Ex. 3 at 55:2-22.

32.     If there were more designated accessible parking spaces that Ms. Bolles could actually use, she would use them.[43]

2)  *Theodosia Robinson, Plaintiff*

33.     Ms. Theodosia "Tessie" Robinson has lived on 7th St. NW between S and R St. for over fifty years.[44] Ms. Robinson uses a rolling walker for mobility and has difficulty stepping up or down.[45]

34.     Ms. Robinson is also very sensitive to light and has to cover herself and keep her eyes down when she is outside.[46] She has a car and a disabled parking permit, which she used to use to drive herself around the District before the COVID pandemic, and she plans to use her car again.[47] She now mostly relies on rides from family or from ride services like Uber.[48]

35.     Sometimes her daughter drives Ms. Robinson's car to take her around the District.[49]

36.     There is a bicycle lane in front of Ms. Robinson's building.[50] It is located between the parking and travel lane, close to the parked cars.[51]

37.     Ms. Robinson has had close calls and has twice fallen outside her building while trying to avoid bicyclists.[52]

---

[43] *Id*. at ¶39.
[44] Ex. 19 at ¶3; Ex. 10 at 11:19-22.
[45] Ex. 19 at ¶5.
[46] *Id*. at ¶8.
[47] *Id*. at ¶6; Ex. 10 at 83:1-2.
[48] Ex. 19 at ¶7.
[49] *Id*. at ¶7.
[50] *Id*. at ¶12.
[51] *Id*. at ¶12.
[52] *Id.* at 51:21-22.

38.     These falls have aggravated the soreness from the arthritis in her knees.[53] In 2022 Ms. Robinson was once getting out of an Uber in front of her building.[54]

39.     There was no accessible space where she could be dropped off, so the Uber dropped her next to the bicycle lane and parked cars.[55] She checked for cyclists before opening the car door and did not see any coming.[56] As she opened the car door, a biker came around the corner and almost hit the car door.[57]

40.     On a different occasion, Ms. Robinson was getting out of the car in front of her building when a biker zoomed by and yelled at her to "get a bike."[58]

41.     There are about ten people who live in Ms. Robinson's building who have mobility disabilities and use wheelchairs and walkers.[59] As President of the tenants' association at her building, she has heard about and observed difficulties they have with loading and unloading due to the bike lane in front of the building.[60]

42.     The bike lane in front of the building and the removal of parking generally has made it so that there is less space for a wheelchair lift to open up and let a wheelchair user in or out of the vehicle.[61]

---

[53] *Id.* at 54:10-18.
[54] Ex. 19 at ¶13.
[55] *Id*. at ¶13.
[56] *Id*. at ¶13.
[57] *Id*. at ¶13: Ex. 10 at 30:7-31:6, 50:15-51:7.
[58] Ex. 19 at ¶14; Ex. 10 at 29:21-30:6, 53:4-54:2.
[59] Ex. 19 at ¶11.
[60] Ex. 10 at 41:1-42:2.
[61] *Id*. at 42:6-22.

43.    Ms. Robinson has observed other bike lanes throughout the District which make it difficult, particularly for individuals using MetroAccess, to safely load or unload from the vehicle.[62]

44.    Both the harm and fear of harm from bicyclists and the lack of accessible parking limit Ms. Robinson's ability to travel.[63] Ms. Robinson would like to go to the CVS at 2009 8th St. but is not able to do so because there is no accessible parking nearby.[64]

45.    She has also had difficulty finding accessible parking near her doctor at Washington Hospital Medical Clinic, 2300 M. St. SW, where she testified she had an upcoming appointment.[65]

46.    Ms. Robinson no longer goes to several museums in the District because there is less accessible parking available in that area.[66]

47.    She recalled one occasion where she was trying to go to Ben's Chili Bowl restaurant ("I wanted a half smoke") but couldn't find anywhere to park and had to turn around and go home.[67]

48.    If there were more accessible parking spaces, with room to get in and out of the vehicle without being in traffic, Ms. Robinson would use them.[68]

3)    *The DC Center for Independent Living, Plaintiff*

49.    The DCCIL was established in 1981 through Congressional Legislation to promote independent lifestyles for individuals with disabilities.[69]

---

[62] *Id*. at 44:11-45:4.
[63] *Id*. at 59-60
[64] *Id*. at 73:20-75:17; Ex. 19 at ¶10.
[65] Ex. 10 at 70, 83.
[66] *Id*. at 65:18-66:5.
[67] *Id*. at 62-63.
[68] *Id*. at ¶17.
[69] Ex. 20 at p. 15; Ex. 11 at 14:17-15:14.

50.     DCCIL is a non-profit, community-based, consumer-controlled, cross-disability center directed by individuals with disabilities.[70] The DCCIL Board is made of up of 51% of people with disabilities and the DCCIL staff is made up of 80% of people with disabilities.[71]

51.     By statutory mandate, all disabled D.C. residents are DCCIL consumers.[72]

52.     In this case, DCCIL represents the interests of its consumers.[73] As such, all affected people described herein are DCCIL consumers. In addition, the following consumers are active participants in its programs and have been injured because of one or more of the barriers at issue in this case: Deborah Barnes, Kim Bellamy, and Robin Mendes-Newell.

53.     DCCIL provides services and engages in advocacy on behalf of persons with disabilities. DCCIL is statutorily mandated to provide five core services: 1) independent living skills training, 2) peer counseling and support, 3) advocacy, 4) information and referral, and 5) transition.[74]

54.     The advocacy bucket includes "systems advocacy" under which, if DCCIL identifies a barrier that is impeding individuals with disabilities from living independently, then it has "an obligation through our mandate to go after that and fight it, remove those barriers."[75]

---

[70] Ex. 20 at p. 15.
[71] *Id.* at pp. 15-16.
[72] *Id.* at p. 2; Ex. 11 at 80:6-81:16.
[73] Ex. 11 at 79:21-80:12 and 81:7-22 ("Q. … And so, when you were looking at that list of declarations before and some of those folks, you didn't necessarily recognize their names, such as Ms. Bolles, Ms. Robinson…. If in the case it shows that those are individuals with disabilities who live in the District, would they be folks that are represented by the DCCIL, even if they've never actually become official consumers? A. Absolutely. Q. And would it be part of DCCIL's mission to ensure that those individuals with disabilities are not injured by barriers at bicycle lanes or on street parking? A. Indeed, yes.").
[74] Ex. 20 at p. 16; Ex. 11 at 19:15-22.
[75] Ex. 11 at 21:4-12.

a.  _Shuttle Van_

55.    One of the services DCCIL provides is the operation of a shuttle van that provides transportation for its consumers.[76]

56.    James Falade drives the DCCIL's passenger van which is equipped with a passenger-side wheelchair lift.[77]

57.    In 2024 and 2025, Mr. Falade transported DCCIL consumers once or twice per month, and more regularly in 2022.[78] These consumers often have mobility or vision disabilities, and use wheelchairs, canes, or walkers.[79]

58.    Richard Simms, the Executive Director of DCCIL, has advised Mr. Falade to be particularly careful when loading and unloading consumers on DCCIL's van in areas with bicycle lanes.[80]

59.    When DCCIL consumers are loaded or unloaded in a bicycle lane, there is a risk of exposure or liability for DCCIL.[81] Also, if a DCCIL consumer were injured while loading or unloading on a DCCIL van, it could discourage other consumers from traveling on the van.[82] Mr. Simms testified that if a consumer were injured in this way, "[the consumer] would lose total confidence in their ability to work with [DCCIL]… They wouldn't ride the vans again."[83] Such an injury might mean DCCIL's insurance premiums would increase.[84] Further, if a DCCIL van

---

[76] Ex. 16 at ¶¶ 9-11; Ex. 11 at 26:10-14.
[77] Ex. 16 at ¶ 5.
[78] Ex. 16 at ¶ 8; _Id._ at ¶ 7; Ex. 6 at 15:1-14.
[79] _Id._ at ¶ 9.
[80] Ex. 20 at p. 17; Ex. 11 at 71:16-19.
[81] Ex. 20 at p. 17; Ex. 11 at 73:9-14, 74:18-75:9.
[82] Ex. 20 at p. 17; Ex. 11 at 75:10-20.
[83] Ex. 11 at 78:6-10.
[84] Ex. 20 at p. 17; Ex. 11 at 75:21-77:3.

passenger were to be injured, it would impede DCCIL's mission to ensure consumers can live independently in their homes and communities.[85]

60.     Mr. Falade has observed that the individuals he transports are fearful of unloading or unloading next to a bike lane.[86]

61.     A bike lane adjacent to the curb "interferes with [his] ability to load and unload customers onto the curb."[87] For example, when he drops consumers off close to the Martin Luther King, Jr. Library on G St. NW, bike lanes make it difficult for him to drop off consumers.[88]

62.     He observed bicyclists in bicycle lanes yell at him and DCCIL consumers when they are getting on and off the van.[89]

63.     Mr. Falade stated that due to the increasing prevalence of bike lanes and the limited number of accessible-designated parking spaces, and the reduction in parking spaces overall, he has had difficulty in locating accessible areas to pick up and drop off consumers.[90]

64.     The bike lanes cause delays and make it difficult to do his job properly.[91] Sometimes Mr. Falade has to circle the block a few times to locate a place where he can pull up to the curb to load or unload consumers without parking in a bike lane.[92]

65.     When there is not a bike lane adjacent to the curb, and he can pull up directly to the curb, he is able to safely let consumers out of the vehicle.[93]

---

[85] Ex. 20 at pp. 17-18; Ex. 11 at 77:13-78:16.
[86] Ex. 16 at ¶ 12; Ex. 6 at 21:1-5.
[87] Ex. 16 at ¶ 13.
[88] Ex. 6 at 20:6-18.
[89] Ex. 16 at ¶ 14; Ex. 6 at 24:5-18.
[90] Ex. 16 at ¶ 15; Ex. 6 at 25:20-26 :2.
[91] Ex. 16 at ¶¶ 16, 17.
[92] Ex. 6 at 22:8-17.
[93] *Id.* at 23:9-11.

66.     Though Mr. Falade does not believe a consumer on a DCCIL van has been hit, he has been concerned about the risk of injury to consumers.[94] In his experience, "the situation has gotten much worse as more bicycle lanes have been installed over the years."[95] DCCIL's shuttle van would benefit from accessible parking and pick up and drop off areas if they existed.

### b. *Deborah Barnes*

67.     Deborah Barnes is a consumer of DCCIL.[96]

68.     Ms. Barnes has low vision and uses a wheelchair to ambulate.[97] Ms. Barnes is at risk of getting hit by a bicycle when she gets on and off the bus at 14th St. NW and U St. NW, due to the placement of the bike lane between the bus stop and the sidewalk.[98] The bus shelter located at this bus stop obscures the view for her to see if bicyclists are approaching as she crosses from the bus stop to the sidewalk.[99]

69.     Ms. Barnes has experienced close call situations where she has almost been hit by a bicycle when crossing from the bus stop.[100] She often either gets a ride from her friend or she takes an Uber to the Target at 3100 14th St. NW, where it is difficult for her get in and out of the car because of the placement of the bike lane between the parking spaces and the sidewalk.[101] She has to wheel herself to Park Rd. NW to use the curb cut and then into the bike lane to get into the vehicle.[102]

---

[94] Ex. 16 at ¶ 19.
[95] Ex. 16 at ¶ 20.
[96] Ex. 12 at ¶1, ¶3.
[97] *Id.* at ¶3.
[98] *Id.* at ¶ 8.
[99] *Id.* at ¶8.
[100] *Id.* at ¶ 10.
[101] *Id.* at ¶ 11-14.
[102] *Id.* at ¶ 15.

70.     Ms. Barnes fears getting hit by a bicycle when she crosses the bike lane to enter a vehicle.[103]

71.     Often the Uber drivers have to circle the block to find an area without a bike lane so that she can more safely load her wheelchair into the vehicle.[104]

72.     The placement of bike lanes and the lack of pedestrian signaling at cross walks that require crossing bike lanes have put her at risk of injury.[105]

      *c.   Kim Bellamy*

73.     Kim Bellamy is a consumer of DCCIL who is vision-impaired and uses a white cane to ambulate.[106]

74.     Ms. Bellamy travels around Washington DC using bus, rail, Metro Access, cabs, or the DCCIL van.[107]

75.     Ms. Bellamy works with a peer support group at DCCIL made up of other individuals with disabilities, which meets monthly at various locations throughout the D.C. area.[108] Ms. Bellamy hears from other members that they regularly almost get hit by bikes when crossing bike lanes.[109]

76.     When Ms. Bellamy takes Metro Access, she has had trouble getting in and out of the Metro Access vehicle because bikes in the bike lanes come by her very quickly.[110]

---

[103] *Id.* at ¶ 15.
[104] *Id.* at ¶ 16.
[105] *Id.* at ¶ 19.
[106] Ex. 14 at ¶ 3.
[107] Ex. 14 at ¶ 4; Ex. 2 at 12:5-8.
[108] Ex. 2 at 16:7-15.
[109] Ex. 14 at ¶ 5; Ex. 2 at 19:2-14.
[110] Ex. 14 at ¶ 6, 7; Ex. 2 at 20:3-9.

77.     Ms. Bellamy has also found the bus stop at 14th St. NW and U St. NW to be particularly dangerous because bikes swoop past her even when the pedestrian indicator signals her to walk.[111]

78.     She has almost been hit several times because the bikes come by without warning, requiring her to jump out of the way.[112]

79.     Ms. Bellamy and the members of her peer support group have experienced this issue at 14th St. NW and U St. NW and in other locations around DC.[113] Ms. Bellamy fears crossing the bike lane to get to and from the bus stop.[114]

80.     When Ms. Bellamy takes the DCCIL van or a cab through Transport DC, she usually does not need to cross a bike lane to get to the sidewalk, but, about three or four times a month, she does.[115]

81.     Ms. Bellamy is at risk of injury due to the placement of bike lanes adjacent to the sidewalk and next to bus stops.[116] She would feel safer crossing the bike lanes if there were additional signaling at bus stops where pedestrians have to cross to get to the sidewalk.[117]

### d. *Robin Mendes-Newell*

82.     Robin Mendes-Newell is a DCCIL consumer who travels around Washington DC using the bus, Metro Access, and being driven by her friends.[118]

---

[111] Ex. 14 at ¶ 8; Ex. 2 at 22:2-14.
[112] Ex. 14 at ¶ 9; Ex. 2 at 28:10-14.
[113] Ex. 2 at 32:6-20; 37:3-20.
[114] *Id.* at 35:20-36:4.
[115] Ex. 14 at ¶ 10; Ex. 2 at 28:15-29:10.
[116] Ex. 14 at ¶ 11.
[117] *Id.* at ¶ 12; Ex. 2 at 31:17-32:5.
[118] Ex. 18 at ¶ 4.

83.    She was almost hit at the 11th St. NW and K St. NW bus stop on September 25, 2024.[119]

84.    She was crossing the bike lane to get on the G8 bus to return to her home when a moped sped through the bike lane and hit her cane, which fell out of her hand and onto the ground.[120]

85.    She fears that she will get injured when she has to cross the bike lane to get to and from the bus stop.[121] Once a month, her friend Ms. Dozier drives Ms. Mendes-Newell to the Bank of America located at 1931 14th St. NW.[122]

86.    There is not accessible designated parking on 14th St. NW near the bank, but it is easier to get in and out of the car because the bike lane there is located between the parking lane and the traffic, rather than between the parking lane and the sidewalk.[123]

87.    When Ms. Dozier parks right next to the sidewalk, it is easy and safe for her to get her walker in and out of the car.[124]

88.    If there were additional designated accessible parking spaces located adjacent to the sidewalk, rather than a bike lane, she would use them.[125]

89.    If there were additional signaling at bus stops where pedestrians have to cross the bike lane to get to the sidewalk, it would be much safer for her to cross the bike lane.[126]

---

[119] *Id.* at ¶ 5.
[120] *Id.* at ¶ 5.
[121] *Id.* at ¶ 6
[122] *Id.* at ¶ 12.
[123] *Id.* at ¶¶ 13, 14.
[124] *Id.* at ¶ 15.
[125] *Id.* at ¶ 16.
[126] *Id.* at ¶ 17.

4)  *The Dupont East Civic Action Association, Plaintiff*

90.    DECAA is a nonprofit that promotes the interests of the residents of the District, in the greater Dupont Circle area and throughout the city.[127]

91.    DECAA's purposes include charitable and educational activities and civic and social improvements to health, safety, welfare, and quality of life.[128]

92.    DECAA members with disabilities impacted by the disability barriers in the Services at Issue include Edward V. Hanlon, Susan Meehan, Kerry Bedard, and Kevin Rogers.[129]

93.    DECAA began to advocate about PBLs when the District began a project in its neighborhood, on 17th St. NW; it subsequently formed a District-wide coalition to address concerns about various PBL projects, including disability access and other issues (such as pedestrian safety, traffic, and first responder traffic flow).[130]

94.    DECAA members pay dues, participate in meetings, discuss and vote on the organization's actions, and elect the board members who direct the organization.[131]

95.    Edward V. Hanlon joined the organization in 2018 or 2019 and has served on its board.[132] He lives in the Dupont Circle neighborhood of Washington DC.[133] From 2018 to 2020, Mr. Hanlon was the Advisory Neighborhood Commissioner for ANC2B09.[134] He has had

---

[127] Ex. 21 at Pl. 312
[128] *Id.* at Pl. 313-14.
[129] Ex. 5 at 34; Ex. 17; Ex. 13. Mr. Rogers also provided a declaration, but defendants noticed his deposition and have been unable to complete it for medical reasons; as such, plaintiffs do not rely on his declaration in this motion.  (Defendants did not notice depositions of Mr. Hanlon or Ms. Bedard.)
[130] Ex. 5 at 16-19.
[131] *Id.* at 14, 16.
[132] Ex. 17 at ¶ 5; Ex. 5 at 63.
[133] Ex. 17 at ¶ 1.
[134] *Id.* at ¶ 6.

extensive surgery on his left foot and has difficulty stepping up and down.[135] He has a metal plate, screws, wire, and an artificial joint in his left foot.[136] As such, he cannot stand on his left foot without losing his balance and risking falling.[137]

96.     In May 2021, the District Department of Transportation ("DDOT")[138] issued a plan to install PBLs along 17th St. (the "New 17th St. Plan").[139]

97.     At the time, Mr. Hanlon identified that there was no accessible-designated parking for a half-mile stretch in the New 17th St. Plan.[140] He also noted that the New 17th St. Plan lacked any accessible pick up and drop off ("PUDO") areas, despite requests from Mr. Hanlon and other DECAA members.[141]

98.     He communicated repeatedly about disability access with DDOT employees on behalf of DECAA about 17th St., as to both the New 17th St. Plan and the prior plan.[142] DDOT employees did not respond to his concerns at the time other than to say that they were not required to provide ADA accessible parking in this area or anywhere outside the Central Business District ("CBD").[143]

99.     The CBD includes 17th St. north of Massachusetts Ave., where most DECAA members live, but does not include several other DC neighborhoods such as Adams Morgan,

---

[135] *Id.* at ¶ 24.
[136] *Id.* at ¶ 24.
[137] *Id.* at ¶ 24.
[138] DDOT was established by The District Department of Transportation Establishment Act of 2002 as a cabinet-level agency responsible for the management of transportation infrastructure and operations within the District. *See* Department of Transportation Establishment Act of 2002, D.C. Law 14-137, § 2, 49 DCR 3444 (2002).
[139] Ex. 17 at ¶ 8.
[140] *Id.* at ¶ 9.
[141] *Id.* at ¶ 10.
[142] *Id.* at ¶ 12.
[143] *Id.* at ¶ 13.

Columbia Heights, Petworth, Georgetown, Cleveland Park, most of Capitol Hill and all of Wards 1, 3, 4, 5, 7, and 8.[144]

100.    DDOT went forward with construction of 17th St. as provided for in the Plan.[145]

101.    DECAA members were concerned that the New 17th St. Plan was much less safe for persons with disabilities.[146]

102.    Mr. Hanlon saw that drivers parking on the west side of the street would need to exit directly into traffic, and drivers on the east side of the street would need to exit their vehicles directly into a PBL and then into a bike lane before being able to get to a sidewalk.[147]

103.    In 2021, DECAA held a rally about these concerns.[148]

104.    Susan Meehan, who uses a mobility scooter, and Kevin Rogers, expressed accessibility and safety concerns.[149]

105.    Mr. Hanlon took photographs of Ms. Meehan and recorded a video of DECAA member Kevin Rogers encountering and describing the new barriers.[150]

106.    Because of the New 17th St. Plan, individuals with disabilities who use folding wheelchairs, like Mr. Rogers, must assemble their wheelchairs directly in a vehicular traffic lane or in a bike lane, potentially risking a deadly collision.[151]

107.    The bike lane installed on one side of 17th St. is "protected" by concrete blocks, and plastic pylons which also make it difficult or impossible for persons with disabilities to exit their

---

[144] *Id.* at ¶ 13.
[145] *Id.* at ¶ 13.
[146] Ex. 17 at ¶ 18; Ex. 5 at 18, 34-35; Ex. 13 at ¶ 4.
[147] Ex. 17 at ¶ 19.
[148] *Id.* at ¶ 22.
[149] *Id.* at ¶ 22; Ex. 5 at 61-62.
[150] Ex. 17 at ¶ 21; Ex. 22.
[151] Ex. 17 at ¶ 21.

vehicles.[152] Mr. Hanlon has tripped on these concrete blocks while exiting his car on 17th St. and has had near-collisions with bicyclists in the PBL.[153]

108.    Before implementation of the New 17th St. Plan, Mr. Hanlon proposed to DDOT an alternative plan to reroute parts of the 17th St. bike lane onto Massachusetts Ave., 18th St., and then New Hampshire Ave..[154] To his knowledge, DDOT has not studied this proposal.[155]

109.    Kerry Bedard is another long-time, active member of DECAA who has several mobility disabilities.[156]

110.    Ms. Bedard sometimes relies on a cane or mobility scooter to ambulate.[157] She lives on N St. NW, near 21st St.[158] She has struggled with curb access and parking, particularly since the construction of the bike lane.[159] She often drives around D.C. and uses a disabled parking permit.[160] She uses the "Red Top" meter spaces and curbside parking.[161]

111.    Due to her disability and service dog, Ms. Bedard has difficulty parking next to the bicycle lane because she cannot safely exit her car without stepping into or walking through a bicycle lane.[162]

---

[152] *Id.* at ¶ 23.
[153] *Id.* at ¶ 24.
[154] *Id.* at ¶ 27.
[155] *Id.* at ¶ 27.
[156] Ex. 13 at ¶5.
[157] *Id.* at ¶7.
[158] *Id.* at ¶9.
[159] *Id.* at ¶11.
[160] *Id.* at ¶12.
[161] *Id.* at ¶12.
[162] *Id.* at ¶13.

112.    In the Fall of 2021, Ms. Bedard tried to park in a space next to the bike lane on 17th St. and was nearly hit by a bicycle as she stepped out of her vehicle.[163] She feels unsafe crossing a bicycle lane, even at crosswalks.[164]

113.    She used to regularly go to the Safeway and hardware store on 17th St.[165] When DDOT added a bicycle lane on 17th St., she was no longer able to find accessible designated parking near those stores.[166]

114.    Following the addition of the bicycle lane on 17th St., she has opted to go to different stores that are further away.[167]

115.    She would return to the stores she used to go to on 17th St. if there was more accessible parking close to the stores as there was before the bike lane was constructed.[168]

116.    Ms. Bedard also regularly used to go to Connecticut Ave. between N and M St.[169] She would use Red Top parking spaces when travelling there.[170] She learned that DDOT would be adding a bike lane to that street and stopped going as frequently due to her fear of being able to park easily.[171]

117.    Though she understands that DDOT has changed this planned bicycle lane, she is concerned about future bicycle lanes.[172]

---

[163] *Id.* at ¶14.
[164] *Id.* at ¶15.
[165] *Id.* at ¶16.
[166] *Id.* at ¶16.
[167] *Id.* at ¶¶ 16-17.
[168] *Id.* at ¶17.
[169] *Id.* at ¶18.
[170] *Id.* at ¶18.
[171] *Id.* at ¶18.
[172] *Id.* at ¶19.

118.    Ms. Bedard believes that the DDOT's plans to continue to add bike lanes will make it harder for her and other individuals with disabilities to move around the District and park safely.[173]

119.    If there were more accessible parking spaces in the District, Ms. Bedard would use them.[174]

A.    **On-Street Parking in the District Is Inaccessible to Persons with Disabilities.**

120.    The District determines which on-street parking spaces are free, which ones are metered, and where the meters are located.[175]

121.    There are 20,000 metered parking spaces in the District.[176] There are generally 150,000 residential permit parking spaces in the District.[177] There are generally 600 diplomatic parking spaces in the District.[178] There are generally 230,000 undesignated parking spaces in the District.[179]

1)    *Defendants' Admissions Concerning Accessible Parking.*

122.    At a town hall meeting on January 25, 2022, Everett Lott, Director of DDOT, repeated three times: "we're not legislatively mandated outside of the central business district" to provide accessible parking.[180]

---

[173] *Id.* at ¶19.
[174] *Id.* at ¶20.
[175] Ex. 4 at 86:9-87:3; Ex. 8 at 22:11-12
[176] Ex. 8 at 32:21-33:2.
[177] *Id.* at 34:3-14.
[178] *Id.* at 34:17-20.
[179] *Id.* at 34:21-25.
[180] *See* R. Doc. 1, ¶ 108; R. Doc. 25-1, ¶ 108 (admitting that Everett Lott participated in a virtual town hall on January 25, 2022, and contending that "the video is the best evidence of its contents."); *see also* The Luv Lounge Radio Show, hosted by DJ One Luv, *DCDBP Virtual Town Hall on DDOT Bike Lanes with special guest DDOT Director Everett Lott*, YOUTUBE (Jan. 27, 2022), https://www.youtube.com/watch?v=wcaeAAJ47bo ("[15:07] [W]e're not legislatively

123.    This same sentiment was mirrored in an internal document where the DDOT noted that they needed to "Identify where gaps in rulemaking impede installation of accessible parking" and adjacent to that statement was the bullet point "* No requirement for accessible parking outside of CBD and Stadium Zone[.]"[181]

124.    Indeed, even as recently as March 2024, DDOT Transportation Planner Matthew Spaniol stated that, "Accessible spaces are not required outside of the CBD and Stadium Zone at present. Currently, many of our meters outside of these areas are not ADA compliant and payment is waived for drivers with disability placards as a result."[182]

125.    The DDOT's ADA Coordinator admitted that the ADA mandates that government entities, such as the District, must provide on-street designated accessible parking spaces in commercial zones.[183]

126.    When he inquired about adding designated accessible parking spaces in commercial zones that are not in the CBD, he was told that "They were looking into it. It was a good idea."[184] David Lipscomb, DDOT's Curbside Programs Manager, also wondered why there were no designated-accessible parking spaces outside of the CBD and Stadium Zone.[185] Mr. Lipscomb "essentially gave a project to a group of students in a class to develop criteria for proactively

---

mandated outside the Central Business District—and let me repeat that—we're not legislatively mandated outside the [15:15] Central Business District. We also work with our ADA coordinators, our accessibility coordinators, to pinpoint accessible parking and loading locations. [15:25] And I'll just repeat that again. While we're not legislatively mandated outside the Central Business District we do however work [15:31] with our ADA coordinators to pinpoint accessible parking as well as loading locations.").

[181] *See* Ex. 23 at DEF-2022-cv-03541-00003408.

[182] *See* Ex. 24 at DEF-2022-cv-03541-00034704.

[183] Ex. 4 at 44:20-24.

[184] *Id.* at 46:4-21.

[185] Ex. 9 at 11:21-12:3; 44:24-45:6.

targeting zones where accessible parking spaces may be in demand."[186] However, nothing came from this project.[187]

127.    A 2006 document created by Defendants' Office of Civil Rights entitled "ADA Guidelines for Accessibility in the Right-of-Way" includes a detailed discussion and diagrams of accessible on street parking and passenger loading zones.[188]

128.    In a DDOT parking program presentation, a slide entitled "Challenges of Existing Programs" includes admissions that there is "no program for accessible parking on metered blocks outside of CBD and Stadium Zone" and that "DMCR rulemaking and Curbside management policy do not align with forthcoming federal guidelines."[189]

2)  <em>Accessible Parking Programs</em>

129.    The only putatively accessible non-residential parking programs in the District are Red Top Meters and Accessible Stadium Zone Meters.[190] There are also ADA Visitor Parking Zones, but they are not yet formalized into a program.[191]

130.    These programs add up to handful of spaces: 298 "Red Top Meters" in the CBD, about 19 red pole accessible parking spaces in the stadium zone, and about 32 accessible metered parking spaces in the Greater U St. Corridor Performance Parking Zone, 80 designated-accessible free visitor parking spaces.[192] Other commercial zones or corridors with a high density of commercial facilities such as Kent Ave. SE, Columbia Road NW, and Barracks Row, all do not

---

[186] Ex. 9 at 45:18-22.
[187] *Id.* at 48:5-12
[188] *See* Ex. 25 at DEF-2022-cv-0033266-0033269.
[189] Ex. 23 at DEF-2022-cv-03541-00003395.
[190] Ex. 8 at 19:18-20:10.
[191] *Id.* at 20:4-12.
[192] *Id.* at 36:5-16.

have designated-accessible on-street parking.[193]

131.    In discovery, the Plaintiffs requested information pertaining to designated-accessible on-street parking spaces in the District; Defendants produced an Excel Spreadsheet (the "Spreadsheet").[194]

132.    The Spreadsheet contains two tabs. The first tab is entitled "Accessible Parking Zones" and lists the locations of 98 putatively accessible parking spaces.[195] The second tab is entitled "Red Top Meter Spaces" and lists the locations of 289 Red Top Meter Spaces.[196] The District still claims the Spreadsheet is "fairly accurate."[197]

133.    Red Top Meters are parking meters with red identifying paint on them, signifying that they serve designated-accessible parking spaces.[198]

134.    DDOT's Curbside Manager, David Lipscomb, could not recall any Red Top Meter that contains a marked access aisle.[199]

135.    He admitted that there was an understanding that the Red Top Meters may be difficult to identify by someone driving by because the top of the painted dome is only thirty-six inches off the ground.[200]

136.    Prior to the Red Top Meter program, there were no ADA spaces in the District.[201] The Redtop Meter program was launched in 2017.[202] Red Top Meters are located only in the CBD;

---

[193] *Id.* at 28:2-29:19.
[194] Ex. 27; Goodell Aff. ¶ 28.
[195] Ex. 27.
[196] *Id.*
[197] Ex. 8 at 42:22-43:5.
[198] Ex. 4 at 43:23-44:5.
[199] Ex. 9 at 39:2-8.
[200] *Id.* at 40:8-41:2.
[201] Ex. 8 at 45:13-16.
[202] *Id.* at 44:12-14.

the DDOT ADA Coordinator does not know why they are not elsewhere.[203]

137.    There is one location in the District where the DDOT installed two on-street parking spaces that are largely accessible to persons with disabilities. At K St. NW and 4 1/2 St., Defendant installed two putatively accessible on-street parking spaces. Plaintiffs referred to these spaces as an exemplar in the Complaint because they are mostly accessible: They contain an access aisle, the access aisle is not in the bicycle lane, the route to the curb cut is not obstructed by bollards or concrete tire stops, and the ground surface is marked with the symbol of accessibility.[204]

138.    During a "Virtual Town Hall" on January 27, 2022, Mr. Everett Lott, then the director of the DDOT, discussed on-street parking.[205]

139.    Mr. Lott utilized a slide deck that had the markings of the "Government of the District of Columbia Muriel Bowser, Mayor" in the bottom right hand corner.[206] Page 8 of Mr. Lott's presentation contains an aerial photograph which is described as "Designated ADA and Loading Features on K St. NW[.]"[207] The two parking spaces, which are clearly visible from the photograph, are circled in red and are labeled "ADA parking[.]" Adjacent to these spaces is another area circled in red and labeled "Loading/PUDO[.]"[208]

140.    At deposition, one of the District's representatives referred to these spaces as a

---

[203] Ex. 4 at 44:13-16.& 45:4-12.

[204] *See* R. Doc. 1, ¶ 62 and n. 15.

[205] See R. Doc. 1, ¶ 108; see also, R. Doc. 25-1, ¶ 108 (admitting that Everett Lott participated in a virtual town hall on January 25, 2022, and contending that "the video is the best evidence of its contents."); *see also*  The Luv Lounge Radio Show, hosted by DJ One Luv, *DCDBP Virtual Town Hall on DDOT Bike Lanes with special guest DDOT Director Everett Lott*, YOUTUBE (Jan. 27, 2022), https://www.youtube.com/watch?v=wcaeAAJ47bo.

[206] *See* The Luv Lounge Radio Show, hosted by DJ One Luv, *DCDBP Virtual Town Hall on DDOT Bike Lanes with special guest DDOT Director Everett Lott*, YOUTUBE (Jan. 27, 2022), https://www.youtube.com/ watch?v=wcaeAAJ47bo, at 14:07.

[207] *Id*.; *see also* Ex. 28 at Pl. 017946.

[208] *See* Ex. 28 at Pl. 017946.

"pick-up and drop-off zone[.]"[209] Whether PUDO or parking, however, there is no colorable dispute that the spaces are a rare example of an "ADA space"[210] that is largely accessible and compliant, created only as an ad hoc response to community complaints.[211]

141.    In May of 2020, Defendants admitted that one "challenge" they had was ensuring "curbside access via a curb cut that has no more than an 8 percent running slope and no protrusion/gap that is more than half-inch in height or width."[212] Unfortunately, Defendants have not acted to address this "challenge." [213]

### 3) *Expert Analysis and Findings*

142.    Plaintiffs engaged two experts: an engineer with significant experience with ADA inspections, Mr. Nicholas Heybeck, P.E., and a statistician, Dr. Eric Heidel. Mr. Heybeck evaluated the overall quantity of putatively accessible parking in the District and found it to be wholly lacking. There are 250,000 general parking spaces in the District.[214] There are eight wards in the District, and Mr. Heybeck mapped the 387 putatively accessible parking spaces identified on the Spreadsheet across these wards.[215]

143.    For each ward, Mr. Heybeck determined that, at an absolute minimum, there should be 310 designated accessible parking spaces per ward.[216]

144.    Mr. Heybeck, which found that, even using the most conservative estimates,

---

[209] Ex. 8 at 81:5-6.
[210] *See* Ex. 28 at Pl. 017936.
[211] Ex. 8 at 129:13-22 ("Oh, you know, those . . . free ADA visitor parking spaces are likely . . . results of that community engagement process where if there's a need for a space, there are ways of reaching out to the – reaching out to the District and – and receiving it or at least requesting it and then having that be assessed and installed based on that assessment.").
[212] *See* Ex. 26 at DEF-2022-cv-00035578.
[213] Ex. 29 at p. 53.
[214] Ex. 29 at p. 4.
[215] *Id.* at p. 5.
[216] *Id.* at p. 14.

Defendant would need approximately 2,480 designated accessible parking spaces, but only has 387 putatively accessible spaces.[217]

145.    The data demonstrates severe deficiencies in accessible parking across the District: seven wards contain drastically fewer spaces than the minimum 310 required per ward, and Ward 2, despite having the most accessible spaces, still falls short of the minimum 1% standard suggested by the ADAAG.[218]

146.    Ward 3 has a mere four accessible parking spaces; Ward 5 has two.[219]

147.    Moreover, even when Defendants provide parking spaces that they claim are accessible, the results are grossly inadequate. Mr. Heybeck performed an objective survey of 73 of the putatively accessible parking spaces. The parking spaces to be surveyed were randomly selected by Plaintiffs' statistician.[220]

148.    Of the surveyed parking spaces that the District claims are accessible, an incredible 32 spaces, or 44%, did not exist—meaning that the location that the District claimed had an accessible parking space did not have a putatively accessible parking space.[221]

149.    Of the spaces Mr. Heybeck could locate, 98% were missing an access aisle, 95% had non-compliant ground surfaces, 80% had non-compliant identification signs, and 61% were

---

[217] Ex. 29 at pp. 5 and 14.
[218] Ex. 29 at p. 5. The Americans with Disabilities Act Accessibility Guidelines ("ADAAG") are design standards published by the U.S. Access Board and adopted by the DOJ that provide specific technical requirements for accessibility in facilities and spaces subject to the ADA. These guidelines establish minimum criteria for making spaces accessible to individuals with disabilities. The applicability of the ADAAG to on-street parking is discussed in detail in the law and analysis sections of this memorandum.
[219] Id. at p. 5.
[220] Id. at p. 6; see also, Ex. 30 at p. 3 ("The randomly chosen 78 parking spots were highlighted and then sent to the legal team for delivery to the inspector."); see also, Ex. 31 (affidavit of Heidel).
[221] Ex. 29 at p. 53.

of an inadequate width.[222]

150.    Most concerning is that 100% of the surveyed spaces were missing the accessible route connecting the parking space to the adjoining circulation path as required by 2010 ADAAG 502.3.[223]

151.    Many of the Plaintiffs have personally experienced the difficulty caused by a parking space not being located along an accessible route.[224]

152.    Mr. Heybeck performed a "verification" or "cross check" of the Defendants' published accessible parking data by surveying four prominent locations of the District for additional accessible spaces.[225]

153.    Three of the four locations surveyed had no additional spaces; in one location, Mr. Heybeck found two spaces marked as "accessible," but both were non-compliant with the ADAAG.[226]

154.    Based on this cross check, Mr. Heybeck determined that "there is not a significant number or even any additional accessible parking spaces that are compliant in the District."[227]

155.    Mr. Heybeck found that 68% of the parking spaces he surveyed had sufficient space to construct a compliant access aisle.[228] Mr. Heybeck went on to explain that "[t]he other 32% could likely be slightly relocated to adjacent areas and also have compliant access aisles designed

---

[222] *Id.* at pp. 53-54.
[223] *Id.* at pp. 16, 21, 26, 29, 32, 39, 45, 52, and 53 (labeling this violation in his summary as "Non-Compliant Access Aisle Connection.")
[224] Ex. 15 at ¶¶ 15-18, 20-22, 24-25 and 32-34; Ex. 19 at ¶ 13; Ex. 17 at ¶¶ 19-21 and 23-26; Ex. 12 at ¶¶ 11-16; Ex. 13 at ¶¶ 13-14 and 16.
[225] Ex. 29 at pp. 4-5.
[226] *Id.* at p. 54.
[227] *Id.* at p. 54.
[228] *See Id.* at p. 54.

and constructed."[229]

156.    Finally, Mr. Heybeck surveyed three different streets in the District where PBLs have been installed. For these three streets, Mr. Heybeck utilized the 2010 ADAAG and the Public Right-of-Way Accessibility Guidelines ("PROWAG").[230]

157.    At 17th St., Mr. Heybeck found that all eleven putatively accessible parking spaces lacked an access aisle and failed to provide a direct connection to the adjacent sidewalk. Based on his inspection, review of the building plans, historical images, etc., Mr. Heybeck opined as follows:

> "Based on the alterations of 17th ST NW, the parking spaces have become less accessible over the past 10 years.  Prior to July 2018, cars could at least park abutting the curb and potentially use the curb somewhat as an access aisle.  The parking stoppers and vertical vehicular control devices added are a direct obstruction to individuals attempting to load and alight a vehicle and a direct obstruction to the use of vans with deployable ramps. Additionally, individuals in wheelchairs are now required to load and alight direcly [sic] into the only single traffic lane. The parking stoppers and vertical vehicular control devices also impede disabled pedestrians who are attempting to navigate from their vehicle to the curb. The parking stoppers and vertical vehicular control devices also impede vehicles that are attempting to pick up or drop off individuals onto the curb using a deployable lift, such as a paratransit van or a commercial transport vehicle with a deployable lift.  Prior to the barrier installation, vans with deployable ramps could deploy their ramps directly onto the adjacent curb.  The alterations brought about by the District have resulted in the street being much less accessible to individuals in wheelchairs."[231]

158.    Mr. Heybeck offers similar opinions as to the other two streets with PBLs he surveyed, 11th St. NW and 4th St. SW.[232]

---

[229] See Id. at p. 54.

[230] The PROWAG is similar to the ADAAG, and many of the requirements overlap. The PROWAG was drafted by the Access Board for public right-of-way locations. But as is discussed below, the PROWAG has not yet been adopted by the DOJ.

[231] Ex. 29 at p 39.

[232] Id. at pp. 40-52 (results of 11th Street and 4th Street surveys) and 54 (global conclusions that specifically reference inspection of blocks containing PBLs).

159.    At all three locations—17th St., 11th St., and 4th St.—all the putatively accessible spaces Mr. Heybeck inspected failed to provide a direct connection from the parking to the sidewalk via an accessible route.[233]

160.    One exemplar accessible space exists in the District.[234] This accessible-designated space on K St. has ground markings, is adjacent to an access aisle, is not obstructed by bollards or vertical tire stops, and is directly adjacent to a curb cut.[235] As Mr. Heybeck explained, "with some planning and forethought it is not difficult to provide compliant accessible street parking even on streets with bike lanes."[236]

161.    At the PBLs, as was explained by Mr. Heybeck, the vertical bollards and concrete tire stops adjacent to the bicycle lane prevent deployment of a lift or ramp.[237]

162.    Defendants produced a report by Dr. Kevin L. Johnson, P.E.[238] In his report, Mr. Johnson does not contest Mr. Heybeck's surveying techniques, measurements, inspection scope, sample size, substantive findings, or opinions concerning the impact of the bicycle lanes.[239]

163.    He does not even address Mr. Heybeck's finding that many of the putatively accessible parking spaces listed on the Spreadsheet do not exist.[240]

164.    Instead, Mr. Johnson's rails against the applicability of the ADAAG. Mr. Johnson reviews the definitions of "site," "facility," "building," and "element," and opines that on-street parking falls within none of those definitions. Based on that, he proclaims that "on-street parking

---

[233] Ex. 29 at pp. 39, 45, and 52.
[234] *See* Ex. 29 at p. 55.
[235] *See Id.* at p. 55.
[236] *See Id.* at p. 55.
[237] Ex. 29 at p. 39
[238] Ex. 36.
[239] *Id.*
[240] *Id.*

is not governed by the DOJ's 2021 ADA Standards[]" and "[t]hus all Opinions, Findings, Evaluations, Global Conclusions, and Recommendations in the Heybeck Expert Report are irrelevant to this case."[241]

165.    Mr. Johnson did not survey the District or the accessibility on-street parking in the District and compare it to any metric. Mr. Johnson offers nothing of substance to this case.[242]

166.    Mr. Heybeck reviewed Mr. Johnson's report and issued a rebuttal statement. In response to Mr. Johnson's assertion that the ADAAG is "irrelevant" to on-street parking, Mr. Heybeck responded in rebuttal that "Based on my knowledge, training, and experience, I am not aware of any accessibility guidelines that would be more apt or appropriate than the UFAS, ADAAG and PROWAG for on-street parking."[243]

167.    Mr. Heybeck went on to rebut Mr. Johnson by explaining:

> "Mr. Johnson refers to my citation to the ADAAG in reviewing the on-street parking as 'irrelevant.' I am not aware of any reason why on-street parking spaces should differ from parking spaces in a lot or garage. Similar to a wheelchair user in a parking lot or garage, an individual in a wheelchair parking on the street must be able to safely park their vehicle, and exit their vehicle or transfer out of the vehicle and into a wheelchair. I am not aware of the transfer methods of individuals with disabilities being different in a parking lot than on-street. I have no reason to believe that the process of assembling a wheelchair would be different on-street than it would be in a parking lot or garage. They also must be able to maneuver safely to the adjacent sidewalk."[244]

---

[241] *Id.* at p. 3.
[242] It should be noted that the DDOT's own ADA Coordinator, Xavier Davis, disagrees with the District's ADA Expert. Mr. Davis stated that the ADA mandates that local municipalities like the District must provide designated accessible parking spaces in commercial zones. (Ex. 4 at 44:20-24). Mr. Davis stated that where designated on-street parking is provided, accessible parking must be provided. (*Id.* at 71:19-23) He stated that for a designated accessible parking space, an access aisle must be provided for the full length of the parking space and shall connect to a pedestrian route. (*Id.* at 72:9-16). He believes that with respect to on-street designated accessible parking spaces, the required accessible route must lead to a sidewalk. (*Id.* at 35:4-36:6)
[243] See Ex. 35 at ¶ 7.
[244] See Ex. 35 at ¶ 8.

168.    The PROWAG has not yet been published by the DOJ, but—as defendants admit[245]—it is also a valuable reference. [246]

**B.    Defendants' Ongoing Protected Bicycle Lane Alteration Program Adds Accessibility Barriers, After the Passage of the ADA.**

169.    The District has undertaken a sweeping PBL program—major, physical alteration of streets—that has both failed to remedy the broad inaccessibility of its on-street parking and created new accessibility barriers known to, but disregarded by, the District.[247]

170.    As noted, a PBL has a physical barrier between the bicyclist and automobile traffic.[248] The barrier can be flexible posts, concrete barriers, or a row of parked cars.[249] PBLs were created within the District in the last ten (10) years.[250] There are approximately 40 miles of PBLs in the District.[251]

171.    The District is currently building at least seven more miles of bicycle lanes in an ongoing and deliberate redesign of its streets.[252]

172.    The District ultimately envisions installing 180 miles of bicycle lanes under the

---

[245] Ex. 32 at DEF-2022-cv-03541-00024943.

[246] Transportation for Individuals With Disabilities; Adoption of Accessibility Standards for Pedestrian Facilities in the Public Right-of-Way, 89 FR 10,2801 (Dec. 18, 2024) ("DOT's authority does not extend to regulating the accessibility of other separate elements of the public right-of-way, such as on-street parking spaces, crosswalks, or sidewalks, with the exception of the elements mentioned above, as applied to transit stops. Such other elements in the public right-of-way fall under the jurisdiction of the [DOJ] under Title II, Part A, of the ADA.").

[247] *See, e.g.*, Ex. 8 at 50, 64:6-13 (acknowledging that there were "no designated ADA or accessible parking spaces, metered or otherwise," on a section of 17th Street, and that purportedly accessible metered parking was only added "after implementation . . . based on community input and feedback.").

[248] Ex. 7 at 22:16-18.

[249] *Id.* at 22:19-23

[250] Ex. 4 at 74:20-75:1.

[251] Ex. 8 at 50:25-51:3.

[252] *Id.* at 49-50, 52.

Bicycle Priority Network program.[253] The "preferred configuration" of the District is to install PBLs on both sides of the street, such that there are physical barriers to parking and curb access along the entire block on both sides.[254]

173.    The long list of considerations for such redesigns, as stated by defendants' representative at deposition, contained no reference to access for people with mobility disabilities, much less to the requirements of the ADAAG or PROWAG.[255]

174.    Prior to the installation of PBL, one side of the car provided barrier-free access to the curb.[256]

175.    Now if a car pulls over to a parking space, there is a both buffer zone and a bicycle lane between the individual and the curb.[257] Prior to the PBL, a paratransit vehicle with a side-loading ramp that is located on the passenger side could pull up to the curb and allow wheelchair users to access the curb; now, since there are PBLs, they cannot.[258]

176.    Overall, there are 25 to 30 segments of PBLs in the District.[259] Mr. Goodno has designed 10 or 12 of these segments.[260] Of the PBL segments Mr. Goodno has managed, he could only recall one segment (K Street) where the District incorporated accessible designated parking spaces.[261]

177.    The PBLs on 17th St. were installed in the Fall of 2020.[262] It was not until July of

---

[253] Ex. 7 at 28:18-29:8.
[254] Ex. 8 at 57.
[255] *Id.* at 59-61.
[256] Ex. 15 at ¶¶ 11-12.
[257] Ex. 8 at 65:3-22
[258] Ex. 8 at 74:11-75:19
[259] Ex. 7 at 32:24-33:6.
[260] *Id.* at 32:6-23.
[261] *Id.* at 36:1-16.
[262] *See* Ex. 1 at 19:10-13.

2021 that DDOT went out "to kind of map out some places where we could put dedicated handicapped spots around the corridor."[263]

178.    Mr. Heybeck determined that the PBL on 11th St. NW was installed between September 2011 and June 2013.[264] Mr. Heybeck determined that the PBL on 4th St. SW was installed between August 2014 and November 2017.[265]

179.    DDOT's own ADA Coordinator agrees that the creation of the PBLs triggers the alteration standard.[266]

180.    At 17th St. NW, in 2020 and 2021, Defendants performed substantial modifications by installing a PBL and, later, several putatively accessible parking spaces. The process involved creation of a detailed plan, and physical construction in the form of removing the existing parking and re-installation of a street setup.[267] A portion of the 17th St. redesign diagram is reproduced below, showing the newly installed lanes (from top to bottom): sidewalk, parking or empty space (8' wide), roadway (11' wide, with combined bicycle and car travel), parking space (8'), bicycle lane buffer area (3' wide – the circles represent plastic posts and the horizontal lines represent concrete curbs), protected bicycle lane (6' wide), streateries or empty space (8' wide – with cross hatches), and, finally, the sidewalk.[268]

---

[263] *See* Ex. 1 at 30:5-12.
[264] Ex. 29 at p. 41.
[265] *Id.* at p. 47.
[266] Ex. 4 at 75:9-17.
[267] *See* Ex. 33 at DEF-2022-cv-03541-00004650 (at 17th St. NW and P St. NW).
[268] *Id.* at DEF-2022-cv-03541-00004651 (near 17th Street NW and Church St. NW).



181.    In some other locations, the setup consists of roadway, parking space, bicycle lane buffer area, bicycle lane, and streatery/empty area.[269]

182.    Per the construction documents for 17th St., there is an eight (8) foot wide span between the bicycle lane and the sidewalk that is marked as "existing streaterie."[270]

183.    Prior to the installation of PBLs, cars, vans, buses, or other vehicles could pull up to the curb and pick-up and drop-off passengers directly onto the sidewalk.[271]

184.    Defendants have even made admissions via publication. For example, in the May 2020 edition of Parking & Mobility, four of Defendants' employees published an article entitled *Bicycles, Wheelchairs, and Freight at the Curb*.[272]

185.    As Defendants' employees admit, a "twist to the challenge of parking/loading protected cycletracks is the issue of accommodating the individual with mobility needs."[273]

---

[269] *See* Ex. 33 at  DEF-2022-cv-03541-00004652 (at 17th St. NW and Corcoran St. NW).
[270] *See* Ex. 33 at DEF-2022-cv-03541-00004651 (near 17th St. NW and Church St. NW).
[271] Ex. 15 at ¶¶ 20-24; Ex. 34 at ¶¶ 10-13 and 17; and Ex. 29 at p. 39.
[272] *See* Ex. 26
[273] See *Id.*

Defendants explain that, from the perspective of a driver with a disability, PBLs create the following issues:

- "First, there is inadequate buffer space for a customer in a wheelchair, considering turning radius needs of their wheelchair.

- Second, there is the challenge of ensuring curbside access via a curb cut that has no more than an 8 percent running slope and no protrusion/gap that is more than half-inch in height or width.

- Third, parking activity may be limited for mobility impaired customers but there are mobility service providers that provide frequent service, such as transit and paratransit, where protected bicycle lanes impose an undue hardship for individuals with disabilities." [274]

186.    Defendants admit that PBLs "can create obstacles or physical barriers for persons with disabilities in terms of services or usages curbside."[275]

187.    This article was written by four DDOT employees, who each supplied their formal DDOT email address at the end of the article. [276]

188.    Plaintiffs' expert found the modification of PBLs constitute "alterations."[277]

189.    Defendants admitted that at least seven more miles of bicycle lane installations are planned, and that the "preferred configuration" involves installing barriers on both sides of the street.[278]

190.    To install a PBL, the Defendants remove some or all of the existing parking, install a new bicycle lane and a bicycle lane buffer area consisting of concrete tire stops and vertical

---

[274] *See* Ex. 26 (emphasis added).
[275] *See* Ex. 26 at DEF-2022-cv-00035578; see also, Ex. 7 at 67:20-68:5 (admitting that the buffer zone in a PBL "could provide some difficulty" for wheelchair users attempting to access the curb.).
[276] *See* Ex. 26.
[277] Ex. 29 at p. 39.
[278] Ex. 8 at 52:17-20.

bollards, and place new parking spaces adjacent to the roadway.[279]

191.    Under this new arrangement, persons with disabilities can no longer load/unload directly onto the sidewalk from their vehicle or a passenger transport van.[280]

192.    When 17th St. was originally altered, no new designated accessible parking spaces were constructed.[281] Only after-the-fact did Defendants claim to install putatively accessible parking spaces.[282] At 4th St., Mr. Heybeck only located three putatively accessible parking spaces, which "for the evaluated area" was "not sufficient."[283]

193.    The PBLs add several new accessibility barriers, including: (i) vertical bollards and concrete tire stops make deploying a ramp impossible; (ii) ground surfaces adjacent to the PBLs were uneven,[284] which can result in a wheelchair user getting stuck[285] or a wheelchair rolling away during transfer;[286] (iii) assembling a wheelchair or walker in a bicycle lane is not safe or reasonable; (iv) a person with a wheelchair or who cannot step up onto the curb must travel in the

---

[279] *See* Ex. 8 at 47:23-48:7 ("A protected bicycle lane is a designated lane of travel for people using bicycles. … the lane is physically separated from a vehicle travel lane that's adjacent to it with a vertical element and it's often typically installed next to the sidewalk, but can be installed in other configurations."); see also, Ex. 29 at p. 36-38 (explaining that the plans for 17th Street "clearly show new or relocated street parking and no design to provide any accessible parking."); see also, Ex. 33 at  DEF-2022-cv-03541-00004651 (near 17th Street NW and Church St. NW).

[280] Wheelchair accessible vehicles with side deployment ramps can no longer deploy their lift in these spaces because (a) the lift would be blocked by the vertical bollards, (b) the lift could end up in the active bicycle travel lane, risking injury to cyclists and the person with a disability; and (c) the street typically slopes down toward the curb, resulting in a slope that is too steep when the ramp deploys.

[281] *See* Ex. 1 at 19:10-13 and 30:5-12.

[282] *Id* at 30:5-31:13.

[283] Ex. 29 at p. 50.

[284] Ex. 29 at p. 53 (finding that 95% of spaces had a non-compliant ground surface).

[285] Ex. 15 at ¶ 16.

[286] See ADAAG § 502.4 & Advisory (2010); ("Access aisles are required to be nearly level in all directions to provide a surface for wheelchair transfer to and from vehicles."); *see also McCune v. Singh*, No. 2:10–CV–02207 JAM–GGH, 2012 WL 2959436, at *4 (E.D. Cal. July 19, 2012) (finding ADA violations for "disabled parking spaces . . . [that] had slopes and cross slopes exceeding 2.0% in violation of [the] ADAAG[.]")

bicycle lane, trying to avoid cyclists, to reach the sidewalk.

194.    The PBLs, and the Alteration Program's goal of minimizing car travel generally, have made pedestrian crossing and travel to/from vehicles more difficult and dangerous for people with disabilities.[287]

195.    Bicycles move at high speeds, sometimes in a different direction than cars and not always obeying the same traffic signals.[288]

196.    Yet the Alteration Program does not require physical design measures safe pedestrian crossings, such as speed bumps. Cyclists can be oblivious and are often openly hostile to pedestrians with mobility disabilities.[289]

### C.    Miscellaneous Facts

197.    Many of the plaintiffs have personally experienced the lack of sufficient designated accessible parking.[290]

198.    People with ambulatory disabilities make up approximately 5.8% of the District's residents.[291]

199.    Ward 2 has a higher proportion of nondisabled (and wealthy, and white) residents than wards not thus favored with accessible parking.[292]

---

[287] *See* Ex. 6 at 19:6-19; Ex. 2 at 37:9-20; Ex. 11 at 33:1-11, 33:18-34:14.; Ex. 10 at 19:9-20:3; Ex. 3 at 41:9-42:6; Ex. 26 at DEF-2022-cv-03541-00035577.

[288] *See* Ex. 6 at 26:16-27:3; Ex. 2 at 22:2-14; Ex. 10 at 29:11-30:16.

[289] *See* Ex. 6 at 26:16-27:3; Ex. 10 at 53:6-54:2.

[290] Ex. 15 at ¶¶ 6, 14, 17 and 33-34; Ex. 19 at ¶¶ 10, 13 and 17; Ex. 17 at ¶¶ 9, 17, and 28; Ex. 12 at ¶ 17; Ex. 18 at ¶¶ 13 and 16; Ex. 13 at ¶¶ 16-17 and 20.

[291] *See District of Columbia, Health*, UNITED STATES CENSUS BUREAU, https://data.census.gov/profile/District_of_Columbia?g=040XX00US11#health.

[292] *See DC Data Analysis & Visualization, Wards*, OFFICE OF PLANNING DEMOGRAPHIC DATA HUB, https://opdatahub.dc.gov/apps/c72450b7815f42e6b38172400cb15de8/explore (*Compare* Ward 2: 78,878 people, 7.4% disabled, 10.4% Black, 1.6% Hispanic, 1.6 average household size, $131,405 median household income, *with* Ward 8: 86,509 people, 17.3% disabled, 82.5% Black, 1.4% Hispanic, 2.1 average household size, $50,931 average household income).

200.    The Alteration Program includes no systemic plan for disability needs or access, but only piecemeal consultation in which District officials weigh the disability law violations like any other community complaint.[293]

201.    There is no evidence of any change in the District's PBL or Alteration Program policies since that blatant violation.[294]

*        *        *

---

[293] *See, e.g.*, Ex. 8 at 64:10-13 ("This plan set [for part of 17th Street] does not include accessible metered parking, but was added after implementation. . . . based on community input and feedback.").; *id* at 129:13-22 ("Oh, you know, those . . . free ADA visitor parking spaces are likely . . . results of that community engagement process where if there's a need for a space, there are ways of reaching out to the – reaching out to the District and – and receiving it or at least requesting it and then having that be assessed and installed based on that assessment.").

[294] Ex. 8 at 98:14-22.

Respectfully Submitted,

/s/ Maia Goodell
VLADECK, RASKIN & CLARK, P.C.
Maia Goodell
 mgoodell@vladeck.com
Demitrios E. Kalomiris, admitted *pro hac vice*
 jkalomiris@vladeck.com
111 Broadway, Suite 1505
New York, New York 10006
T: (212) 403-7300; F: (212) 221-3172

***and***

/s/ Garret S. DeReus
BIZER & DEREUS, LLC
Andrew D. Bizer, admitted *pro hac vice*
 andrew@bizerlaw.com
Garret S. DeReus, admitted *pro hac vice*
 gdereus@bizerlaw.com
Eva M. Kalikoff, admitted *pro hac vice*
 eva@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: (504) 619-9999; F: (504) 948-9996

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of June, 2025 a true and correct copy of the foregoing has been furnished by ECF filing to all counsel of record via email.

By:     */s/ Maia Goodell*