UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

```
-------------------------------------------------------x
DC CENTER FOR INDEPENDENT          :
LIVING; DUPONT EAST CIVIC ACTION   :
ASSOCIATION, DANA BOLLES,          :
THEODOSIA ROBINSON,                :       CIVIL ACTION
                                   :
          Plaintiffs,              :       CASE NO.: 1:22-cv-03541-JMC
                                   :
vs.                                :       JUDGE JIA M. COBB
                                   :
DISTRICT OF COLUMBIA; and          :
MURIEL BOWSER, in her official     :
capacity,                          :
                                   :
          Defendants.              :
-------------------------------------------------------x
```

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFFS' MOTION
## FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

I.      HIGH LEVEL SUMMARY ...................................................................................... 1

II.     FACTS ...................................................................................................................... 5

        A.      Background on the Plaintiffs and the Harms. ........................................... 5

                1)      Dana Bolles, Plaintiff ................................................................... 5

                2)      Theodosia Robinson, Plaintiff ...................................................... 7

                3)      The DC Center for Independent Living, Plaintiff .................... 9

                a.      Shuttle Van .................................................................................... 9

                b.      Deborah Barnes ........................................................................... 11

                c.      Kim Bellamy ................................................................................ 11

                d.      Robin Mendes-Newell .................................................................. 12

                4)      The Dupont East Civic Action Association, Plaintiff ........... 13

        B.      On-Street Parking in the District Is Inaccessible to Persons with Disabilities. ....... 16

                1)      Defendants' Admissions Concerning Accessible Parking. .................. 16

                2)      Accessible Parking Programs ............................................................ 18

                3)      Expert Analysis and Findings........................................................... 20

        C.      Defendants' Ongoing Protected Bicycle Lane Alteration Program Adds
                Accessibility Barriers, After the Passage of the ADA............................................. 23

II.     LAW ........................................................................................................................ 24

III.    ANALYSIS .............................................................................................................. 27

        A.      Plaintiffs Are Qualified Individuals with a Disability Under the ADA with Standing
                to Pursue Injunctive Relief ...................................................................................... 28

        B.      The Services at Issue Are Well-Established Government Programs Subject to the
                Law's Accessibility Mandates ................................................................................. 29

        C.      Defendants Are in Violation of the Program Access Requirement. ........................ 30

i

1)          Insufficient Quantity of Accessible Spaces ........................................... 31

2)          Inaccessibility of Putatively Accessible Spaces ................................... 32

3)          Defendants' On-Street Parking Program is Inaccessible to People with Disabilities ........................................................................................ 34

D.    Defendants Are in Violation of the New Construction/Alteration Requirements of the ADA Because the PBLs Make Parking Less Accessible ................................. 35

1)          Defendants Modified Their On-Street Parking by Installing PBLs. .... 36

2)          Where the Protected Bicycle Lanes Have Been Installed, the On-Street Parking is Less Accessible to Persons with Disabilities. ..................... 38

E.    Defendants Are in Violation of the Alteration Requirements of Disability Discrimination Laws Because the Protected Bicycle Lanes Block Curb Access for People with Disabilities and Make Pedestrian Crossings Less Accessible. ............ 41

IV.    CONCLUSION ............................................................................................................ 44

## **TABLE OF AUTHORITIES**

**Cases**

*Alston v. D.C.*, 561 F. Supp. 2d 29 (D.D.C. 2008) ........................................................ 29

*Am. Council of Blind of New York, Inc. v. City of New York*, 495 F. Supp. 3d 211 (S.D.N.Y.

    2020) ........................................................................................................................ 27

*Am. Council of the Blind v. Paulson*, 525 F.3d 1256 (D.C. Cir. 2008) ................................. 44, 46

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................. 25

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ................................................................. 30

*Bronx Indep. Living Servs. v. Metro. Transp. Auth.*, 358 F. Supp. 3d 324 (S.D.N.Y. 2019) ....... 39

*Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850 (10th Cir. 2003) ..................................... 32

*Civic Ass'n of Deaf of N.Y.C. v. Giuliani*, 970 F. Supp. 352 (S.D.N.Y. 1997)............................ 38

*Cohen v. Culver City*, 754 F.3d 690 (9th Cir. 2014)................................................. 31, 46

*Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1 (D.D.C. 2024)................................... 30

*Czekalski v. Peters*, 475 F.3d 360 (D.C. Cir. 2007)....................................................... 25

*Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189 (2d Cir. 2014).......... 32

*Disabled in Action v. City of New York*, 437 F. Supp. 3d 298 (S.D.N.Y. 2020) ................... 37, 46

*Falls v. Bd. of Comm'rs of New Orleans Reg'l Transit Auth.*, 2017 WL 2730781 (E.D. La. June

    26, 2017) ................................................................................................................... 37

*Fortyune v. Lomita*, 766 F.3d 1098 (9th Cir. 2014)................................................. 31, 46

*\*Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011)......................................... 25, 31, 38, 46

*Gaylor v. Ga. Dep't of Nat. Res.*, 2013 WL 4790158 (N.D. Ga. Sept. 6, 2013) ................... 32, 33

*Hunter ex. rel. A.H. v. D.C.*, 64 F. Supp. 3d 158 (D.D.C. 2014).................................... 29

*Kinney v. Yerusalim*, 9 F.3d 1067 (3d Cir. 1993) .................................................. 27, 38, 46

*Kirola v. S.F.*, 860 F.3d 1164 (9th Cir. 2017)............................................................ 30

*Levine v. Nat'l R.R. Passenger Corp.*, 80 F. Supp. 3d 29 (D.D.C. 2015) ................................... 26

*McCune v. Singh*, 2012 WL 2959436 (E.D. Cal. July 19, 2012)................................................... 43

*Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45 (D.D.C. 2020)......................................... 32

*Nat'l Assoc. of Home Builders v. EPA*, 667 F.3d 6 (D.C. Cir. 2011) .......................................... 30

*Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63 (2d Cir. 2012) ..................................... 31

*Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.,* 950 F. Supp. 393

   (D.D.C. 1996) ............................................................................................................. 45

*\*Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d 221 (S.D.N.Y. 1999)................................................. 32

*PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001) ........................................................................ 25

*Porter v. Martinez*, 68 F.4th 429 (9th Cir. 2023).................................................................... 30

*Roberts v. Royal Atl. Corp.*, 542 F.3d 363 (2d Cir. 2008) ........................................................ 41

*\*Sarfaty v. City of Los Angeles*, 2020 WL 4697906 (C.D. Cal. Aug. 12, 2020) ............... 28, 39, 42

*Shotz v. Cates*, 256 F.3d 1077 (11th Cir. 2001)..................................................................... 33

*Tatum v. Doctor's Assocs., Inc.*, 2016 WL 852458 (E.D. La. Mar. 4, 2016) .............................. 33

*Tennessee v. Lane*, 541 U.S. 509 (2004)..................................................................... 26, 39, 41

*Trans Union LLC v. Ramirez*, 141 S. Ct. 2190 (2020) ............................................................. 29

## Statutes

29 U.S.C. § 794............................................................................................................. 25

42 U.S.C. § 12102......................................................................................................... 29

42 U.S.C. § 12132.................................................................................................... 25, 26

42 U.S.C. §§ 12101........................................................................................................ 25

42 U.S.C. §§ 12134........................................................................................................ 27

42 U.S.C. §§ 12186........................................................................................................ 27

D.C. Code §§ 2-1402 .................................................................................................. 26

**Other Authorities**

*DC Data Analysis & Visualization, Wards*, OFFICE OF PLANNING DEMOGRAPHIC DATA HUB,

    https://opdatahub.dc.gov/apps/c72450b7815f42e6b38172400cb15de8/explore ....................... 2

*District of Columbia, Health*, UNITED STATES CENSUS BUREAU, https://data.census.gov/

    profile/District_of_Columbia?g=040XX00US11#health. .......................................... 1

H.R.Rep. No. 101-485(II) (1990) ................................................................................ 31

**Rules**

F.R.E. 801 .................................................................................................................. 18

Fed. R. Civ. P. 56 ....................................................................................................... 25

**Regulations**

28 C.F.R. § 35.150 ..................................................................................................... 26

28 C.F.R. § 35.151 .......................................................................................... 27, 39, 41

28 C.F.R. § 36.402 ..................................................................................................... 39

36 C.F.R. Pt. 1191 .................................................................................................. 1, 27

56 Fed. Reg. 35,408 (July 26, 1991) ........................................................................... 27

75 Fed. Reg. 56,236 (Sept. 15, 2010) ......................................................................... 27

88 Fed. Reg. 53,604 (Aug. 8, 2023) ........................................................................... 28

89 Fed. Reg. 10,2801 (Dec. 18, 2024) ........................................................................ 28

ADAAG § 502.4 ......................................................................................................... 43

On-street parking, curb access, and pedestrian crossings ("Services at Issue") are services that the District of Columbia ("the District") provides to members of the public. Under Title II of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973 ("RA"), and the District of Columbia Human Rights Act ("DCHRA"), these services must be readily accessible to and useable by persons with disabilities. Unfortunately, on-street parking in the District is woefully inadequate for persons with disabilities. Incredibly, the District has worsened this problem by installing bicycle lanes—including Protected Bicycle Lanes ("PBL")[1]—which decrease accessibility for people with disabilities in on-street parking, curb access, and pedestrian crossings. These problems do not need to exist; they are a product of choices made by Defendants.

## I.   HIGH LEVEL SUMMARY

The undisputed evidence is that most of the curbside parking the District provides is not accessible to people with mobility disabilities, including plaintiffs and their members:

- The District provides 250,000 non-residential, curbside parking spaces. Even crediting defendants' numbers, only 387 (less than 0.2%) are accessible. *Infra* II.B.3. Regulatory guidance requires at least 1% of spaces be accessible,[2] and people with ambulatory disabilities make up approximately 5.8% of the District's residents.[3]

- Almost all of these putatively accessible spaces are concentrated in one of the District's eight wards—Ward 2. *Infra* II.B.3. Ward 2 has a higher proportion of nondisabled (and wealthy, and white) residents than wards not thus favored with accessible parking.[4]

---

[1] A "Protected Bicycle Lane" is a bicycle lane that has a physical barrier between the bicyclist and the automobile traffic. See Ex. 7 at 22:16-18.

[2] 36 C.F.R. Pt. 1191, App'x B, Table 208.2.

[3] *See District of Columbia, Health*, UNITED STATES CENSUS BUREAU, https://data.census.gov/profile/District_of_Columbia?g=040XX00US11#health.

[4] *See DC Data Analysis & Visualization, Wards*, OFFICE OF PLANNING DEMOGRAPHIC DATA HUB, https://opdatahub.dc.gov/apps/c72450b7815f42e6b38172400cb15de8/explore (*Compare* Ward 2:

1

- Plaintiffs' survey of a random sample of the District's putatively accessible spaces, attached at Ex. 29 and summarized *infra* II.B.3, is not materially disputed. It found:

  o 44 percent of the accessible parking spaces that the District says it provides do not even exist.

  o The overwhelming majority of the "accessible" spaces violate accessibility regulations in serious ways that make them unusable for many disabled people, including Plaintiffs.

  o For example, 95% of the putatively accessible spaces are next to ground surfaces that are too rough or sloped for a motorized wheelchair user.

  o 61% of the putatively accessible spaces are of inadequate width, and 98% lack a compliant access aisle—so someone like Theodosia Robinson, who uses a rolling walker and has a limited field of vision, cannot get in and out of a vehicle safely.

  o Accessibility is possible: 68% of the putatively accessible spaces have room for a fully compliant access aisle, and the others could be moved to a nearby spot that has room.

Defendants admit they are engaged in a program of major alterations of the streets, including parking, to further transportation policy goals ("Alteration Program"). These goals were formulated and continue to be implemented without consideration of people with disabilities:

- The Alteration Program centers on construction of PBLs, many miles of which have been constructed in recent years, with seven more miles currently underway. *Infra* II.C.

- PBLs add physical barriers between the curb/sidewalk and occupants of cars, buses, and vans. *Infra* II.C.

- These barriers make parking less accessible to people with disabilities:

---

78,878 people, 7.4% disabled, 10.4% Black, 1.6% Hispanic, 1.6 average household size, $131,405 median household income, *with* Ward 8: 86,509 people, 17.3% disabled, 82.5% Black, 1.4% Hispanic, 2.1 average household size, $50,931 average household income).

- Spaces that were adjacent to the sidewalk now have a barrier and/or traffic on both sides. *Infra* II.C.

- Removal of curbside parking decreases safe space for Metro Access vans, rideshares, friends and family, medical or DCCIL van transportation, to pick up and drop off disabled passengers. *Infra* II.C.

- Pedestrian crossings, including for bus stops, have become more cumbersome and dangerous for people with disabilities because they must traverse the PBLs.

- The Alteration Program includes no systemic plan for disability needs or access, but only piecemeal consultation in which District officials weigh the disability law violations like any other community complaint.[5]

- When disabled community members expressly raised ADA concerns, defendants responded, repeatedly, that they believed they could ignore the ADA. *Infra* II.B.1-2.

- In one example, the District proceeded with construction in open disregard of disability rights concerns, repeating that it was not required to comply with the ADA, and only adding (woefully inadequate and non-compliant) "accessible" parking years later. *Infra* II.B.2.

- There is no evidence of any change in the District's PBL or Alteration Program policies since that blatant violation.[6]

---

[5] *See, e.g.*, Ex. 8 at 64:10-13 ("This plan set [for part of 17th Street] does not include accessible metered parking, but was added after implementation. . . . based on community input and feedback.").; *id* at 129:13-22 ("Oh, you know, those . . . free ADA visitor parking spaces are likely . . . results of that community engagement process where if there's a need for a space, there are ways of reaching out to the – reaching out to the District and – and receiving it or at least requesting it and then having that be assessed and installed based on that assessment.").

[6] Ex. 8 at 98:14-22.

3

- In fact, Defendants know that PBLs create barriers: In 2020, four of its employees, acting officially, published an article with this image and text, admitting that PBLs "can create physical barriers for persons with disabilities in form of services or usage of curbside"[7]:



In sum, there is no colorable dispute that the District provides on-street parking to nondisabled street users, and overwhelmingly not to people with mobility disabilities. Instead, three decades after the passage of the ADA, defendants adopted an Alteration Program that compounds the discrimination, deliberately redesigning streets in a way that takes away what accessible parking there was, and builds new barriers to travel for disabled folks—flouting the legal mandate that such alterations must improve, not diminish, accessibility.

Plaintiffs sue because (1) the putatively accessible on-street parking spaces in the District are not accessible; (2) there are not enough designated accessible on-street parking spaces in the District; (3) the PBLs are new construction that do not remediate the parking program's inaccessibility; (4) the PBLs create new parking barriers; and (5) the PBLs create barriers to curb

---

[7] *See* Ex. 26, DEF-2022-cv-00035575-35578.

access and unsafe pedestrian crossings.[8] Ms. Bolles, Ms. Robinson, and the persons with disabilities represented by DCCIL and DECAA desire to use the streets, sidewalks, and on-street parking in the District without the serious barriers created by the miles of recently added PBLs.

## II.   **FACTS**

*First*, Plaintiffs provide background on themselves and their relationship to on-street parking, curb access, and pedestrian crossings, and how they have been harmed by the conduct at issue. *Second*, Plaintiffs review the facts related to the inaccessibility of the on-street parking, curb access, and pedestrian crossing service to persons with disabilities. *Third and finally*, Plaintiffs describe the PBL program, including the impact of their installation after the passage of the ADA.

### A.   **Background on the Plaintiffs and the Harms.**

#### 1)   *Dana Bolles, Plaintiff*

Ms. Dana Bolles lives in the Navy Yard neighborhood in the Southeast part of the District. Ms. Bolles is missing both of her legs and portions of both of her arms, and uses a power wheelchair for mobility. Ms. Bolles wants to be able to drive her accessible van around the District when she is unable to walk (in her wheelchair) or take the subway. Ms. Bolles' van has hand controls and a ramp that deploys on the passenger side. To get into the van, Ms. Bolles uses a switch on the rear passenger side, which requires that the space next to the length of the van be accessible (a flat surface without barriers). Ms. Bolles often has trouble accessing parking spaces that are designated as "accessible," because they contain obstacles, such as a tree box, trash can, or bicycle rack, which block the area where Ms. Bolles would deploy her wheelchair ramp.[9]

---

[8] Plaintiffs are the DC Center for Independent Living ("DCCIL") Dupont East Civic Action ("DECAA") Association, two organizations representing individuals with disabilities; and Dana Bolles and Theodosia Robinson, two individuals with disabilities.

[9] *See* Statement of Undisputed Facts, ¶¶ 1-5.

Ms. Bolles' neighborhood has four designated accessible parking areas within a two-block radius, but at least two have sidewalk obstacles that render them unusable for her wheelchair. Also, the signage designating the spaces as accessible has gone missing several times and taken months to be replaced. Ms. Bolles documented some of these obstacles with photographs. The lack of accessible parking forces Ms. Bolles to limit her grocery shopping, avoid driving outside the District due to uncertainty about finding parking upon return, and restrict evening driving after past struggles finding accessible parking.[10]

The PBLs installed between the sidewalk and the parking spaces have also made it difficult for Ms. Bolles to park. Without a PBL, Ms. Bolles can park if she can deploy her ramp onto an even curb. PBLs create accessibility barriers for Ms. Bolles due to her ramp ending too close to the curbs or an uneven surface. She often avoids these spaces entirely to prevent getting stuck. In December 2022 on I St. SE, Ms. Bolles exited her vehicle but couldn't re-enter due to a steep slope at the PBL, and she had to rely on a stranger to push her up the ramp.[11]

Ms. Bolles is consequently reluctant to try to drive and park in the District, particularly next to bike lanes. Steep slopes pose safety risks including loss of wheelchair control or tipping over. She fears collision with a cyclist when deploying her ramp into bike lanes. Ms. Bolles was almost hit by a fast-moving cyclist while crossing a bike lane to get up onto the curb.[12]

Ms. Bolles identified areas she would like to travel but has had difficulty parking. For example, for museums and sites like the Mall, Native American Museum, and Peace Officers' Memorial, the PBL on 4th St. SW is designed the same as the one on I St. SE, where she got stuck. In July 2019, Ms. Bolles wanted to take her nieces to the Library of Congress, but could not do so

---

[10] *See* Statement of Undisputed Facts, ¶¶ 6-10.
[11] *See* Statement of Undisputed Facts, ¶¶ 11-15.
[12] *See* Statement of Undisputed Facts, ¶¶ 16-19.

because of elevator outages and the lack of sufficient number of accessible parking spaces. In the past, Ms. Bolles has tried to find accessible parking near the Mall, but was unable to find any.[13]

Ms. Bolles cannot access nearly a mile of New Jersey Ave. SE near the Navy Yard due to uneven street surfaces and inadequate parking. She also faces barriers near the Southwest Wharf, where no accessible street parking exists and alternative spots across Main Ave. are not wide or flat enough. She would like to visit the Wharf and park nearby, which she would do if there were parking in that area. Ms. Bolles has also had trouble finding accessible parking around U St.[14]

When Ms. Bolles travels to places inaccessible via public transit, she has to make a difficult choice: either take a taxi or ride service, and risk getting stranded if a return ride is unavailable, or drive and risk not being able to find accessible parking when she returns to the District. As a result, Ms. Bolles has relied much more on, and spent more money on, Uber. She would have been able to drive her own car and avoid these costs, if accessible parking were available. Ms. Bolles would use designated accessible parking spaces, if more were available.[15]

2) *Theodosia Robinson, Plaintiff*

Ms. Theodosia "Tessie" Robinson has lived on 7th St. NW between S and R St. for over fifty years. Ms. Robinson uses a rolling walker for mobility and has difficulty stepping up or down. Ms. Robinson is also very sensitive to light and has to cover herself and keep her eyes down when she is outside. She has a car and a disabled parking permit, which she used to use and plans to use again. She now mostly relies on rides from family or from ride services like Uber. Sometimes her daughter drives Ms. Robinson's car to take her around the District.[16]

---

[13] *See* Statement of Undisputed Facts, ¶¶ 20-22.
[14] *See* Statement of Undisputed Facts, ¶¶ 23-24; ¶ 27.
[15] *See* Statement of Undisputed Facts, ¶¶ 28-32.
[16] *See* Statement of Undisputed Facts, ¶¶ 33-35.

There is a bicycle lane in front of Ms. Robinson's building. It is located between the parking and travel lane, close to the parked cars. Ms. Robinson has had close calls and has twice fallen outside her building while trying to avoid bicyclists, aggravating the soreness from the arthritis in her knees. In 2022, because there was no accessible space, an Uber dropped Ms. Robinson in the bicycle lane outside her building. Although she checked for cyclists, a biker came around the corner and almost hit the car door. On a different occasion, Ms. Robinson was getting out of the car in front of her building when a biker zoomed by and yelled at her to "get a bike."[17]

About ten people who live in Ms. Robinson's building have mobility disabilities and use wheelchairs and walkers. As President of her building's tenants' association, she has heard about and observed difficulties they have with loading and unloading due to the bike lane in front of the building. This bike lane and the removal of parking generally has decreased the space for a wheelchair lift to deploy. Ms. Robinson has observed other bike lanes in the District make loading or unloading from vehicles difficult, particularly for individuals using MetroAccess.[18]

Both the harm and fear of harm from bicyclists, and the lack of accessible parking, limit Ms. Robinson's ability to travel. Ms. Robinson would like to go to the CVS at 2009 8th St. but cannot do so because there is no accessible parking nearby. She has also had difficulty finding accessible parking near her doctor at Washington Hospital Medical Clinic, where she testified she had an upcoming appointment. Ms. Robinson no longer goes to several museums in the District because there is less accessible parking available in that area. She recalled an occasion where she was trying to go to Ben's Chili Bowl restaurant ("I wanted a half smoke") but could not find

---

[17] *See* Statement of Undisputed Facts, ¶¶ 36-40.
[18] *See* Statement of Undisputed Facts, ¶¶ 41-43.

parking and had to turn around and go home. If there were more accessible parking spaces, with room to get in and out of the vehicle without being in traffic, Ms. Robinson would use them.[19]

3)  *The DC Center for Independent Living, Plaintiff*

The DCCIL was established in 1981 through Congressional Legislation to promote independent lifestyles for individuals with disabilities. DCCIL is a non-profit, community-based, consumer-controlled, cross-disability center directed by individuals with disabilities. The DCCIL Board is made of up of 51% of people with disabilities and the DCCIL staff is made up of 80% of people with disabilities. By statutory mandate, all disabled D.C. residents are DCCIL consumers. In this case, DCCIL represents the interests of its consumers. As such, all affected people described herein are DCCIL consumers. In addition, the following consumers are active participants in its programs and have been injured because of one or more of the barriers at issue in this case: Deborah Barnes, Kim Bellamy, and Robin Mendes-Newell.[20]

DCCIL provides services and engages in advocacy on behalf of persons with disabilities. DCCIL is statutorily mandated to provide five core services: 1) independent living skills training, 2) peer counseling and support, 3) advocacy, 4) information and referral, and 5) transition. The advocacy bucket includes "systems advocacy" under which, if DCCIL identifies a barrier that is impeding individuals with disabilities from living independently, then it has "an obligation through our mandate to go after that an fight it, remove those barriers."[21]

a.  *Shuttle Van*

DCCIL provides a shuttle van to transport its consumers. James Falade drives the van, which is equipped with a passenger-side wheelchair lift. In 2024 and 2025, Mr. Falade transported

---

[19] *See* Statement of Undisputed Facts, ¶¶ 44-48.
[20] *See* Statement of Undisputed Facts, ¶¶ 49-52.
[21] *See* Statement of Undisputed Facts, ¶¶ 53-54.

DCCIL consumers once or twice per month, and more regularly in 2022. These consumers often have mobility or vision disabilities, and use wheelchairs, canes, or walkers.[22]

DCCIL risks exposure or liability when loading or unloading passengers in a bicycle lane. Also, if a DCCIL consumer were injured while loading or unloading on a DCCIL van, it could discourage other consumers from traveling on the van. If a consumer were injured in this way, "[the consumer] would lose total confidence in their ability to work with [DCCIL] . . . They wouldn't ride the vans again." Such an injury might increase DCCIL's insurance premiums. Further, if a DCCIL van passenger were to be injured, it would impede DCCIL's mission to ensure consumers can live independently in their homes and communities.[23]

Mr. Falade has observed that the individuals he transports are fearful of unloading or unloading next to a bike lane. A bike lane adjacent to the curb "interferes with [his] ability to load and unload customers onto the curb." For example, he experiences difficulty when dropping consumers off near the Martin Luther King, Jr. Library. He has observed bicyclists in bicycle lanes yell at him and DCCIL consumers when they are getting on and off the van.[24]

Due to the increasing prevalence of bike lanes and the limited number of designated accessible parking spaces, and the reduction in parking spaces overall, Mr. Falade has had difficulty in locating accessible areas to pick up and drop off consumers. Sometimes Mr. Falade has to circle the block a few times to locate a place where he can pull up to the curb to load or unload consumers without parking in a bike lane. When there is not a bike lane adjacent to the curb, and he can pull up directly to the curb, he is able to safely let consumers out of the vehicle.[25]

---

[22] *See* Statement of Undisputed Facts, ¶¶ 55-57.
[23] *See* Statement of Undisputed Facts, ¶ 59.
[24] *See* Statement of Undisputed Facts, ¶¶ 60-62.
[25] *See* Statement of Undisputed Facts, ¶¶ 63-65.

Mr. Falade is concerned about the risk of injury to consumers. In his experience, "the situation has gotten much worse as more bicycle lanes have been installed over the years." DCCIL's van would benefit from accessible parking and pick up and drop off areas if they existed.[26]

### b.  *Deborah Barnes*

Deborah Barnes is a DCCIL consumer. Ms. Barnes has low vision and uses a wheelchair to ambulate. Ms. Barnes risks getting hit by a bicycle when she gets on and off the bus at 14th St. NW and U St. NW, where the bike lane is between the bus stop and the sidewalk. The bus shelter there obscures her view of potentially approaching bicyclists, and bicyclists have almost hit her when she has crossed the bike lane. At the Target at 3100 14th St. NW, it is difficult for Ms. Barnes to get in and out of the car because of the bike lane between the parking spaces and the sidewalk. She has to wheel herself to Park Rd. NW to use the curb cut and then into the bike lane to get into the vehicle. She fears getting hit by a bicycle when she crosses the bike lane. Uber drivers often have to circle the block to find an area without a bike lane so that she can more safely load her wheelchair. Ms. Barnes is at risk of injury because of the bike lanes' placement and lack of pedestrian signaling at crosswalks that require crossing bike lanes.[27]

### c.  *Kim Bellamy*

Kim Bellamy is a DCCIL consumer who is vision-impaired and uses a white cane to ambulate. Ms. Bellamy travels around the District using bus, rail, Metro Access, cabs, or the DCCIL van. She works with a DCCIL peer support group, which meets monthly throughout the

---

[26] *See* Statement of Undisputed Facts, ¶ 66.
[27] *See* Statement of Undisputed Facts, ¶¶ 67-72.

District. Organization members nearly get hit by bikes when crossing bike lanes, and she has difficulty safely exiting Metro Access vehicles due to fast-moving cyclists in adjacent bike lanes.[28]

Ms. Bellamy has also found the bus stop at 14th St. NW and U St. NW to be particularly dangerous because bikes swoop past her even when the pedestrian indicator signals her to walk. She has almost been hit several times, requiring her to jump out of the way. Ms. Bellamy and members of her peer support group have experienced this at 14th St. NW, U St. NW, and elsewhere around DC. Ms. Bellamy fears crossing the bike lane to get to and from the bus stop.[29]

Ms. Bellamy usually does not need to cross a bike lane to get to the sidewalk when taking the DCCIL van or a cab, but, about three or four times a month, she does. Ms. Bellamy risks injury when bike lanes are adjacent to the sidewalk and next to bus stops. She would feel safer if there were additional signaling at these bus stops.[30]

### d. _Robin Mendes-Newell_

Robin Mendes-Newell is a DCCIL consumer who travels around the District by bus, Metro Access, and rides from her friends. She was almost hit at the 11th St. NW and K St. NW bus stop on September 25, 2024. She was crossing the bike lane to get on the bus to return home when a moped sped through the bike lane and hit her cane, which fell out of her hand onto the ground. She fears that she will get injured when she has to cross the bike lane to get to and from the bus stop. Once a month, her friend Ms. Dozier drives Ms. Mendes-Newell to the Bank of America at 1931 14th St. NW. There is not accessible designated parking on 14th St. NW near the bank, but it is easier to get in and out of the car because the bike lane there is between the parking lane and traffic, not the parking lane and sidewalk. When Ms. Dozier parks right next to the sidewalk, it is easy

---

[28] _See_ Statement of Undisputed Facts, ¶¶ 73-76.
[29] _See_ Statement of Undisputed Facts, ¶¶ 77-79.
[30] _See_ Statement of Undisputed Facts, ¶¶ 80-81.

and safe for her to get her walker in and out of the car. If there were additional designated accessible parking spaces located adjacent to the sidewalk, rather than a bike lane, she would use them. If there were additional signaling at bus stops where pedestrians have to cross the bike lane to get to the sidewalk, it would be much safer for her to cross the bike lane.[31]

### 4)  *The Dupont East Civic Action Association, Plaintiff*

DECAA is a nonprofit that promotes the interests of the residents of the District, in the greater Dupont Circle area and throughout the city. DECAA's purposes include charitable and educational activities and civic and social improvements to health, safety, welfare, and quality of life. DECAA members with disabilities impacted by the disability barriers in the Services at Issue include Edward V. Hanlon, Susan Meehan, Kerry Bedard, and Kevin Rogers. DECAA began to advocate about PBLs when the District began a project on 17th St. NW; it subsequently formed a District-wide coalition to address concerns about various PBL projects, including disability access and other issues. DECAA members pay dues, participate in meetings, discuss and vote on the organization's actions, and elect the board members who direct the organization.[32]

Edward V. Hanlon joined the organization in 2018 or 2019 and he served on its board. He lives in the Dupont Circle neighborhood of the District. From 2018 to 2020 Mr. Hanlon was the Advisory Neighborhood Commissioner for ANC2B09. He has had extensive surgery on his left foot, is unsteady on that foot, and has difficulty stepping up and down.[33]

In May 2021, the District Department of Transportation ("DDOT")[34] issued a plan to install PBLs along 17th St. (the "New 17th St. Plan"). At the time, Mr. Hanlon saw that there was no

---

[31] *See* Statement of Undisputed Facts, ¶¶ 82-89.
[32] *See* Statement of Undisputed Facts, ¶¶ 90-94.
[33] *See* Statement of Undisputed Facts, ¶ 95.
[34] DDOT was established by The District Department of Transportation Establishment Act of 2002 as a cabinet-level agency responsible for the management of transportation infrastructure and

accessible-designated parking for a half-mile stretch in the New 17th St. Plan. He also noticed that the New 17th St. Plan lacked any accessible pick up and drop off ("PUDO") areas. He communicated about accessible parking and PUDOs with DDOT employees on behalf of DECAA about 17th St. DDOT employees did not respond to his concerns at the time other than to say that they were not required to provide ADA accessible parking anywhere outside the Central Business District ("CBD"). The CBD includes 17th St. north of Massachusetts Ave., where most DECAA members live, but does not include other DC neighborhoods such as Adams Morgan, Columbia Heights, Petworth, Georgetown, Cleveland Park, most of Capitol Hill and all of Wards 1, 3, 4, 5, 7, and 8. DDOT proceeded with the New 17th St. Plan despite DECAA's concerns.[35]

DECAA members were concerned that the New 17th St. Plan was much less safe for persons with disabilities. Mr. Hanlon saw that drivers parking on the west side of the street would need to exit directly into traffic, and drivers on the east side of the street would need to exit their vehicles directly into a PBL before being able to get to a sidewalk. In 2021, DECAA held a rally about these concerns. Ms. Meehan, who uses a mobility scooter, and Mr. Rogers, expressed accessibility and safety concerns. Mr. Hanlon took photographs of Ms. Meehan and recorded video of Mr. Rogers encountering and describing the new barriers. Because of the New 17th St. Plan, individuals with disabilities who use folding wheelchairs, like Mr. Rogers, must assemble their wheelchairs in a vehicular traffic lane or a bike lane, risking a deadly collision.[36]

The bike lane installed on one side of 17th St. is "protected" by concrete blocks and plastic pylons, making it difficult or impossible for persons with disabilities to exit their vehicles. Mr. Hanlon has tripped on these concrete blocks while exiting his car and has had near-collisions

---

operations within the District. *See* Department of Transportation Establishment Act of 2002, D.C. Law 14-137, § 2, 49 DCR 3444 (2002).

[35] *See* Statement of Undisputed Facts, ¶¶ 96-100.
[36] *See* Statement of Undisputed Facts, ¶¶ 101-106.

with bicyclists in the PBL. Before implementation of the New 17th St. Plan, Mr. Hanlon proposed to DDOT an alternative plan to reroute parts of the 17th St. bike lane onto Massachusetts Ave., 18th St., and then New Hampshire Ave. To his knowledge, DDOT has not studied this proposal.[37]

Kerry Bedard is another long-time, active member of DECAA who has several mobility disabilities. Ms. Bedard sometimes relies on a cane or mobility scooter to ambulate. She lives on N St. NW, near 21st St. She has struggled with curb access and parking, particularly since the construction of the bike lane. She often drives around D.C. and uses a disabled parking permit. She uses the "Red Top" meter spaces and curbside parking. Due to her disability and service dog, Ms. Bedard has difficulty parking next to the bicycle lane because she cannot safely exit her car without stepping into or walking through a bicycle lane.[38]

In Fall 2021, a bicycle nearly hit Ms. Bedard as she stepped out of her vehicle into the 17th St. bike lane. She feels unsafe crossing bicycle lanes, even at crosswalks. She used to regularly go to the Safeway and hardware store on 17th St. When DDOT added a bicycle lane on 17th St., she could no longer find accessible-designated parking near those stores. After the addition of the bicycle lane on 17th St., she has gone to different stores that are further away. She would return to the stores she used to go to on 17th St. if there were more accessible parking.[39]

Ms. Bedard also regularly used to go to Connecticut Ave. between N and M St. She would use Red Top parking spaces when traveling there. She stopped going as frequently when learned that DDOT would be adding a bike lane to that street. Though DDOT has changed this planned bicycle lane, she is concerned about future bicycle lanes. Ms. Bedard believes DDOT's planned

---

[37] *See* Statement of Undisputed Facts, ¶¶ 107-108.
[38] *See* Statement of Undisputed Facts, ¶¶ 109-111.
[39] *See* Statement of Undisputed Facts, ¶¶ 112-115.

bike lane expansion will impede safe parking and mobility for individuals with disabilities in the District. Ms. Bedard would use accessible parking spaces, if more were available.[40]

**B.     On-Street Parking in the District Is Inaccessible to Persons with Disabilities.**

Defendants fail to provide adequate accessible on-street parking for persons with disabilities. There are approximately 250,000 parking spaces throughout the District, but Defendants provide limited putatively accessible parking. Further, the limited putatively accessible parking that Defendants identify either (1) does not exist or (2) is not actually accessible. Plaintiffs' personal experiences are confirmed by expert analysis, which shows a severe shortage of accessible spaces and widespread non-compliance with ADA accessibility guidelines.

The District determines what on-street parking spaces are free and what ones are metered. The District determines where the metered parking spaces are located. There are 20,000 metered parking spaces in the District. There are generally 150,000 residential permit parking spaces in the District. There are generally 230,000 undesignated parking spaces in the District. Almost none are accessible to people with mobility disabilities.[41]

1)    *Defendants' Admissions Concerning Accessible Parking.*

Defendants openly ignore accessibility when it comes to parking. At a town hall meeting on January 25, 2022, Everett Lott, then-Director of DDOT, repeated three times: "we're not legislatively mandated outside of the central business district" to provide accessible parking. This same sentiment was mirrored in an internal document where DDOT noted that they needed to "Identify where gaps in rulemaking impede installation of accessible parking" and adjacent to that statement was the bullet point, "No requirement for accessible parking outside of CBD and Stadium Zone[.]" Indeed, as recently as March 2024, DDOT Transportation Planner Matthew

---

[40] *See* Statement of Undisputed Facts, ¶¶ 116-119.
[41] *See* Statement of Undisputed Facts, ¶¶ 120-121.

Spaniol stated that, "Accessible spaces are not required outside of the CBD and Stadium Zone at present. Currently, many of our meters outside of these areas are not ADA compliant and payment is waived for drivers with disability placards as a result."[42]

The District knows this position is illegal. DDOT's ADA Coordinator admitted that the ADA mandates government entities, like the District, to provide on-street designated accessible parking spaces in commercial zones. When he inquired about adding designated accessible spaces to commercial zones outside the CBD, he was told, "They were looking into it. It was a good idea." DDOT's Curbside Programs Manager also wondered why there were no designated-accessible spaces outside of the CBD and Stadium Zone ("SZ"). He "essentially gave a project to a group of students in a class to develop criteria for proactively targeting zones where accessible parking spaces may be in demand." However, nothing came from this project.[43]

Indeed, DDOT has long known that it must provide accessible on-street parking. Defendants' Office of Civil Rights created a document in 2006 on the ADA guidelines, which includes detailed discussion and diagrams of accessible on-street parking and passenger loading zones. Unfortunately, Defendants did not implement these changes. Moreover, a DDOT parking program presentation includes admissions that there is "no program for accessible parking on metered blocks outside of CBD and Stadium Zone" and that "DMCR rulemaking and Curbside management policy do not align with forthcoming federal guidelines."[44]

Defendants have even made admissions via publication. For example, in the May 2020 edition of Parking & Mobility, four of Defendants' employees published an article titled *Bicycles, Wheelchairs, and Freight at the Curb*. As Defendants' employees admit, a "twist to the challenge

---

[42] *See* Statement of Undisputed Facts, ¶¶ 122-124.
[43] *See* Statement of Undisputed Facts, ¶¶ 125-126.
[44] *See* Statement of Undisputed Facts, ¶¶ 127-128.

of parking/loading protected cycletracks is the issue of accommodating the individual with mobility needs." Defendants explain that, from the perspective of a driver with a disability, PBLs create the following issues:

- "First, there is inadequate buffer space for a customer in a wheelchair, considering turning radius needs of their wheelchair.

- Second, there is the challenge of ensuring curbside access via a curb cut that has no more than an 8 percent running slope and no protrusion/gap that is more than half-inch in height or width.

- Third, parking activity may be limited for mobility impaired customers but there are mobility service providers that provide frequent service, such as transit and paratransit, where protected bicycle lanes impose an undue hardship for individuals with disabilities."

The four DDOT employees who authored the article supplied their DDOT email addresses at the end of the article.[45] These concessions are opposing party admissions. *See* F.R.E. 801(d)(2)(D).

### 2)   *Accessible Parking Programs*

The only putatively accessible non-residential parking programs in the District are Red Top Meters and Accessible SZ Meters. There are also ADA Visitor Parking Zones, but they are not yet formalized into a program. This adds up to a handful of spaces: 298 "Red Top Meters" in the CBD, about 19 "red pole" spaces in the SZ, about 32 accessible metered parking spaces in the Greater U St. Corridor Performance Parking Zone, and 80 designated-accessible free visitor parking spaces. Other dense commercial zones or corridors, like Kent Ave. SE, Columbia Road NW, and Barracks Row, do not have designated-accessible on-street parking.[46]

In discovery, Defendants produced an Excel Spreadsheet (the "Spreadsheet") containing two tabs. The first tab, "Accessible Parking Zones" lists the locations of 98 putatively accessible

---

[45] *See* Statement of Undisputed Facts, ¶¶ 184-187.
[46] *See* Statement of Undisputed Facts, ¶¶ 129-130.

parking spaces. The second tab, "Red Top Meter Spaces" lists the locations of 289 Red Top Meter Spaces. The District claims the Spreadsheet is "fairly accurate."[47]

Red Top Meters are parking meters painted red to signify that they serve designated-accessible parking spaces. DDOT's Curbside Manager could not recall any Red Top Meter that contains a marked access aisle. He admitted that Red Top Meters may be difficult to identify by someone driving because the top of the painted dome is only three feet off the ground. Prior to the Red Top Meter program, there were no ADA spaces in the District. Red Top Meters are located only in the CBD; DDOT's ADA Coordinator does not know why they are not elsewhere.[48]

Defendants are capable of implementing accessible parking. At K St. NW and 4 1/2 St., Defendant installed two on-street parking spaces that are mostly accessible to persons with disabilities. They contain an access aisle, the access aisle is not in the bicycle lane, the route to the curb cut is not obstructed by bollards or concrete tire stops, and the ground surface is marked with the symbol of accessibility.[49] Moreover, these spaces co-exist with the existing PBLs, clearly demonstrating that accessible parking and PBLs can be implemented together.

During a "Virtual Town Hall" on January 27, 2022, Mr. Lott, then-Director of DDOT, discussed on-street parking. Mr. Lott utilized a slide deck that had the markings of the "Government of the District of Columbia Muriel Bowser, Mayor" in the bottom right hand corner. Page 8 of Mr. Lott's presentation contains an aerial photograph which is described as "Designated ADA and Loading Features on K St. NW[.]" The two parking spaces are circled in red and are labeled "ADA parking[.]" Adjacent to these spaces is another area circled in red and labeled

---

[47] *See* Statement of Undisputed Facts, ¶¶ 131-132.
[48] *See* Statement of Undisputed Facts, ¶¶ 133-136.
[49] *See* Statement of Undisputed Facts, ¶ 137.

"Loading/PUDO[.]"[50] The spaces are a rare example of an "ADA space"[51] that is largely accessible and compliant, created only as an *ad hoc* response to community complaints.[52]

       3)  *Expert Analysis and Findings*

Plaintiffs engaged two experts: an engineer with significant experience with ADA inspections, Mr. Nicholas Heybeck, P.E., and a statistician, Dr. Eric Heidel. Mr. Heybeck's inspection assessed (1) the quantity and distribution of putatively accessible spaces, (2) whether the spaces Defendants have designated as accessible are actually accessible, and (3) the availability and accessibility of on-street parking on streets with PBLs. To ensure that Mr. Heybeck's report was accurate, Dr. Heidel performed a random sampling of the putatively accessible spaces that were provided by Defendants in the Spreadsheet. Mr. Heybeck also performed a "cross check" whereby he surveyed several additional areas to gauge the Spreadsheet's accuracy.

Mr. Heybeck found numerous failures by Defendants to make their putatively accessible parking service accessible. Mr. Heybeck found the overall quantity of putatively accessible parking in the District to be wholly lacking. There are 250,000 general parking spaces in the District. There are eight wards in the District, and Mr. Heybeck mapped the 387 putatively accessible parking spaces identified on the Spreadsheet across these wards. Mr. Heybeck determined that, at an absolute minimum, there should be 310 designated accessible parking spaces per ward.[53] The data demonstrates severe deficiencies in accessible parking across the District: seven wards contain drastically fewer spaces than the minimum 310 required per ward, and Ward

---

[52] *See* Statement of Undisputed Facts, ¶ 140 ("Oh, you know, those . . . free ADA visitor parking spaces are likely . . . results of that community engagement process where if there's a need for a space, there are ways of reaching out to the – reaching out to the District and – and receiving it or at least requesting it and then having that be assessed and installed based on that assessment.").
[53] *See* Statement of Undisputed Facts, ¶¶ 142-144.

2, despite having the most accessible spaces, still falls short of the minimum 1% ADAAG standard.[54] Ward 3 has a mere four accessible parking spaces; Ward 5 has two.[55]

Moreover, even when Defendants provide parking spaces they claim are accessible, the results are grossly inadequate. Mr. Heybeck performed an objective survey of 73 of the putatively accessible parking spaces. Plaintiffs' statistician randomly selected the surveyed spaces. Of the 73 purportedly accessible spaces, an incredible 32 spaces, or 44%, did not exist. Of the spaces Mr. Heybeck could locate, 98% were missing an access aisle, 95% had non-compliant ground surfaces, 80% had non-compliant identification signs, and 61% were of an inadequate width. Most concerning, is that 100% of the surveyed spaces were missing the accessible route connecting the parking space to the adjoining circulation path as required by 2010 ADAAG 502.3.[56]

Mr. Heybeck cross-checked Defendants' published data by surveying four prominent locations of the District for extra accessible spaces. Three of the four locations had no additional spaces; in one location, he found two spaces marked as "accessible," but both were non-compliant with the ADAAG. Based on his cross check, Mr. Heybeck determined "there is not a significant number or even any additional accessible parking spaces that are compliant in the District."[57]

Finally, Mr. Heybeck surveyed three streets in the District where PBLs have been installed utilizing the 2010 ADAAG and the Public Right-of-Way Accessibility Guidelines ("PROWAG"). On 17th St., all eleven purportedly accessible parking spaces lacked access aisles and direct sidewalk connections. Based on his inspection, building plans review, and historical images, he

---

[54] *See* Statement of Undisputed Facts, ¶ 145. The Americans with Disabilities Act Accessibility Guidelines ("ADAAG") are design standards published by the U.S. Access Board and adopted by the DOJ that provide specific technical requirements for accessibility in facilities and spaces subject to the ADA. As discussed below, these guidelines establish minimum criteria for making spaces accessible to individuals with disabilities.
[55] *See* Statement of Undisputed Facts, ¶ 146.
[56] *See* Statement of Undisputed Facts, ¶¶ 147-150.
[57] *See* Statement of Undisputed Facts, ¶¶ 152-154.

concluded that recent alterations made the street significantly less accessible than before. Previously, vehicles could park against the curb and somewhat use it as an access aisle, and vans with deployable ramps could deploy directly onto the adjacent curb. After installation of the PBL, the parking stoppers and vertical barriers obstruct wheelchair users who must load/alight directly into the single traffic lane, prevent deployment of accessible van ramps, and impede disabled pedestrians navigating from vehicles to the curb. These alterations also obstruct paratransit and commercial vehicles with deployable lifts. Mr. Heybeck offers similar opinions as to the other two streets with PBLs he surveyed, 11th St. NW and 4th St. SW.[58]

Defendants produced a report by Dr. Kevin L. Johnson, P.E. In his report, Mr. Johnson does not contest Mr. Heybeck's surveying techniques, measurements, inspection scope, sample size, substantive findings, or opinions concerning the impact of the bicycle lanes. He does not even address Mr. Heybeck's finding that many of the putatively accessible parking spaces listed on the Spreadsheet do not exist. Instead, Mr. Johnson's rails against the applicability of the ADAAG and proclaims that "all Opinions, Findings, Evaluations, Global Conclusions, and Recommendations in the Heybeck Expert Report are irrelevant to this case."[59]

Notably, Mr. Johnson does not direct the Court to a set of guidelines that is more apt than the ADAAG. He does not state that on-street parking is substantively different from parking in a lot or a garage, provides no opinion on whether the District on-street parking is accessible or safe for persons with disabilities, conducted no surveys comparing parking in the District to accessibility metrics, and offers nothing of substance to this case.[60]

---

[58] See Statement of Undisputed Facts, ¶¶ 156-158
[59] See Statement of Undisputed Facts, ¶¶ 162-164.
[60] DDOT's own ADA Coordinator, Xavier Davis, disagrees with the District's expert. Mr. Davis stated that the ADA mandates that local municipalities like the District provide designated accessible parking spaces in commercial zones. (Ex. 4 at 44:20-24). He stated that where

Mr. Heybeck rebutted Mr. Johnson's report. In response to Mr. Johnson's assertion that the ADAAG is "irrelevant," Mr. Heybeck stated that, "Based on my knowledge, training, and experience, I am not aware of any accessibility guidelines that would be more apt or appropriate than the UFAS, ADAAG and PROWAG for on-street parking." He explained:

> Mr. Johnson refers to my citation to the ADAAG in reviewing the on-street parking as 'irrelevant.' I am not aware of any reason why on-street parking spaces should differ from parking spaces in a lot or garage. Similar to a wheelchair user in a parking lot or garage, an individual in a wheelchair parking on the street must be able to safely park their vehicle, and exit their vehicle or transfer out of the vehicle and into a wheelchair. I am not aware of the transfer methods of individuals with disabilities being different in a parking lot than on-street. I have no reason to believe that the process of assembling a wheelchair would be different on-street than it would be in a parking lot or garage. They also must be able to maneuver safely to the adjacent sidewalk."[61]

## C.  Defendants' Ongoing Protected Bicycle Lane Alteration Program Adds Accessibility Barriers, After the Passage of the ADA.

The District's sweeping PBL program—a major, physical alteration of streets—has both failed to remedy the broad inaccessibility of its on-street parking and created new accessibility barriers, which the District disregards. As noted, a PBL has a physical barrier between the bicyclist and automobile traffic. The barrier can be a flexible post, concrete barrier, or a row of parked cars. The District began using PBLs in the last ten years; it has implemented nearly 40 miles of PBLs in that time. The District is currently building at least seven more miles of bicycle lanes in an ongoing and deliberate redesign of its streets. The District ultimately envisions installing 180 miles of bicycle lanes. The District's "preferred configuration" is to install PBLs on both sides of the street, creating physical barriers to parking and curb access along both sides of the entire block.

---

designated on-street parking is provided, accessible parking must be provided. (*Id.* at 71:19-23) He stated that for a designated accessible parking space, an access aisle must be provided for the full length of the space and shall connect to a pedestrian route. (*Id.* at 72:9-16). He believes, for on-street designated accessible parking spaces, that the required accessible route must lead to a sidewalk. (*Id.* at 35:4-36:6).

[61] *See* Statement of Undisputed Facts, ¶¶ 166-167.

Defendants' representative gave a long list of considerations for such redesigns that contained no reference to disability access, much less the ADAAG or PROWAG.[62]

Prior to the installation of PBLs, one side of the car provided barrier-free access to the curb. Now, when a car parks next to a PBL, there is both buffer zone and bicycle lane between the individual and the curb. Prior to the PBLs, vehicles with passenger-side ramps could pull up to the curb, letting wheelchair users access the curb; now, they cannot. DDOT's bicycle and pedestrian program specialist, Mr. Mike Goodno, has designed 10 or 12 of the 25 to 30 PBL segments in the District. Of those segments, he recalled only one (K St.) where the District incorporated accessible designated parking spaces.[63]

The PBLs on 17th St. were installed in the Fall of 2020. It was not until July of 2021 that DDOT went out "to kind of map out some places where we could put dedicated handicapped spots around the corridor." Mr. Heybeck determined that the PBL on 11th St. NW was installed between September 2011 and June 2013. Mr. Heybeck determined that the PBL on 4th St. SW was installed between August 2014 and November 2017.[64]

## II.    **LAW**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007).

---

[62] *See* Statement of Undisputed Facts, ¶¶ 169-173.
[63] *See* Statement of Undisputed Facts, ¶¶ 174-176.
[64] *See* Statement of Undisputed Facts, ¶¶ 177-178.

Congress enacted the ADA over thirty years ago to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," and to assure "equality of opportunity, full participation, independent living, and economic self-sufficiency for [individuals with disabilities]." 42 U.S.C. §§ 12101(b)(1), (a)(7). "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life[.]" *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Similarly, "Section 504 of the [RA] prohibits disability discrimination by recipients of federal funding." *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011); *see* 29 U.S.C. § 794(a)(no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]").The DCHRA makes it an "unlawful discriminatory practice" for any person, including a government agency, to deny "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations" based on an individual's disability. D.C. Code §§ 2-1402.02(21); 2-1402.31(a)(1). The ADA, RA, and DCHRA are generally interpreted *in pari materia*. *Levine v. Nat'l R.R. Passenger Corp.*, 80 F. Supp. 3d 29, 38 (D.D.C. 2015).

These laws prohibit, and define as discrimination, barriers to access. "Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility." *Tennessee v. Lane*, 541 U.S. 509, 531 (2004) (citing 42 U.S.C. § 12132). Courts, and Department of Justice ("DOJ") implementing regulations,

explain that unlawful discrimination includes, first, the failure to provide some means of access to a program or service provided to nondisabled people, even for older facilities that would be difficult or costly to make fully accessible. *Id.* at 532-33. Second, new facilities or major renovations undertaken after the ADA must comply with accessibility guidelines. *Id.* at 532.

First, an entity can be held liable for failure to comply with the requirement for "program access." Under 28 C.F.R. § 35.150(a), each "service, program, or activity" of a public entity must "when viewed in its entirety, [be] readily accessible to and usable by individuals with disabilities." The test is "whether all services available for the use of non-disabled patrons also are available for the use of disabled patrons." *Am. Council of Blind of New York, Inc. v. City of New York*, 495 F. Supp. 3d 211, 237 (S.D.N.Y. 2020) (citation and internal alterations and quotation marks omitted).

Second, a more stringent standard applies when constructing new facilities or modifying existing ones: entities must make these facilities accessible to persons with disabilities. *See* 28 C.F.R. § 35.151(a) (new construction) and § 35.151(b) (alterations to existing facilities). It is "discriminatory to the disabled to enhance or improve an existing facility without making it fully accessible to those previously excluded." *Kinney v. Yerusalim*, 9 F.3d 1067, 1073 (3d Cir. 1993). Consequently, the regulations governing new construction and alterations are more stringent than those for existing facilities and are not subject to an undue burden defense. *Id.* at 1071, 1074–75.

Two sets of technical guidelines, the ADAAG and PROWAG, provide additional guidance, particularly for new construction and alterations. Under the ADA, the DOJ must issue regulations consistent with the "minimum guidelines" issued by the Access Board. 42 U.S.C. §§ 12134(c), 12186(c). The ADAAG was first published by the DOT in 1991, and it was re-published by the DOJ in 2010 with some minor updates.[65] While a violation of ADAAG does not result in

---

[65] 56 Fed. Reg. 35,408 (July 26, 1991), 36 C.F.R. Part 1191; *see also* 75 Fed. Reg. 56,236 (Sept. 15, 2010) (noting the 2010 update as to both Title III and Title II of the ADA).

automatic imputation of liability, it is a valuable reference.[66] The PROWAG was published by the Access Board.[67] The PROWAG has not yet been published by the DOJ, but—as defendants admit[68]—it is also a valuable reference. [69]

## III.   ANALYSIS

When the evidence is evaluated within the appropriate legal framework, there is no material dispute that Defendants are liable under the ADA, RA, and DCHRA. The elements of an ADA discrimination claim are 1) plaintiff is a qualified individual with a disability; 2) the public entity denied her the benefits of or prohibited her from participating in the entity's services, programs or activities; and 3) that denial or prohibition was "by reason of" her disability. *Alston v. D.C.*, 561

---

[66] *See, e.g.*, *Sarfaty v. City of Los Angeles*, No. 2:17-CV-03594-SVW-KS, 2020 WL 4697906, at *5 (C.D. Cal. Aug. 12, 2020) ("[O]n-street parking cannot properly be considered 'accessible' without consideration of how disabled individuals reach the sidewalk from a parking space, because a parking space is useful only to the extent it permits individuals to reach businesses and other establishments that are connected to on-street parking by a public sidewalk. Turning to the 2010 ADA Standards for guidance on this issue, the Court notes that Section 502.3 of the 2010 ADA Standards expressly requires that 'Access aisles shall adjoin an accessible route.' 2010 ADA Standards for Accessible Design, available at https://www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf.   Similarly, Section 208.3.1 requires that accessible parking spaces be located on the 'shortest accessible route' from parking to an entrance. *Id.* Based on this guidance, the Court concludes that whether the on-street parking along the altered portion of Reseda Boulevard is 'readily accessible' depends (in part) on whether individuals like Plaintiff may park their vehicles in those spaces and successfully reach the sidewalk in order to reach their final destination.").

[67] Accessibility Guidelines for Pedestrian Facilities in the Public Right-of-Way, 88 Fed. Reg. 53,604 (Aug. 8, 2023) ("The Architectural and Transportation Barriers Compliance Board (Access Board or Board) issues its final rule that provides minimum guidelines for the accessibility of pedestrian facilities in the public right-of-way.").

[68] Ex. 32 at DEF-2022-cv-03541-00024943.

[69] Transportation for Individuals With Disabilities; Adoption of Accessibility Standards for Pedestrian Facilities in the Public Right-of-Way, 89 FR 10,2801 (Dec. 18, 2024) ("DOT's authority does not extend to regulating the accessibility of other separate elements of the public right-of-way, such as on-street parking spaces, crosswalks, or sidewalks, with the exception of the elements mentioned above, as applied to transit stops. Such other elements in the public right-of-way fall under the jurisdiction of the [DOJ] under Title II, Part A, of the ADA.").

F. Supp. 2d 29, 37 (D.D.C. 2008).[70] Plaintiffs have established each of these elements as a matter of law. *First*, Plaintiffs and the represented individuals are qualified individuals with disabilities and have standing to pursue injunctive relief. *Second*, Defendants denied Plaintiffs the benefits of on-street parking, curb access, and pedestrian crossings, both through denial of meaningful access to the overall programs, and through new construction and alteration of PBLs, which make the Services at Issue less accessible. Because the barriers to access are specific to the Plaintiffs' disabilities, there is no colorable dispute that this discrimination is by reason of disability and violates the law.

### A.    Plaintiffs Are Qualified Individuals with a Disability Under the ADA with Standing to Pursue Injunctive Relief

There is no material dispute that plaintiffs are qualified individuals with a disability under the governing laws. *See* 42 U.S.C. § 12102(1)(A). Each of the plaintiffs and represented individuals explains their substantial impairment in walking; most use assistive devices to walk, including wheelchairs. *Supra* II.A.1-4.

In denying the District's motion to dismiss, this Court held that plaintiffs had sufficiently alleged standing, R. Doc. 34 at 6, and there is no material dispute as to these facts after discovery. Plaintiffs have shown: (1) an injury in fact; (2) that the injury was likely caused by defendant; and (3) that judicial relief will likely redress the injury. *Id.* (citing *Trans Union LLC v. Ramirez*, 141 S. Ct. 2190 (2020)). Standing for any one plaintiff is sufficient to support a finding of liability in this injunctive relief case. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) ("If at least one plaintiff has standing, the suit may proceed."); *Ctr. for Biological Diversity v. Regan*, 734 F. Supp.

---

[70] There is no question that Defendants administer the Services at Issue, the District is a public entity covered by the ADA, and it receives federal funding. *See* R. Doc. 1, ¶¶ 206, 222, R. Doc. 25-1 ¶¶ 206, 222; *Hunter ex. rel. A.H. v. D.C.*, 64 F. Supp. 3d 158, 170 (D.D.C. 2014).

3d 1, 32 (D.D.C. 2024) (holding liability established on summary judgment where at least some plaintiffs had standing).

The individual plaintiffs have such injuries, as have named members of both DCCIL and DECAA. *Supra* II.A.1-4; II.B. Removing the barriers to these members' lives is germane to both organizations' purposes—for DCCIL, promoting independence for people with disabilities; for DECAA, promoting vehicular and pedestrian safety and quality of life. *See* R. Doc. 34 at 11-12 (citing *Nat'l Assoc. of Home Builders v. EPA*, 667 F.3d 6 (D.C. Cir. 2011)); *supra* II.A.3, 4. DCCIL also suffers direct injury as an organization because it has more difficulty providing transportation and promoting independence to its members. *Supra* II.A.3. Notably, this motion seeks a determination of liability, not remedy: "any scope of the remedy will be addressed if plaintiffs can establish liability." R. Doc. 34 at 8; see *Porter v. Martinez*, 68 F.4th 429, 438 (9th Cir. 2023) (holding that proposed injunctions "go to the proper scope of any remedy" rather than redressability) (citing *Kirola v. S.F.*, 860 F.3d 1164, 1176 (9th Cir. 2017)).

**B.**      **The Services at Issue Are Well-Established Government Programs Subject to the Law's Accessibility Mandates**

It is well established that the services at issue in this case—parking spaces, sidewalks, public rights of way—are government programs subject to the ADA's prohibition on discrimination. "[T]he phrase 'services, programs, or activities' has been interpreted to be 'a catch-all phrase that prohibits all discrimination by a public entity.'" *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) (citation omitted). A House Report recommending passage of the ADA noted that the rights conferred by the law "would be meaningless if people who use wheelchairs were not afforded the ability to travel on and between the streets." H.R.Rep. No. 101-485(II), at 84, (1990). Thus, it should be no surprise that accessible parking spaces, curb access, and public right of way are central to the ADA's non-discrimination mandates.

Courts have consistently held that the prohibition on disability discrimination includes a requirement of accessible parking, curb cuts, accessible pedestrian signals, and more. *See, e.g.*, *Fortyune v. Lomita*, 766 F.3d 1098, 1102 (9th Cir. 2014) ("Recognizing the broad reach of the ADA, we have held that Title II requires public entities to maintain accessible public sidewalks . . . . The same reasoning leads us to conclude that local governments must maintain accessible on-street public parking") (citations omitted); *Frame*, 657 F.3d at 226 (building and altering public sidewalks); *Cohen v. Culver City*, 754 F.3d 690, 700 (9th Cir. 2014) ("[T]he City discriminated against Cohen by reason of his disability by failing to take simple, low-cost, reasonable measures to accommodate persons who rely on curb ramps to navigate public sidewalks."); *Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45, 57 (D.D.C. 2020) (White House COVID briefings, under Section 504); *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 199 (2d Cir. 2014) (voting).

## C.     Defendants Are in Violation of the Program Access Requirement.

Defendants have failed to provide program access to their on-street parking service in the District. Under the program access test, "[w]hile proving that particular barriers exist might not be sufficient to establish Title II liability, each barrier is a building block for a finding that the [service], viewed in its entirety, is not readily accessible." *Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d 221, 224 (S.D.N.Y. 1999). The *Pascuiti* court also explained that "[a]n important part of the program access requirement for the [service] is whether all services available for the use of non-disabled patrons also are available for [the] use of disabled patrons." *Id.*; *see also Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 861 (10th Cir. 2003), *overruled on other grounds*.

A public entity must take affirmative steps to provide their programs and services in the most integrated setting appropriate. *See Gaylor v. Ga. Dep't of Nat. Res.*, No. 2:11-CV-288-RWS, 2013 WL 4790158, at *7 (N.D. Ga. Sept. 6, 2013) (citing *Shotz v. Cates*, 256 F.3d 1077, 1080

(11th Cir. 2001)). Plaintiffs do not need to prove that they are completely prevented from enjoying a service, only that certain features are not readily accessible to them as individuals with disabilities. *Gaylor*, 2013 WL 4790158, at *7. To that effect, merely being able to enter a facility where a program is being offered does not absolve a defendant of liability. *See generally Tatum v. Doctor's Assocs., Inc.*, 14-CV-2980, 2016 WL 852458, at *6 (E.D. La. Mar. 4, 2016) ("Simply because the Plaintiff ultimately achieved his goal of making a purchase does not mean that he did so in a manner comparable to that of non-wheelchair-using patrons").[71] There is overwhelming, undisputed evidence that Defendants' on-street parking service in the District is not readily accessible to persons with disabilities.

    1)  *Insufficient Quantity of Accessible Spaces*

There is an insufficient quantity of accessible on-street parking spaces. Many of the plaintiffs have personally experienced the lack of sufficient designated accessible parking.[72] The experiences of the Plaintiffs are backed up by the report of Mr. Heybeck, which found that, even using the most conservative estimates, Defendant would need approximately 2,480 designated accessible parking spaces, but only has 387 putatively accessible spaces.[73] The data demonstrates severe deficiencies in accessible parking across the District: seven wards contain drastically fewer spaces than the minimum 310 required per ward, and Ward 2, despite having the most accessible spaces, still falls short of the 1% standard suggested by the ADAAG.[74] Defendants' expert claims the ADAAG should not apply, but defendants offer no other measure or evidentiary basis for the Court to conclude that plaintiffs have meaningful access to parking.

---

[71] While *Doctor's Assocs.* is a Title III case, its holding is equally applicable; the question is whether the plaintiff's access was impaired because of inaccessible features.

[72] Ex. 15 at ¶¶ 6, 14, 17 and 33-34; Ex. 19 at ¶¶ 10, 13 and 17; Ex. 17 at ¶¶ 9, 17, and 28; Ex. 12 at ¶ 17; Ex. 18 at ¶¶ 13 and 16; Ex. 13 at ¶¶ 16-17 and 20.

[73] Ex. 29 at pp. 5 and 14.

[74] *Id.* at p. 5.

Mr. Heybeck evaluated the segregation of putatively accessible parking both statistically and using maps. The statistical table shows the raw numbers, and the desert-like status of Wards 1, 3, 4, 5, 7, and 8 is striking. Consider Ward 5, which has a paltry two (2) accessible parking "zones." In no sense is the on-street parking in these wards accessible.

But even the 387 putatively accessible space number is deceivingly high because, during his survey, Mr. Heybeck could not locate 44% of Defendants' putatively accessible spaces.[75] The impact of Defendants misstating that accessible parking spaces exist—when they don't exist—will naturally lead to additional burden not experienced by non-disabled persons. Of course, it shouldn't be surprising that there is such a paltry number of putatively accessible spaces in the District given that, by Defendants' own admission, there is "[n]o program for accessible parking on metered blocks outside of CBD and Stadium Zone[.]"[76]

    2) *Inaccessibility of Putatively Accessible Spaces*

Where putatively accessible parking spaces are provided, they are almost never actually accessible. *First,* they are not connected to an accessible route.[77] Many of the Plaintiffs have personally experienced the difficulty caused by a parking space not being located along an accessible route.[78] This is one of the more concerning violations because individuals in wheelchairs have to roll down the street to reach a curb cut, spending additional time on a busy street intended for vehicles and bicycles to reach their destination. In May of 2020, Defendants admitted that one "challenge" they had was to ensure that is "curbside access via a curb cut that

---

[75] *Id.* at p. 53.

[76] *See* Exhibit 23 at DEF-2022-cv-03541-00003395.

[77] Ex. 29 at p. 53 (in the statistical survey, finding that 100% of the surveyed spaces were found to be missing the accessible route connecting the parking space to the adjoining circulation path as required by 2010 ADA 502.3.)

[78] Ex. 15 at ¶¶ 15-18, 20-22, 24-25 and 32-34; Ex. 19 at ¶ 13; Ex. 17 at ¶¶ 19-21 and 23-26; Ex. 12 at ¶¶ 11-16; Ex. 13 at ¶¶ 13-14 and 16.

has no more than an 8 percent running slope and no protrusion/gap that is more than half-inch in height or width."[79] Unfortunately, Defendants have not acted to address this "challenge." [80] It is dangerous to force people with disabilities to travel in the street to reach a curb cut because wheelchair users are lower to the ground, folks using walkers can move more slowly, and vison impaired individuals lack the full gambit of sensory clues.

*Second*, where putatively accessible parking spaces are provided, they lack access aisles. Of his statistical survey, Mr. Heybeck found that 98% of the putatively accessible parking spaces were missing an access aisle.[81] This is significant because the access aisle is the location where a person with a disability will embark or disembark from a vehicle. Where no access aisle is provided, a person with a disability can get stuck.[82] Ms. Bolles testified that without adequate space, the ramp on her van cannot deploy with sufficient clearance for her to safely exit, forcing her to avoid parking in spots that appear too narrow.[83]

A parking space without an access aisle is not "accessible." Merely slapping the symbol of accessibility on a parking space does not make it accessible. If persons with disabilities are unable to use the space out of concern that they won't be able to safely leave their vehicle—or that they will be trapped when they return to their vehicle—then that space is not "accessible."

*Third*, where putatively accessible parking spaces are provided, they lack other important accessibility features, such as compliant ground surface, vertical signage, etc. There is no evidence that on-street parking is materially different from parking in a parking lot or garage. When on-street parking is not flat, it can be too steep for a wheelchair user to get into or out of their vehicle.

---

[79] *See* Ex. 26 at DEF-2022-cv-00035578.
[80] Ex. 29 at p. 53.
[81] *Id.* at p. 53.
[82] Xavier Davis, Defendants' ADA Coordinator agreed that access aisles were necessary because wheelchair users need to open their car doors all the way. See Ex. 4 at 33:1-11.
[83] *See* Ex. 15 at ¶21.

For example, Ms. Bolles recounted an incident where she had to request the assistance of a stranger because she parked in an on-street parking space that was too steep:

> "This happened to me in late December 2022. Because the weather was very cold and it was late at night, against my better judgment, I parked outside a protected bicycle lane on I St. SE, near my home at the time. I was able to get out, but when I returned to my car, I was not able to get back up the ramp independently– the slope was too steep for my wheelchair to get up. I had to ask a stranger to push me up the ramp."[84]

Again, the ADA guidelines exist because people with disabilities require certain modifications so they can interact with the built world around them in a manner close to that experienced by non-disabled persons. A parking space that is not level is not "readily accessible to and usable by" many persons with disabilities. Unfortunately, according to Mr. Heybeck, an incredible 95% of the accessible designated parking spaces in the District have non-compliant ground surfaces.[85]

Likewise, the signage requirements matter because (1) it shows persons with disabilities where they can park; and (2) the signs dissuade non-disabled persons from parking in said spaces. Without signage, it is difficult or impossible for persons with disabilities to find an accessible space. Without a marked space or access aisle, the accessible parking area and/or access aisle can be obstructed by other motorists who are (understandably) unaware that said location is needed by persons with disabilities. Eighty percent (80%) of the parking signage in the District were non-compliant.[86]

3) _Defendants' On-Street Parking Program is Inaccessible to People with Disabilities_

Given all of the above evidence, this Court should readily conclude that Defendants' on-street parking in the District, taken as a whole, is not accessible to people with disabilities. This Court would not be treading new ground. Indeed, as discussed _supra_ II.B.1, DDOT itself has been

---

[84] Ex. 15 at ¶22.
[85] Ex. 29 at p. 53.
[86] _Id._ at p. 53.

well aware of the problem and has been "looking into" doing better for year—but, without Court compulsion, it simply did not get done.[87] Liability in a program access claim is evaluated based on subjective and objective evidence. For example, in *Falls v. Bd. of Comm'rs of New Orleans Reg'l Transit Auth.*, the Court evaluated whether there was program access for the bus stops in New Orleans and to do so the Court evaluated the plaintiffs' individual accounts and expert evidence demonstrating pervasive non-compliance. No. CV 16-2499, 2017 WL 2730781, at *4 (E.D. La. June 26, 2017). Likewise, in *Disabled in Action v. City of New York*, the court granted summary judgment on liability in favor of the plaintiff based on the accounts of individuals with disabilities and an "uncontested accessibility survey conducted by Plaintiffs' expert[.]" 437 F. Supp. 3d 298, 303 (S.D.N.Y. 2020). Here, the Plaintiffs have had difficulty parking or have encountered safety concerns because of the on-street parking and PBLs. These subjective accounts are buttressed by objective evidence in the form of Mr. Heybeck's expert report, Defendants' internal documents, and deposition testimony. *Supra* II.B.1-3, II.C.

Defendants' wholesale failure to make its on-street parking system accessible constitutes discrimination and renders Defendants liable under the ADA, RA, and DCHRA. Thus, just as in *Falls* and *Disabled in Action*, and given the pervasive non-compliance, the Court should find that Defendants' on-street parking system is not accessible when it is viewed in its entirety.

D. **Defendants Are in Violation of the New Construction/Alteration Requirements of the ADA Because the PBLs Make Parking Less Accessible.**

There is no material dispute that Defendants have modified various roads and on-street parking in the District, pursuant to the Alteration Program, and particularly by installing PBLs. Through these projects, Defendants have subjected themselves to the "alteration" and "new construction" standards of the ADA. However, instead of making on-street parking "readily

---

[87] Ex. 4 at 46:4-21; Ex. 9 at 48:5-12.

accessible to and usable by individuals," Defendants' modifications have *reduced* accessibility for persons with disabilities. Here too, summary judgment should be granted in favor of Plaintiffs.

Constructing new facilities in an inaccessible manner "unnecessarily entrench[es] the types of discrimination Title II was designed to prohibit." *Frame*, 657 F.3d at 230. "'New construction and alterations . . . present an immediate opportunity to provide full accessibility'" and it is therefore "'discriminatory to the disabled to enhance or improve an existing facility without making it fully accessible to those previously excluded.'" *Civic Ass'n of Deaf of N.Y.C. v. Giuliani*, 970 F. Supp. 352, 359 (S.D.N.Y. 1997) (quoting *Kinney*, 9 F.3d at 1073-74). To ensure that new construction does not violate the law by building in accessibility barriers, "[i]n the case of facilities built or altered after 1992, the regulations require compliance with specific architectural accessibility standards." *Lane*, 541 U.S. at 532.

1) *Defendants Modified Their On-Street Parking by Installing PBLs.*

The creation of the PBLs constitutes an "alteration." DDOT's own ADA Coordinator agrees that the creation of the PBLs triggers the alteration standard.[88] An alteration is a change "that affects or could affect the usability of the facility or part of the facility[.]" 28 C.F.R. § 35.151(b)(1); *see also* 28 C.F.R. § 36.402(b) (equivalent definition of alteration in Title III of the ADA). Alterations should be read broadly to include any change that affects the usability of the facility. *Bronx Indep. Living Servs. v. Metro. Transp. Auth.*, 358 F. Supp. 3d 324, 330-31 (S.D.N.Y. 2019) (reviewing various regulations and DOJ materials and determining that replacement of a stairway "affected the usability" of a subway station and thus triggered the alteration standard). In *Sarfaty*, the court explained how modification of a bicycle lane can trigger the alteration standard:

> "[B]ecause that alteration prevented Plaintiff's wheelchair van from unloading directly onto the sidewalk, the installation of the cycletracks imposed an additional burden on the Plaintiff, thereby 'affecting the

---

[88] Ex. 4 at 75:9-17.

usability of . . . part of the facility.' 28 C.F.R. § 35.151(b)(1). Because the alteration and restriping of Reseda Boulevard went far beyond maintenance activity and affected the usability of that portion of the City's on-street parking, it must be evaluated under the higher accessibility standard embodied by 28 C.F.R. § 35.151." 2020 WL 1078804, at *3.

The record contains several examples of PBL alteration projects, as well as the admission that they represent a continuous and ongoing program of the District. At 17th St. NW, in 2020 and 2021, Defendants performed substantial modifications by installing a PBL and, later, several putatively accessible parking spaces. The process involved creation of a detailed plan, and physical construction in the form of removing the existing parking and re-installation of a street setup.[89] The diagram shows the newly installed lanes (from top to bottom): sidewalk, parking or empty space (8' wide), roadway (11' wide, with combined bicycle and car travel), parking space (8'), bicycle lane buffer area (3' wide – the circles represent plastic posts and the horizontal lines represent concrete curbs), protected bicycle lane (6' wide), streateries or empty space (8' wide – with cross hatches), and, finally, the sidewalk.[90]

In some other locations, the setup consists of roadway, parking space, bicycle lane buffer area, bicycle lane, and streatery/empty area.[91] Plaintiffs' expert found these modifications to constitute "alterations."[92] Plaintiffs' expert also surveyed 11th St. NW and found that Defendants installed the PBL there between September 2011 and June 2013.[93] Plaintiffs' expert surveyed 4th St. SW and determined that this PBL was installed between August 2014 and November 2017.[94]

---

[89] *See* Ex. 33 at DEF-2022-cv-03541-00004650 (at 17th St. NW and P St. NW).
[90] *See* Statement of Undisputed Facts, ¶ 180.
[91] *See* Ex. 33 at DEF-2022-cv-03541-00004652 (at 17th St. NW and Corcoran St. NW).
[92] Ex. 29 at p. 39.
[93] *Id.* at p. 41.
[94] *Id.* at p. 47.

Defendants admitted that at least seven more miles of bicycle lane installations are planned, and that the "preferred configuration" involves installing barriers on both sides of the street.[95]

To install a PBL, the Defendants remove some or all of the existing parking, install a new bicycle lane and a bicycle lane buffer area consisting of concrete tire stops and vertical bollards, and place new parking spaces adjacent to the roadway.[96] Under this new arrangement, persons with disabilities can no longer load/unload directly onto the sidewalk from their vehicle or a passenger transport van.[97] Just as in *Sarfaty*, these changes decreased the usability of the on-street parking and trigger the "alteration" standard. DDOT's own ADA Coordinator agrees that the creation of the PBLs triggers the alteration standard.[98]

>   2)   *Where the Protected Bicycle Lanes Have Been Installed, the On-Street Parking is Less Accessible to Persons with Disabilities.*

A heightened standard applies for "facilities built or altered after 1992," where "the regulations require compliance with specific architectural accessibility standards." *Lane,* 541 U.S. at 530. Projects like PBLs must make public programs and facilities "accessible to and usable by persons with disabilities" "to the maximum extent feasible." 28 C.F.R. § 35.151(b)(1). The maximum extent feasible requirement does not ask the court to make a judgment involving costs and benefits. Instead, it requires accessibility except where providing it would be "'virtually

---

[95] Ex. 8 at 52:17-20.

[96] *See* Ex. 8 at 47:23-48:7 ("A protected bicycle lane is a designated lane of travel for people using bicycles. … the lane is physically separated from a vehicle travel lane that's adjacent to it with a vertical element and it's often typically installed next to the sidewalk, but can be installed in other configurations."); see also, Ex. 29 at p. 36-38 (explaining that the plans for 17th Street "clearly show new or relocated street parking and no design to provide any accessible parking."); see also, Ex. 33 at DEF-2022-cv-03541-00004651 (near 17th Street NW and Church St. NW).

[97] Wheelchair accessible vehicles with side deployment ramps can no longer deploy their lift in these spaces because (a) the lift would be blocked by the vertical bollards, (b) the lift could end up in the active bicycle travel lane, risking injury to cyclists and the person with a disability; and (c) the street typically slopes down toward the curb, resulting in a slope that is too steep when the ramp deploys.

[98] Ex. 4 at 75:9-17.

impossible'" in light of the "'nature of an existing facility.'" *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 371 (2d Cir. 2008) (quoting 28 C.F.R. § 36.402(c)) (while *Roberts* is a Title III case, the maximum extent feasible language is the same under both Title II and Title III regulations).

In *Sarfaty*, the Court found that the installation of PBLs placed a substantially higher burden on disabled than nondisabled individuals, and thus violated the alteration requirement. 2020 WL 4697906, at *6 (C.D. Cal. Aug. 12, 2020).

Here, Plaintiffs experienced, and Plaintiffs' expert inspection confirmed, that the altered on-street parking has the same defects as the existing program, *supra* II.B.3—and adds more, new barriers. *First*, it does not typically add even putatively accessible parking, except as a rare, ad-hoc response to public complaints. *Supra* II.B.2. For example, when 17th St. was originally altered, no new designated accessible parking spaces were constructed.[99] Only after-the-fact did Defendants claim to install putatively accessible parking spaces.[100] At 4th St., Mr. Heybeck only located three putatively accessible parking spaces, which "for the evaluated area" was "not sufficient."[101] And, these putatively accessible parking spaces are <u>still</u> not actually accessible – they have all of the problems discussed above.[102] Some of these issues, such as inadequate signage and marking of the space, are easily remedied—yet Defendants persist in ignoring basic, legally mandated requirements to allow people with disabilities to use its streets, while completing elaborate, extensive construction of projects for others' benefit.

*Second*, the PBLs add several new accessibility barriers, including: (i) vertical bollards and concrete tire stops make deploying a ramp impossible; (ii) ground surfaces adjacent to the PBLs

---

[99] *See* Ex. 1 at 19:10-13 and 30:5-12.
[100] *Id* at 30:5-31:13.
[101] Ex. 29 at p. 50.
[102] *Id.* at p. 39.

were uneven,[103] which can result in a wheelchair user getting stuck[104] or a wheelchair rolling away during transfer;[105] (iii) assembling a wheelchair or walker in a bicycle lane is not safe or reasonable; (iv) a person with a wheelchair or who cannot step up onto the curb must travel in the bicycle lane, trying to avoid cyclists, to reach the sidewalk. At all three locations—17th St., 11th St., and 4th St.—all the putatively accessible spaces Mr. Heybeck inspected failed to provide a direct connection from the parking to the sidewalk via an accessible route.[106] Non-disabled persons do not have to travel down the vehicular way to reach a curb cut—they can simply step up and over the curb onto the sidewalk. Incredibly, Defendants have known about these issues for years, even going as far as to write a magazine article cataloging various accessibility issues created by PBLs.[107] Despite identifying the accessibility barriers created by PBLs, Defendants prioritized their preferred street design over people with disabilities and compliance with civil rights law.

Defendants cannot claim that they made the parking accessible to the "maximum extent feasible." As Mr. Heybeck pointed out in his report, one exemplar accessible space exists in the District.[108] This accessible-designated space on K St. has ground markings, is adjacent to an access aisle, is not obstructed by bollards or vertical tire stops, and is directly adjacent to a curb cut.[109] As Mr. Heybeck explained, "with some planning and forethought it is not difficult to provide

---

[103] Ex. 29 at p. 53 (finding that 95% of spaces had a non-compliant ground surface).

[104] Ex. 15 at ¶ 16.

[105] See ADAAG § 502.4 & Advisory (2010); ("Access aisles are required to be nearly level in all directions to provide a surface for wheelchair transfer to and from vehicles."); *see also McCune v. Singh*, No. 2:10–CV–02207 JAM–GGH, 2012 WL 2959436, at *4 (E.D. Cal. July 19, 2012) (finding ADA violations for "disabled parking spaces . . . [that] had slopes and cross slopes exceeding 2.0% in violation of [the] ADAAG[.]")

[106] Ex. 29 at pp. 39, 45, and 52.

[107] *See* Ex. 26 at DEF-2022-cv-00035578.

[108] *See* Ex. 29 at p. 55.

[109] *See Id.* at p. 55.

compliant accessible street parking even on streets with bike lanes."[110] There is no reason why more of these spaces have not been created.

Additionally, there is sufficient space for an access aisle in most locations. Mr. Heybeck found that 68% of the parking spaces he surveyed had sufficient space to construct a compliant access aisle.[111] Mr. Heybeck went on to explain that "[t]he other 32% could likely be slightly relocated to adjacent areas and also have compliant access aisles designed and constructed."[112] That the streets in the District have enough space is something that Plaintiffs have advanced from the beginning. Per the construction documents for 17th St., there is an eight (8) foot wide span between the bicycle lane and the sidewalk that is marked as "existing streaterie."[113] Some of the streaterie space could have been used to install accessible on-street parking in a design equivalent to that on K St. Defendants simply made a design decision to prioritize streateries over persons with disabilities.

In sum, there is no material dispute of fact that Defendants failed to make the altered on-street parking adjacent to PBLs accessible to the maximum extent feasible under the ADA.

**E.    Defendants Are in Violation of the Alteration Requirements of Disability Discrimination Laws Because the Protected Bicycle Lanes Block Curb Access for People with Disabilities and Make Pedestrian Crossings Less Accessible.**

Defendants have also made curb access and pedestrian crossings less accessible to persons with disabilities where they created PBLs. Like parking, street curbs and pedestrian crossings easily fall within the broad sweep of programs that Courts have held must be made accessible. Where the plaintiffs identify an obstacle that impedes their access to such a government program

---

[110] *See Id.* at p. 55.
[111] *See Id.* at p. 54.
[112] *See Id.* at p. 54.
[113] *See* Ex. 33 at DEF-2022-cv-03541-00004651 (near 17th St. NW and Church St. NW).

or benefit, they likely have established that they lack meaningful access to the program or benefit. *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1267 (D.C. Cir. 2008).

Prior to the installation of PBLs, cars, vans, buses, or other vehicles could pull up to the curb and pick-up and drop-off passengers directly onto the sidewalk.[114] From there, pedestrians could safely go along their way. Under the Alteration Program, new physical barriers are installed along miles of street, on both sides. In these miles of PBLs, vehicle occupants must traverse concrete blocks, the buffer area, the bicycle lane, and then the curb to get to the sidewalk. Nondisabled people can still perhaps pull up and step over these barriers, but pick-up and drop-off becomes treacherous or impossible for persons with disabilities. As was explained by Mr. Heybeck, the vertical bollards and concrete tire stops adjacent to the bicycle lane prevent deployment of a lift or ramp.[115] Additionally, it is not safe or reasonable to deploy a ramp or lift into a lane of travel actively being used by bicycles traveling at high speeds. The PBLs make miles of District streets less accessible to people with disabilities.

Defendants have suggested that pick up and drop off is still available in more distant locations, such as around the corner. This response ignores the alteration standard. New construction and alterations must be fully accessible. Constructing a brand new, inaccessible public facility is discriminatory, regardless of whether there is an accessible facility somewhere else. *Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.,* 950 F. Supp. 393, 402-03 (D.D.C. 1996) (holding that new stadium must implement design, not policy, for clear sightlines for people in wheelchairs).[116] Even less availing is Defendants' suggestion that disabled

---

[114] Ex. 15 at ¶¶ 20-24; Ex. 34 at ¶¶ 10-13 and 17; and Ex. 29 at p. 39.
[115] Ex. 29 at p. 39
[116] *See also, e.g.*, *Disabled in Action v. City of New York*, 437 F. Supp. 3d 298, 311 (S.D.N.Y. 2020) (holding plan requiring disabled people to travel farther for police services to violate disability rights laws); *Kinney*, 9 F.3d at 1073-74 (holding that repaving a street without installing

people can be forced to rely on third party private parking facilities for pick up and drop off. *Paulson,* 525 F.3d at 1269; *Bd. of Elections*, 752 F.3d at 199.

Defendants could, but chose not to, install PUDOs that would alleviate, or at least ameliorate, this concern. For example, on 17th St., defendants had space that could have been used to create an accessible PUDO, but chose not to, despite community requests. *Supra* II.A.4. Defendants' Alteration Program does not include installation of PUDOs, or any other measure or plan to make the altered streets fully accessible to people with mobility disabilities. Defendants admit that PBLs "can create obstacles or physical barriers for persons with disabilities in terms of services or usages curbside."[117] Defendants also admit that PBLs create accessibility issues for pick up and drop off for people with disabilities using transport services and paratransit.[118]

In the same vein, the PBLs, and the Alteration Program's goal of minimizing car travel generally, have made pedestrian crossing and travel to/from vehicles more difficult and dangerous for people with disabilities.[119] Bicycles move at high speeds, sometimes in a different direction than cars and not always obeying the same traffic signals.[120] Yet the Alteration Program does not require physical design measures safe pedestrian crossings, such as speed bumps. Cyclists are not only oblivious, but often openly hostile to pedestrians with mobility disabilities.[121] Defendants claim to train bicyclists but have produced no evidence that this training includes anything about people with disabilities.

---

adjacent curb ramps to be discriminatory); *Frame*, 657 F.3d at 226 (building and altering public sidewalks); *Fortyune*, 766 F.3d at 1102 (on-street parking); *Cohen*, 754 F.3d at 700.

[117] *See* Ex. 26 at DEF-2022-cv-00035578; see also, Ex. 7 at 67:20-68:5 (admitting that the buffer zone in a PBL "could provide some difficulty" for wheelchair users attempting to access the curb.).

[118] *See* Ex. 26 at DEF-2022-cv-00035578.

[119] *See* Ex. 6 at 19:6-19; Ex. 2 at 37:9-20; Ex. 11 at 33:1-11, 33:18-34:14.; Ex. 10 at 19:9-20:3; Ex. 3 at 41:9-42:6; Ex. 26 at DEF-2022-cv-03541-00035577.

[120] *See* Ex. 6 at 26:16-27:3; Ex. 2 at 22:2-14; Ex. 10 at 29:11-30:16.

[121] *See* Ex. 6 at 26:16-27:3; Ex. 10 at 53:6-54:2.

IV.     **<u>CONCLUSION</u>**

For the foregoing reasons, and as supported by Plaintiffs' Statement of Undisputed Facts and exhibits, partial summary judgment should be granted for Plaintiffs.

*     *     *

Respectfully Submitted,

/s/ Maia Goodell

VLADECK, RASKIN & CLARK, P.C.
Maia Goodell
 mgoodell@vladeck.com
Demitrios E. Kalomiris, admitted *pro hac vice*
 jkalomiris@vladeck.com
111 Broadway, Suite 1505
New York, New York 10006
T: (212) 403-7300; F: (212) 221-3172

          ***and***

/s/ Garret S. DeReus

BIZER & DEREUS, LLC
Andrew D. Bizer, admitted *pro hac vice*
 andrew@bizerlaw.com
Garret S. DeReus, admitted *pro hac vice*
 gdereus@bizerlaw.com
Eva M. Kalikoff, admitted *pro hac vice*
 eva@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: (504) 619-9999; F: (504) 948-9996

*Counsel for Plaintiffs*